In re ADLER, COLEMAN CLEARING CORP., Debtor.

Edwin B. Mishkin, as SIPC Trustee for the Liquidation of the Business of Adler, Coleman Clearing Corp., Plaintiff,

v.

Daniel David Ensminger, et al., Defendants.

Bankruptcy No. 95–08203 JLG.
Adversary No. 97/8423A.

United States Bankruptcy Court, S.D. New York.

Dec. 15, 1999.

56

Kenneth J. Caputo, Associate General Counsel and Senior Trial Counsel, Washington, DC, for Securities Investor Protection Corporation.

Cleary, Gottlieb, Steen & Hamilton, New York, for Trustee.

Zeisler & Zeisler, P.C., Bridgeport, CT, for certain Claimants.

Gould & Ratner, Chicago, IL, for certain Claimants.

Sadler & Associates, P.C., Atlanta, GA, for Claimants David Laskey, Kenneth Leech and Michael and Laura Polselli.

Kalmus & Martuscello, P.C., New York, for Claimant William G. Giarusso.

Bruce A. Langer, Esq., New York, for Claimants Catherine and John Romano.

Satterlee Stephens Burke & Burke LLP, New York, for Claimant Ann D. Kusch.

Ziegler, Ziegler & Altmann LLP, New York, for Claimant A.F. Lehmkuhl.

Shereff, Friedman, Hoffman & Goodman, LLP, New York, for Claimant Dr. David L. Ostman.

Kohrman Jackson & Krantz P.L.L., Cleveland, OH, for Claimant Norman Bennett.

Deutsch & Lipner, Garden City, for Claimant Robert Jurgensmeyer.

Schneck Weltman & Hashmall LLP, New York, for Claimant Gary Anderson.

Anthony Motta, Esq., New York, for Claimant Dr. David Sulman.

S.W. Azriliant, P.C., New York, for Claimants Georgios and Maria Kapsalis.

## DECISION ON TRUSTEE'S COMPLAINT SEEKING JUDGMENT UPHOLDING HIS DETERMINATIONS REGARDING CERTAIN CUSTOMER CLAIMS

JAMES L. GARRITY, Jr., Bankruptcy Judge.

### Introduction

Adler, Coleman Clearing Corp. ("Adler" or "debtor") is subject to this liquidation proceeding under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa–lll (1970) ("SIPA"). Edwin B. Mishkin, Esq., is the Securities Investor Protection Corporation's ("SIPC") court-appointed trustee (the "trustee") for Adler's liquidation. Prior to its demise, Adler acted primarily as a clearing firm serving various introducing firms and their customers on a fully disclosed basis, pursuant to clearing agreements (with the introducing brokers) and Customer Agreements (with those brokers' customers). Hanover Sterling & Company ("Hanover") was among those introducing brokers.[1]

In accordance with the procedures which we established at the outset of the case, more than 15,000 customers filed claims against Adler to recover cash and/or securities in their accounts when SIPC closed Adler. As required by SIPA, the trustee has reviewed the filed claims and, where appropriate, has distributed cash or securities to the customers.

---

1. Hanover is the subject of its own SIPA liquidation proceeding in this court, although Mishkin is not Hanover's SIPC trustee.

Among the customers who have filed claims against Adler are former Hanover customers whose claims arise from transactions that purportedly occurred during the period from February 17 through 24, 1995, the last five business days of Hanover's existence (the "Final Week"). They assert preferred SIPA customer claims [2] against Adler to recover (i) the cash proceeds of their purported sales to Hanover of stocks (the "House Stocks") [3] in which Hanover was the market maker (the "Challenged Sales"), and (ii) for some of them, brand name securities other than House Stocks (the "Blue Chips") which they purportedly purchased with the cash proceeds from the Challenged Sales (the "Challenged Blue Chip Buys", and together with the Challenged Sales, the "Challenged Trades").

The trustee denied those former customers' claims. Pursuant to a December 18, 1996 application, he sought an order (i) upholding his determinations denying those claims, and (ii) expunging the objections to those determinations filed by those customers herein. In substance, he says that we should disallow their claims for cash and Blue Chips, but allow those customers to retain the House Stocks that were in their accounts prior to the Challenged Sales. The posted prices for the House Stocks are a fraction of what they were during the Final Week and the House Stocks are not worth nearly as much as the cash and/or securities in the customers' accounts. A group of those customers (the "Claimants") opposed the application, and on consent of the parties, we deemed the application a complaint (the "Complaint") initiating an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure.

All agree that under SIPA, the Claimants are "customers" of Adler, and that we must apply the SIPC Rules, 17 C.F.R. §§ 300.501 through 300.503 (the "Series 500 Rules"), to determine whether they hold preferred "customer claims" for the cash and/or securities they say was in their accounts. As support for his Complaint, the trustee contends that the Claimants do not hold claims for cash and/or securities under those rules because the Claimants (i) did not authorize their brokers to make the Challenged Trades; (ii) lacked the funds to pay for the Challenged Blue Chip Buys and (iii) did not receive trade confirmations for the Challenged Trades that Hanover supposedly effected on February 24, 1995. The trustee also contends that, in any event, under Adler's August 22, 1994 clearing agreement with Hanover (the "Clearing Agreement"), he can cancel the Challenged Trades and that pursuant

---

**2.** A person whose claim against the debtor qualifies as a "customer claim" is entitled to preferential treatment in the distribution of assets from the debtor's estate. That person shares in a fund of "customer property", *see* SIPA § 78lll(4), distinct from the general estate, to the extent of the "net equity" in its account. "Net equity" is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed. SIPA § 78lll(11). Congress authorized SIPC to advance funds to the trustee to pay up to $500,000 to each holder of a valid customer claim, with a maximum of $100,000 for the cash portion of that claim, to the extent the customer's pro rata share of customer property does not fully satisfy the customer's net equity claim. SIPA § 15fff–3(a). Other claimants must seek recovery from the assets in the debtor's general estate along with the debtor's other general creditors. SIPA § 78fff–2(c)(1).

**3.** Hanover was the market maker for the following House Stocks:
All–Pro Products Inc. Units
American Toys Inc. Stock
American Toys Inc. Warrants
American Toys Inc. Warrants Non–Redeemable
Envirometrics Inc. Stock
Envirometrics Inc. Warrants
Mister Jay Fashions Int'l Inc. Stock
Mister Jay Fashions Int'l Inc. Warrants
Panax Pharmaceutical Co. Ltd. Units
Play Co. Toys Stock
Play Co. Toys Units
Play Co. Toys Warrants
Porter McLeod Nat'l Retail Inc. Stock
Porter McLeod Nat'l Retail Inc. Warrants
Eagle Vision, Inc.

to SIPC Rule 300.503, he can avoid the Challenged Trades as fraudulent transfers under the Bankruptcy Code and New York's Debtor and Creditor Law, and because they are illegal trades under the federal securities law, the Martin Act (New York's Blue Sky law) and the criminal provisions of SIPA.

On March 6, 1998, we denied a motion filed on behalf of 90 Claimants for an order dismissing the Complaint for failure to state a claim. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 689 (Bankr.S.D.N.Y.1998) (*"Ensminger I"*). In doing so, we held that the Complaint is legally sufficient and that if the trustee could prove the allegations in support of his Complaint, we would grant him judgment upholding his determinations respecting the Claimants, and overruling the Claimants' objections to those determinations. On March 13, 1998, we granted the trustee's cross-motion for partial summary judgment on the Complaint against the 65 Claimants who are asserting claims based upon the trades that Hanover effected on February 24. None of them

received written confirmations of their trades from Adler. We held that they did not hold claims for cash or securities under the Series 500 Rules. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 13, 22–24 (Bankr. S.D.N.Y.1998) (*"Ensminger II"*). We assume familiarity with those decisions.

We conducted a trial on the issues raised in the Complaint on March 13, March 17, March 19 and March 20, 1998.[4] In May and June 1998, we approved settlements between the trustee and 18 Claimants. The trustee and the remaining Claimants submitted post-trial memoranda of law and proposed findings of fact and conclusions of law.[5] We heard oral argument on October 2, 1998.

The Claimants say that we should deny the trustee any relief under the Complaint because they hold valid SIPA claims for the cash and/or securities allegedly in their accounts. They maintain that they are innocent customers and that the trustee wants to make them scapegoats for the illegal, ill advised and fraudulent conduct of others. They assert that the Short

4. Incident to the trial, (i) we denied Claimants' motion *in limine* for an order precluding the trustee's expert witness from testifying at trial and excluding from evidence both his declaration as well as the statements of certain former Hanover customers that he relied on or referred to in it, *see Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, Adv. Proc. No. 97/8423A, 1998 WL 160039 (Bankr.S.D.N.Y. Apr.3, 1998) (*"Ensminger III"*); (ii) we denied in part and granted in part their motion *in limine* for an order excluding from evidence certain of the trustee's exhibits that describe the actions or alleged actions of certain former Hanover brokers and traders because they constitute inadmissible character evidence offered to prove that those former brokers and traders acted in conformity with the conduct described and or/alleged therein, *see Mishkinm v. Ensminger (In re Alder, Coleman Clearing Corp.)*, Adv. Proc. No. 97/8423A, 1998 WL 160036 (Bankr. S.D.N.Y. Apr. 3, 1998) (*"Ensminger IV"*); and (iii) we denied Claimants' motion *in limine* to preclude the admission of the former Hanover brokers' invocation of the Fifth Amendment privilege for the purpose of drawing adverse inferences. *See Mishkin v.*

*Ensminger (In re Adler, Coleman Clearing Corp.)*, Adv. Proc. No. 97/8423A, 1998 WL 182808 (Bankr.S.D.N.Y. Apr.17, 1998) (*"Ensminger V"*).

5. The majority of Claimants (the "Represented Customers") are represented by the law firms Zeisler & Zeisler and Gould & Ratner. They jointly submitted proposed findings of fact and conclusions of law. Ann Kusch, A.F. Lehmkuhl, William G. Giarusso, Stuart and Judy Smith, David Laskey, Kenneth Leech, Michael and Laura Poselli, Dr. Jude Barbera, Catherine and John Romano, Dr. David L. Ostman, Norman Bennett, Robert Jurgensmeyer, and Gary Anderson are former customers who are not among the Represented Customers. They have submitted their own proposed findings of fact and conclusions of law and/or post-trial memoranda of law. For the most part, they adopt the Represented Customers' arguments. Where necessary, we will discuss the arguments that are unique to a particular customer. Otherwise, when we speak of the "Claimants" we are referring to the Represented Customers and all other former Hanover customers who have opposed the Complaint.

Sellers (as we define that term below) intentionally destroyed Adler and Hanover by their illegal short selling of House Stocks, because they drove down the prices of those securities and in doing so, overwhelmed Hanover's and Adler's abilities to maintain their prices. They contend that the Short Sellers succeeded in their illegal scheme, but only after a protracted battle with Adler Hanover where—in a calculated business decision—Adler cooperated with Hanover to support the price of the House Stocks by funding all of Hanover's House Stock purchases in unprecedented levels. They argue that Adler financed Hanover's (and its own) defense of the Short Sellers with full knowledge that Hanover had no cash to pay for its House Stock purchases and inadequate customer demand to counteract the illegal short selling pressure. For them, Adler made a business decision to finance Hanover in reliance on Adler and Hanover's abilities to force the Short Sellers to "buy back" the House Stocks that they had sold "naked". They state that Adler's belief that it would ultimately profit from the illegal short selling motivated its conscious disregard for Hanover's wrongdoing, and that ultimately, the trustee, standing in Adler's shoes, enforced the illegal short sales by conducting a buy-in of the House Stocks on March 20 and 29, 1995, in which he received $17 million on behalf of the estate. Thus, the Claimants deny that we should grant judgment to the trustee on the Complaint. They say, among other things, that they can enforce those trades under the Clearing Agreement and the trustee cannot rescind them or otherwise avoid them because Adler guaranteed Hanover's performance under those trades.

As we will explain, the evidence proves, among other things, that beginning on or about January 20, 1995, the Short Sellers illegally manipulated the prices of the House Stocks downward and that Hanover initially sought to combat that action by purchasing large quantities of House Stocks at the posted prices. It also shows that on February 16, Hanover knew that it could not defeat the Short Sellers and knew that because it was operating in violation of its net capital requirements, it was obligated by law to cease trading. However, Hanover did not shut down, and it masked its true financial position and deceived Adler and the regulators long enough for a group of Hanover brokers to generate the Challenged Trades. They did so to give the Claimants preferred SIPA claims in Hanover's inevitable liquidation proceeding, because they knew that the regulators would shut down Hanover when they learned of its true financial condition. Some of the Claimants are family members or close friends of certain of the Hanover Brokers and they were selected for the favored treatment for that reason. Those brokers favored the other Claimants in an effort to secure their future business. Indeed, after the regulators closed Hanover, all the Hanover Brokers went to work for broker-dealers and solicited those Claimants' business. The evidence proves that Adler and the regulators were unaware of Adler's true financial condition until on or about February 23, and could not reasonably have been expected to know about it prior to that time. Moreover the evidence establishes that while the Claimants are seeking to enforce the Challenged Trades as if those transactions settled, the regulators actually closed Adler before those trades cleared. No one has paid for the Blue Chips that the Claimants seek to recover and Hanover had no funds to pay for the Challenged Sales when it purportedly bought the House Stocks from the Claimants. Adler did not guarantee the Challenged Trades. The trustee has established that we should permit him to avoid those transactions.

Accordingly, as we will explain, we award the trustee judgment on his Complaint and uphold his determinations disallowing the Claimants' claims and expunging the Claimants' objections to those determinations. We do so as to some of

the Claimants, because they failed to establish that they hold claims for cash and/or securities under SIPC Rules 300.501 and/or 300.502, either because they have not shown that they authorized their Hanover brokers to effect the Challenged Sales or because they lacked the funds to pay for the Challenged Blue Chip Buys.[6] In any event, we award the trustee judgment on the Complaint as against all Claimants because we find under the Clearing Agreement, he can cancel the Challenged Trades, and that pursuant to SIPC Rule 300.503, he can avoid the Challenged Trades as fraudulent transfers under the Bankruptcy Code and New York's Debtor and Creditor Law, and because they are illegal trades under the federal securities law, the Martin Act (New York's Blue Sky law) and the criminal provisions of SIPA.[7]

 Before discussing the merits of the Complaint, we consider one matter. Throughout their papers, the Claimants, directly and indirectly, have asked us to reconsider and/or revise certain of the rulings that we made in *Ensminger I* through *Ensminger V*. The trustee says that those rulings are the law of the case and govern our disposition of the Complaint and, in any event, that we should not alter them. Under the law of the case doctrine, if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case. *See DiLaura v. Power Authority of the State of New York*, 982 F.2d 73, 76 (2d Cir.1992). Application of that doctrine is discretionary because a court can freely reconsider its own decisions prior to the entry of final judgment. *Id.* Thus, although our decisions in *Ensminger I* through *Ensminger V* serve as the law of the case, the Claimants are correct that, among other things, pursuant to Fed.R.Civ.P. 54(b), we can revise our decision in *Ensminger II*, because we have not entered a final judgment granting partial summary judgment in that matter. *See Gallant v. Telebrands Corp.*, 35 F.Supp.2d 378, 394 (D.N.J.1998). The Claimants say that we should "revise" that decision to deny the trustee's summary judgment motion. As we will explain, even assuming, *arguendo*, that Rule 54(b) empowers us to so "revise" that decision, the Claimants have not established any basis for us to do so. Likewise, the Claimants are correct that even though in *Ensminger I* we denied their motion to dismiss the Complaint, we can revisit the legal arguments and determinations we made therein. As necessary, we will review the Claimants' requests in that regard. As we will explain, we find no merit to their requests.

### Facts [8]

On February 25, 1995 (the "Filing Date"), the Honorable Loretta A. Preska of the United States District Court for the Southern District of New York entered an order pursuant to SIPA § 5(b) finding that Adler's customers required the protections SIPA affords, appointing the trustee to liquidate Adler's business and removing the liquidation proceeding to this court. UF ¶ 1. Until the regulators shut it down, Adler was a securities clearing firm which

---

**6.** We identify those Claimants below in footnotes 37, 40 and 41. As we explain, in *Ensminger II*, 218 B.R. 13, we disallowed the claims of some of those Claimants because they did not receive trade confirmations from Adler. The grounds stated herein are separate and additional grounds for disallowing their claims.

**7.** The following constitutes our findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a), as made applicable herein pursuant to Fed. R. Bankr.P. 7052.

**8.** Pursuant to a joint pre-trial order dated March 6, 1998, as amended (the "JPO"), the trustee and counsel to most Claimants agreed to certain undisputed facts relevant to the issues and events described in the Complaint (annexed as Ex. A to the JPO; hereinafter referred to as the "UF"). As necessary, we supplement those facts based upon our review and consideration of the documentary evidence and testimony proffered by the parties.

was a member of the New York Stock Exchange ("NYSE"), the Securities Investors Protection Corp. ("SIPC") and the National Securities Clearing Corp. ("NSCC") and a broker-dealer registered with the Securities Exchange Commission ("SEC").[9] Adler acted as clearing firm for 42 introducing or correspondent broker-dealers, including Hanover. *Id.* ¶¶ 2–3, 9. It cleared trades for more than 66,000 customers, including 15,500 Hanover customers. *See* December 17, 1996 Declaration of John P. Norris in Support of Trustee's Application to Disallow Certain Claims of Hanover Customers (the "Norris Decl.") (Trustee Ex. 37) ¶¶ 14–15 ¶ 17; [10] Transcript of March 13, 17, 19 and 20, 1998 Trial ("Tr.") (Press) 48:21–49:14.

Hanover was a broker-dealer registered with the SEC and a member of NASD and SIPC. Its principal office was in New York City and it had a branch office in Boca Raton, Florida.[11] Hanover's business almost exclusively concerned acting as the underwriter for the initial public offering (an "IPO") of securities issued by certain companies, and then acting as a market maker for the underwritten securities. UF ¶ 20. Hanover made orderly markets for those securities by holding itself out as ready and able to buy them. Hanover was the lead underwriter in the IPOs of, and the dominant market maker for, the House Stocks. UF ¶¶ 21, 22. Adler cleared trades for Hanover pursuant to its August 22, 1994 Clearing Agreement. *Id.* ¶ 13; Trustee Ex. 771 (Clearing Agreement). Adler required Hanover customers whose trades it cleared to sign a standard form customer agreement (the "Customer

9. William Giordano, Jay Zaremba and Ed Cohan were Adler's President, Senior Vice President/Director of Operations and Chief Executive Officer, respectively. Together with Charles Sanacore, Paul McCurdy, Howard Joyce, Ron Bozan and Jerry Schwartzman, they comprised Adler's Risk Management Committee. UF ¶¶ 4–8.

10. Norris is a Vice President of Peterson Consulting LLC, a consulting firm specializing in providing non-audit accounting services, including transaction analysis, fraud investigation and forensic accounting. *Id.* ¶ 1. The trustee relies on him as an expert in the discovery of financial fraud and the reconstruction of the books and records that have been distorted or manipulated by fraud or other improper activities. *See* JPO p. 12. In *Ensminger III,* we overruled all of Claimants' evidentiary objections to the admission of Norris' testimony. We assess the relevancy, credibility and probity of that testimony and give it appropriate weight.

The trustee also utilized the services of Mr. Joel Press, a senior partner at Ernst & Young LLP and a certified public accountant, specializing in providing accounting, auditing and consulting services to broker-dealers and investment managers. *See* December 17, 1996 Declaration of Joel Press (Trustee Ex. 38) (the "Press Decl."); JPO p. 12. Press reviewed the Norris Decl. and various financial records of both Adler and Hanover. He is relied on by the trustee as an expert in the calculation of net capital under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder. *Id.;* Tr. (Press) 34–48.

Finally, the Claimants retained the services of Robert W. Lowry of RL Consulting Services, Inc. as an expert in the field of securities regulation specializing in matters involving trading and sales practices of broker dealers. *See* October 31, 1997 Report of Robert W. Lowry pursuant to Rule 7026(a), Federal Rules of the Bankruptcy Procedure p. 2 (the "Lowry Report") (Cl.Ex. 86); JPO p. 13.

Norris, Press and Lowry submitted declarations and/or reports and testified at trial.

Throughout this decision we cite to the trial testimony of these witnesses. In doing so, we cite to it as: "Tr. ([witness name]) [page]:[line]". We also cite to the deposition testimony of various persons. In doing so, we cite to it as "[witness name] Dep. [page]:[line]" unless the witness was deposed more than once, in which case we also include the date. Finally, we cite to trial exhibits as "Trustee Ex. [number]" or "Cl. Ex. [number]".

11. In February 1995, Hanover employed the following registered representatives, among others: Roy Ageloff, Robert R. Catoggio, Ronan Garber, Joseph DiBella, John Lembo, Mark A. Mancino, Joseph Scarfone, Chris Wolf, Randy M. Ashenfarb, Earl Rusnak, Danny Garber, Ronald Cropper and Jason Prussing. UF ¶¶ 16–19. These and other Hanover employees were Claimants' brokers at Hanover. Trustee Ex. 769. Lowell Schatzer was Hanover's president.

Agreement"), *see* Trustee Ex. 66, although apparently not all Claimants actually executed one. Among other things, the Clearing Agreement called for Adler to: (a) clear and settle trades at Hanover's instruction; (b) prepare and mail trade confirmations to Hanover's customers; (c) settle contracts and securities transactions between Hanover and other broker-dealers (the Street), and between Hanover and its customers; (d) perform cashiering functions for Hanover's customers' accounts; and (e) maintain copies of the documentation relating to the accounts of Hanover's customers. Clearing Agreement ¶ 3(a). Each Claimant that is party to a Customer Agreement agreed that it would not enter into an order to trade or carry any security until after [the customer] has received and reviewed a letter entitled "Disclosure Statement Pursuant to SEC Approved Amendments to New York Stock Exchange Rules 382 and 405 Effective February 19, 1982" (the "Disclosure Letter"). Trustee Ex. 66 (Customer Agreement) ¶ 21. The Disclosure Letter explains that the Clearing Agreement allocates responsibilities between Adler and Hanover, and that under the Clearing Agreement, Adler's responsibilities included the receipt, retention, and after they come into Adler's possession, payment or delivery of funds or securities credited to customer accounts. Trustee Ex. 46. In essence, when a broker-dealer clears and settles claims, it ensures that after a trade is made, the securities and cash are recorded in the proper accounts and in the proper amounts. Norris Decl. ¶ 15. Adler booked a record in each customer's account after it learned that a trade had been executed on behalf of that customer.

*Id.* However, the trades did not settle until cash and securities were actually transferred to and from the accounts of the buyers and sellers. *Id.* At all relevant times, stock trades did not settle until five days after the trades were agreed upon.

The brokers at Adler's introducing firms had the primary contacts with their customers, although Adler, as the clearing entity, held those customers' cash and securities. *See* Norris Decl. ¶¶ 14–15. Adler cleared trades on a fully disclosed basis: the introducing firms' customers knew that Adler held their property in their accounts, and Adler sent account statements and papers confirming trades directly to them. UF ¶ 9; Norris Decl. ¶ 14; Tr. (Press) 37:3–10, 48:21–49:14.

Hanover maintained its own proprietary, or trading accounts with Adler. Norris Decl. ¶ 16; Tr. (Press) 48:21–49:14. Adler held the securities for Hanover's proprietary and customer accounts at its Depositary Trust Company account. It held the cash for Hanover's proprietary accounts in its bank accounts. Adler cleared and settled trades between Hanover's proprietary accounts and Hanover's customers within the Adler system. It cleared and settled trades between Hanover's customers and the Street through the NSCC, the clearing organization that matched Adler's buy and sell orders with buy and sell orders from other brokerage houses. Norris Decl. ¶ 16; Tr. (Press) 48:21–49:14. Under the NSCC's rules, Adler was contractually obligated to the NSCC to pay for Hanover's trades with the Street; i.e., Adler guaranteed those trades.[12]

---

**12.** The NSCC is a securities clearing agency registered with the SEC pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78q-(b) (the "1934 Act"). As such, it provides clearance and settlement services for its members. Transactions between NSCC members settle through the Continuous Net Settlement ("CNS") System. Under that system, NSCC guarantees its members' transactions, generally as of midnight on the first business day after the trade is executed. At that point,

NSCC assumes (i) the obligation of its buying members to make payment to its selling members upon delivery of the securities, and (ii) the obligation of the selling members to deliver securities to the buying members. It does so for the sole benefit of its members and to facilitate the clearance and settlement of the underlying transactions. The settlement day for NSCC guaranteed transactions is generally on the fifth business day after trade execution.

Hanover's proprietary accounts contained the majority of the assets and liabilities associated with the firm. Norris Decl. ¶ 84. Trading in House Stocks affected Hanover's proprietary accounts because all Hanover trades went through Hanover's proprietary accounts. *Id.* ¶ 85. Thus, no transaction among Hanover customers or between a Hanover customer and the Street took place without Hanover's proprietary accounts acting as the "middle man". *Id.*[13]

As broker-dealers, Adler and Hanover were subject to the SEC's net-capital rule. *See* Press Decl. ¶ 16 (discussing SEC Rule 15c3–1). Net capital is a derivation of net worth, excluding certain non-liquid, non-secured assets and other adjustments the SEC determine necessary to protect the investment community and its customers. *Id.* The rule requires a broker-dealer to maintain certain levels of liquid capital, depending, in part, on the type of business the broker-dealer conducts. Net capital is the difference between a broker-dealer's total capital (calculated in accordance with generally accepted accounting principles) and the aggregate of certain non-allowable assets, operational charges and "haircuts". *Id.* ¶ 17. "Haircuts" represent charges against net capital for investment or proprietary positions that the broker-dealer holds in its proprietary accounts. *Id.* ¶ 21. They are supposed to provide a safety margin based on, among other things, the status of the broker-dealer as a market maker and any undue concentration of securities for which it was a market maker. *Id.* ¶ 21. The SEC requires broker-dealers to file financial information on a monthly and quarterly basis in the form of a Financial and Operational Combined Uniform Single Report ("FOCUS Report"). *Id.* ¶ 18. The report includes a net capital calculation. A broker-dealer must calculate its net capital by the tenth business day of every month, and more frequently if the broker-dealer is approaching its net capital requirement. *Id.* ¶ 19. If it falls out of net capital compliance, it must report the violation to its self-regulatory organization, which for Hanover was the NASD. *Id.*

As of December 31, 1994, Hanover's net capital requirement was $297,798 and its net capital position was $3,776,463. Press Decl. ¶ 24. Thus, it enjoyed excess net capital of $3,478,665. *Id.* By January 31, 1995, Hanover's excess net capital position decreased to $162,000. *Id.* ¶ 26. In large part, that decrease is attributable to increases in "haircuts" due to a substantial increase of House Stocks in Hanover's proprietary accounts. *Id.* ¶ 28. That was due to the illegal activities of certain broker-dealers. From approximately January 20, 1995 through at least March 20, 1995 (the "Short Selling Period"), those broker-dealers (the "Short Sellers") engaged in considerable illegal short selling of House Stocks. UF ¶ 26.[14] During that period, the Short Sellers sold more House Stock shares than they possessed or had arranged to borrow, or were publicly available. *Id.* ¶¶ 31, 32. They did so to depress the market prices of the House Stocks, in order to manipulate and deceive the market. *Id.* ¶¶ 29–30. Moreover, to increase that downward price manipulation, at the outset of the Short Selling Period, the Short Sellers planted negative information regarding Hanover and certain of the House Stocks with Dan Dorf-

---

13. For example, if Hanover customer A were selling House Stocks and Hanover customer B was the ultimate buyer of those House Stocks, Hanover itself, through its proprietary accounts, would buy the stock from A and sell it to B. Generally, neither A nor B would know who the ultimate counterparty to their sale was. Norris Decl. ¶ 85. Similarly, when the Street sold to Hanover, the Hanover proprietary accounts sold the securities. *Id.*

14. Those transactions were short sales because the Short Sellers generally did not own the House Stocks at the time that they sold them. They were illegal because the sales violated NASD rules and federal securities laws, including, but not limited to SEC Rule 10b–5 promulgated under § 10(b) of the 1934 Act. UF ¶¶ 27–28.

man, a financial reporter for CNBC, who then broadcast a negative assessment of those securities on January 20, 1995, and reported that Hanover was under SEC investigation. UF ¶ 33. They also originated and spread rumors in the market that Hanover was going to fail due to the concerted short-selling scheme. *Id.* ¶ 34.

The posted prices of the House Stocks were significant to Hanover both because it owned large quantities of those securities and used them to support its net capital, and because many of its customers owned large quantities of House Stocks. Norris Decl. ¶¶ 18; Press Decl. ¶¶ 28, 31; Trustee Ex. 769 (Claimants' trade file); Trustee Ex. 29 (Hanover FOCUS Reports); Cl. Ex. 55 (activity file). In response to the illegal short selling, as the dominant market maker for those securities, Hanover could have lowered their posted prices to discourage the Short Sellers from selling them. Moran Dep. 143:9–23;[15] Norris Decl. ¶¶ 98–99. However, in so acting, Hanover would have created losses for its customers holding House Stocks, and for itself, to the extent that it held those securities in its proprietary account. Those losses eventually would have threatened Hanover's net capital. Press Decl. ¶¶ 6, 13, 15.

Hanover first responded to the illegal short selling by supporting the House Stock prices. It purchased, through its propriety accounts, all the House Stocks that the Short Sellers were offering and at the prices that Hanover posted for them. Press Decl. ¶¶ 87–95. However, each time Hanover's proprietary accounts purchased House Stocks, Hanover had to increase the "haircuts" it took against its net capital. UF ¶ 25. To avoid being out of net capital, Hanover had to match its House Stock purchases with sales of those securities to the Street or its customers. Thus, Hanover's initial response to the Short Sellers

offered only temporary relief because by February 13, 1995, Hanover realized that there were not enough interested House Stock buyers among its customers or the Street to account for the volume of House Stocks that the Short Sellers were selling, and that its net capital could not legally withstand the Short Seller's efforts. Nonetheless, Hanover continued to acquire House Stocks in its proprietary account. However, to deceive Adler and the regulators into believing that it was in net capital compliance, Hanover began to record fictitious "buys" of House Stocks in real and phony customer accounts to make it look like it was matching its House Stock buys with sales of those securities at the posted prices. Between February 13 and 16, while it was acquiring House Stocks in its proprietary accounts, Hanover booked $3.3 million in fake House Stock buys in the accounts of 31 customers (the "Pre–Final Week Fake Buys"). We conclude that those "buys" were fake because (i) no one ever paid for them, Cl. Ex. 54 (trades file); Norris Decl. ¶¶ 101–05; Press Decl. ¶¶ 10–12; Trustee Ex. 34 (fake buys February 13–16); (ii) customers representing 75% of the "buys" by dollar value denied that they ordered them and no customers acknowledged ordering them; (iii) Hanover booked 70% of those "buys" by dollar value in closed accounts, dormant accounts, accounts with no assets and/or no activity while Hanover cleared through Adler; (iv) because the remaining "buys" (30% in dollar value) were at unprecedented levels in the accounts where Hanover booked them; (v) the average "buy" ($63,-118) in those accounts is almost four times the average House Stock buy ($16,594) by Hanover customers prior to the Final Week; and (vi) Hanover masked a portion of the fake buys by booking $2.7 million of fake sales in customer accounts credited with fake buys to make it appear that there was sufficient cash in those accounts

---

**15.** John T. Moran is a founder of the Blackmoor Group, which provides financial consulting services in the securities industry. *See* Moran Dep. 24:10–13, 31:15–32:9. He testi-

fied concerning, among other things, the activities of the Short Sellers during January and February of 1995.

to pay for the "buys". *See* Norris Decl. ¶¶ 101–02. By February 16, Hanover booked purchases of another $9.8 million of House Stocks in customer accounts having similar characteristics. *Id.* Although Hanover eventually canceled those transactions, we find that they too were fake transactions and that Hanover effected them to further its deceptive and illegal actions.

In January and February 1995, Hanover held its material assets in its bank and proprietary accounts, although it held the vast amount of its assets and liabilities in its proprietary accounts. Press Decl. ¶ 31. From January 31 through February 16, Hanover's assets in its bank accounts decreased, while it accumulated significant amounts of House Stocks in its proprietary accounts. *Id.* Thus, there was no net increase in Hanover's capital during that period. *Id.* As a result, using the posted prices as of February 16, and giving Hanover credit for the fake buys and buys that Hanover would later cancel, on that day, Hanover was out of net capital compliance by at least $2,000,000. *Id.* ¶¶ 35–37. If we disregard the fake and canceled buys, Hanover's net capital deficiency on that day was approximately $6.0 million. *Id.* ¶¶ 38–43; Tr. 85:18–86:7.[16] The Clearing Agreement mandated that Hanover advise Adler if it fell out of net capital compliance, or even if it approached the minimum net capital requirement. Clearing Agreement ¶ 2(a)(iv) (Trustee Ex. 771). Nonetheless, Hanover failed to do so. Press Decl. ¶ 44.

The regulators would have closed Hanover on February 16 had they known the true extent of Hanover's net capital deficiency. Tr. (Press) 66:25–68:2; Press Decl. ¶ 38; Tr. (Lowry) 714:12–17. The NASD would have done so if it knew the extent of Hanover's net capital deficiency. *See* LaFond Dep. 10:8–13, 19:16–21:9.[17] However, as we will explain, the regulators and Adler were not aware of Hanover's true financial condition.

During the Final Week, Hanover acquired more House Stocks and booked $59.2 million in House Stock "buys" in its customers' accounts. Those customers only acknowledge $2.9 million of those "buys", or less than 5% of them, and Hanover canceled $7.7 million of them before it closed. Norris Decl. ¶ 22, n.3. We find that $ 45.1 million of those "buys" in 199 accounts were fake (the "Fake Buys") (*i.e.* the customers never ordered them) because: (i) customers explicitly deny making 90% ($40.4 million) of the Fake Buys and no customer has acknowledged any of the transactions as a real purchase, *see* Norris Decl. ¶¶ 58–61; (ii) at least two Hanover brokers whose accounts were booked with Fake Buys denied that they effected those trades; [18] (iii) Hanover brokers Catoggio and Garber took the Fifth Amendment when they were questioned about those trades, Garber Dep. 23–24; Catoggio 17–19; Norris Decl. ¶ 63; (iv) $10.8 million worth of those "buys" were recorded with Hanover brokers who were not working at Hanover when the "buys" allegedly took place in their customers' accounts, *see* Norris Decl. ¶ 64; (v) over 77% of the dollar value of the "buys" occurred in accounts that never before had any trading activity cleared by Adler, and

16. The trustee did not have access to all the records necessary to calculate precisely Hanover's net capital (e.g., a trial balance for February 16), and he made various assumptions in calculating the net capital. Press Decl. ¶¶ 31–35. We find that those assumptions are reasonable and that the trustee's calculations accurately reflects Hanover's financial condition as of that date.

17. John J. LaFond is an Assistant Director of NASD Regulation, Inc. His responsibilities include dealing with member brokerage firms experiencing financial and/or operational problems. *See id.* 7:17–8:8.

18. *See* Norris Decl. ¶¶ 62–64; 1995 DiBella Dep. 54:11–56:12, 59:8–22, 60:2–9, 63:12–22, 69:3–21, 69:24–71:3, 73:4–21, 79:4–19, 81:2–82:6, 87:14–88:10, 90:8–10, 90:15–91:18, 120:22–122:4, 122:22–123:20; 1995 Ashenfarb Dep. 125–32.

the average "buy" in those accounts was more than ten times the average House Stock buy in all Hanover accounts prior to the Final Week, *id.* ¶ 24; Trustee Ex. 3C (dormant accounts); Trustee Ex. 5 (unprecedented accounts); Trustee Ex. 7 (average buys); (vi) the "buys" booked in 42 of the accounts, or over 22% of the dollar value ($10.1 million) were at least five times higher than other buys or sells in those accounts, Norris Decl. ¶ 29; (vii) the purchase volume of House Stocks during the Final Week was greater than any other five-day period in Hanover's trading history with Adler, *see* Trustee Ex. 6 (total buys); Norris Decl. ¶ 33; (viii) the accounts in which Hanover recorded the Fake Buys contained in aggregate approximately $300,000 in cash and securities;[19] and (ix) Hanover made several attempts to conceal the Fake Buys from Adler. As to the latter, Hanover booked sales of largely Blue Chip securities in the accounts of 31 customers who had been booked with Fake Buys, even though those customers did not own the Blue Chips and never attempted to borrow them with the intention of effecting short sales. These disguised and illegal short sales (the "Fake Short Sales") made it appear as though those accounts held $15.5 million in cash (representing the proceeds of those fake sales), which could be used to pay for House Stocks later booked into the accounts, Norris Decl. ¶¶ 40–51; Trustee Ex. 8 (fake short sale accounts); Trustee Ex. 10 (Adler trading reports). Hanover also submitted phony address changes to Adler—so that once it recorded the Fake Buys or Fake Short Sales, Adler sent confirmations of those "transactions" to the wrong addresses, thereby preventing the real customers from learning of the trades and complaining about them. Norris Decl. ¶ 52; Trustee Ex. 17 (summary of address changes); Trustee Ex. 47 (notices of address changes). Moreover, Hanover booked some of the phony transactions into accounts that its brokers opened without authorization or which they failed to close after the customer directed them to do so. Norris Decl. ¶¶ 53–57.[20] Hanover also effected fake buys of House Stocks in its proprietary accounts during the Final Week. *See* Norris Decl. ¶ 90.

During the Final Week, House Stock sales totaled approximately $53.2 million. Norris Decl. ¶ 87. The Short Sellers booked $21.4 million of those "sales" as part of their illegal short selling scheme. *Id.* During that week, Hanover booked approximately $31.5 million in House Stock sales for cash credits in the accounts of its customers, including the Claimants. Norris Decl. ¶ 66. Mechanically, this meant that Hanover's proprietary accounts purchased that amount of House Stocks from them and Hanover credited their accounts with cash credits aggregating $31.5 million. Trustee Ex. 770 (customers' activity file); Cl. Ex. 55 (activity file); Norris Decl. ¶¶ 66–67. Although that level of House Stock "sales" by Hanover customers was unprecedented,[21] only 9% of the 5,900 cus-

---

**19.** After giving effect to the Fake Buys, they collectively had a negative balance of approximately $44.8 million. Trustee Exs. 3 and 5 (Fake Buys); Norris Decl. ¶ 37; Cl. Ex. 55 (activity file).

**20.** One Claimant who would have had control over such a fake account learned of its existence from the trustee. *See* Sulman Dep. 17:17–18:1, 85:5–13, 86:16–87:13, 87:16–23; Trustee Ex. 317 (Sulman new account application dated February 15, 1995); *see also* Norris Decl. ¶¶ 53–57; Austin Dep. 11:15–12:3; Carroll Dep. 63:9–64:8; Trustee Ex. 364 (Carroll new account application); Berlin Dep. 28:1–31:9, 31:21–32:12–33:15; Trustee Ex. 106 (new account application for Stephen and Judith Berlin); Trustee Ex. 108 (trade tickets and confirmation for Stephen and Judith Berlin for February 17, 1995); Trustee Ex. 18 (Stephen Berlin trading history, account operating document, letter denying opening of second account and wire transfer to Stephen Berlin).

**21.** In the Final Week, Hanover booked more House Stock sales for its customers than in any other five-day period on Adler's records. Norris Decl. ¶ 68. The average sale during that period was considerably higher than the average for any other week in Adler's records. *Id.;* Trustee Ex. 24 (average House Stock

tomers holding House Stocks were able to sell their securities, *see* Cl. Ex. 55 (activity file); Norris Decl. ¶ 69; Tr. 691:10–16, although many more of them unsuccessfully attempted to do so. *See* Trustee Ex. 64 (written customer complaints about Hanover's refusal and failure to execute sell orders). Moreover, the customers who were able to "sell" their securities liquidated 80% of their holdings. Norris Decl. ¶ 68.

While many Claimants left their "sale" proceeds in their accounts, Hanover purported to use the proceeds of some of them to purchase Blue Chip securities for those Claimants' accounts. During the Final Week, Hanover purchased $18.7 million in Blue Chips on behalf of the Claimants. Norris Decl. ¶ 71. It booked more than 80% of those purchases ($15.4 million) on February 24, 1995, when Hanover was open for no more than 90 minutes. *Id.* The activity in the Final Week was unprecedented.[22] Hanover booked those Blue Chip buys in accounts where the "proceeds" of the House Stock "sales" exceeded $100,000. Norris Dec. ¶¶ 70–82. As we will explain, that was not by chance. Rather, the Hanover Brokers selected those customers because they knew Hanover was insolvent and that SIPA only insured up to $100,000 in cash in customer accounts and up to $500,000 in securities. By substituting the Blue Chips for the "cash", Hanover was attempting to maximize the Claimants' customer claims in the inevitable liquidation proceeding.

Almost all (94%) of the Blue Chip buys were concentrated in eight securities: Apple, Dell, Ford, Cisco Systems, IBM, AT & T, Birmingham Steel and Microsoft. *Id.* ¶ 73. During Adler's tenure clearing for Hanover, the Claimants never purchased (either in their Hanover accounts or elsewhere) Apple, Ford, IBM, AT & T or (other than Hanover broker John Lembo) Microsoft. Certain Claimants had purchased the remaining Blue Chips prior to the Final Week, but only in the aggregate amount of $194,553. Norris Decl. ¶¶ 72–73; Trustee Ex. 26 (chart of Hanover Blue Chip buys); Trustee Ex. 27 (chart of eight Blue Chips); Tr.(Lowry) 647:25–649:8.

On January 27, 1995, Adler's net worth was $11.11 million and it had excess net capital. *See* Trustee Ex. 35 (Adler's January 27 FOCUS Report). Leaving aside any Hanover-related losses, its net worth remained roughly constant through February 16, 1995. Trustee Ex. 36 (declaration of Adler Chief Operating Officer Jay Zaremba); *see also* Norris Decl. ¶ 115, Press Decl. ¶ 46. Hanover's $16.9 million loss in its proprietary accounts (by virtue of the fictitious and canceled transactions) was the net debt that Hanover owed Adler for the execution of its trades. Tr. (Press) 73:12–24. As we will explain, by the close of business on February 16, Hanover was insolvent and was never going to repay that contingent receivable. Accordingly, Adler's true net worth on that day was at least a negative $5.8 million,[23] and it had a

sales). Although Hanover customarily sold large amounts of House Stocks in connection with initial public offerings, during its relationship with Adler, prior to the Final Week (*i.e.* from November of 1994 through February 16, 1995), sales of House Stocks by Hanover customers never exceeded $6.8 million on any day, and on most days, they tallied between $1 million and $3 million. Norris Decl. ¶ 67. On February 21 and 24, 1995, for example, those sales totaled $13.3 million and $14 million, respectively. Trustee Ex. 23 (House Stock sales); Norris Decl. ¶¶ 67–68.

22. On February 24, the average Blue Chip buy was over $218,000. Norris Decl. ¶¶ 71 and 72. By contrast, prior to the Final Week,

Hanover customers never bought more than $3.8 million in Blue Chips on any single day, *see id.* ¶ 71; Trustee Ex. 769 (favored customer trades file); Norris Decl. ¶ 71; Trustee Ex. 25 (Blue Chip buys), and the average Blue Chip buy for any one day never exceeded $45,000. Trustee Ex. 26 (chart of Hanover Blue Chip buys); Norris Decl. ¶ 72; Cl. Ex. 55 (activity file).

23. As of February 16, Hanover held $1.2 million in its bank accounts. Those funds were withdrawn by unknown parties and Adler never received them. Norris Decl. ¶ 109. Without those funds, Adler's net worth was negative $7.0 million.

negative net capital of $ 12,777,324. Press Decl. ¶ 46.

On Friday, February 24, Hanover generally was not receiving or accepting telephone calls. LaFond Dep. 24:11–24, 66:14–21, 67:3–10. That day, at approximately 11:00 a.m., the NASD closed Hanover. Tr. (Lowry) 649:14–16; Norris Decl. ¶ 68. On Sunday, February 26, the NYSE directed Adler to cease operating as a broker-dealer. Adler did so. Trustee Ex. 89 (N.Y.SE letter); Trustee Ex. 90 (Cohan letter).

### Discussion

We base our subject matter jurisdiction of this proceeding on SIPA §§ 78eee(b)(2)(A) and (b)(4) and the district court order dated February 27, 1995 referring and removing debtor's case to this court. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (B).

### Claimants' Claims for Cash and Securities under the SIPC Rules

■■■ The Claimants must prove that they hold preferred SIPA "customer claims". *Jackman v. SIPC (In re Brentwood Securities, Inc.)*, 96 B.R. 1002, 1006–

07 (9th Cir. BAP 1989); *Schultz and Schultz v. Omni Mutual Inc.*, 93 Civ. 3700(KC), 1993 WL 546671, *1 (S.D.N.Y. Dec. 30, 1993); *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr.S.D.N.Y.1998); *see also SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir.1974) (claimants have burden of showing that they are entitled to customer status). Because there is no dispute that the Claimants are SIPA "customers", to recover the cash proceeds from the sales of their House Stocks, they must prove that they authorized each Challenged Sale in advance of the sale and either that Adler sent them confirmation of the sale, or that each sale constituted a completed or executory contract under New York State law. *See* 17 C.F.R. § 300.501.[24] As for the Claimants seeking to recover the Blue Chip securities, in addition to the foregoing, they must show that they had enough cash in their accounts to pay for each Challenged Blue Chip Buy. *See id.* § 301.502.[25] If the Claimants meet their burdens, the trustee must demonstrate that we should not give effect to the trades.[26]

As noted, in *Ensminger II*, we upheld the trustee's determinations disallowing the preferred SIPA customer claims of

24. Rule 300.501 provides that:

(a) Where a SIPC member ("Debtor") held securities in an account for a customer, the customer has a "claim for cash" with respect to any authorized securities sale:
(1) If the Debtor has sent written confirmation to the customer that the securities in question have been sold for or purchased from the customer's account; or
(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.
17 C.F.R. § 300.501.

25. Rule 300.502 provides in pertinent part that:

(a) Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:
(1) If the Debtor has sent written confirmation to the customer that the securities

in question have been purchased for or sold to the customer's account; or
(2) Whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for sale for or purchase from the account.
17 C.F.R. § 300.502.

26. Claimants Dr. Jude Barbera and Catherine and John Romano state that they need to prove either that they authorized the transactions *or* that they have a completed executory contract with Alder. *See* Claimant Dr. Jude Barbera' Proposed Findings of Fact and Conclusions of Law, dated July 17, 1998 (Conclusions of Law ¶ 7); Claimants Catherine Romano and John Romano's Proposed Findings of Fact and Conclusions of Law, dated July, 17, 1998 (Conclusions of Law ¶ 7). That does not square with the language of the rules, which state that a customer has a claim for cash or a claim for securities only for "any authorized" securities sale or purchase. 17 C.F.R. §§ 300.501 and 300.502.

those Claimants seeking to recover the cash and/or securities allegedly generated from the Challenged Trades that the Hanover Brokers booked on February 24. Thus, we have already disallowed most of the claims for the Blue Chip securities [27] and some of the cash claims. *Id.* The same rationale does not apply for the balance of the Challenged Trades, because Adler generated and mailed written confirmations for all trades that the Hanover effected on or before February 23, 1999. There are other grounds under the Series 500 Rules for granting the trustee judgment on his Complaint as to certain of the pre-February 23 Challenged Trades, as well as to many of the claims that we considered in *Ensminger II.* Certain of those Claimants have not established that they authorized their brokers to execute the underlying Challenged Trade (we identify those Claimants in footnotes 40, 43 and 44) and no Claimant asserting a claim for Blue Chips has shown that there were funds in its account to pay for the securities. Before we discuss those matters, we must resolve a related issue.

■ The Claimants contend that we erroneously granted the trustee partial summary judgment in *Ensminger II,* and that because we have not yet entered a judgment implementing that decision, pursuant to Fed.R.Civ.P. 54(b),[28] we can "revise" it to deny the motion. The Claimants first say that in his moving papers, the trustee contended that he was entitled to summary judgment because: (i) Adler determined not to clear and settle and, affirma-

tively, to cancel the Challenged Trades that certain Hanover brokers booked on February 24, and (ii) the New York Statute of Frauds rendered those trades unenforceable because N.Y.U.C.C. § 8–319(a) requires the Claimants actually to possess the written confirmations, which they did not have, and that the trustee recognized that N.Y.U.C.C. §§ 8–319(b),(c) and (d) were inapposite. They maintain that in response to the motion, they proved that Adler did not cancel the Challenged Trades and that N.Y.U.C.C. § 8–319(a) does not require actual delivery, and that in *Ensminger II,* we did not find anything to the contrary. They contend that one week prior to the September 30, 1995 argument of the summary judgment motion, the trustee introduced an entirely new argument: by retrieving the confirmation slips from Imtech Corp., a third-party vendor who, among other things, mailed confirmations to the customers, Adler "refused to confirm" the February 24 Challenged Trades and thereby prevented the formation of a contract in the first place. They assert that in making that argument, the trustee did not refer to paragraph 8(a) of the Customer Agreement, yet we relied solely on that paragraph in concluding that the Claimants who purportedly made the Challenged Trades on February 24 could not have formed a contract with Adler since they did not receive written confirmations of those trades. They say that we relied on the lack of evidence to rebut the inference that the Customer Agreement reflected the custom of all

27. As noted, 80% of the Challenged Blue Chip Buys took place on February 24. Norris Decl. ¶ 71.

28. Bankruptcy Rule 7054 makes Fed.R.Civ.P. 54(b) applicable herein. The latter states:
When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express

direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
Fed.R.Civ.P. 54(b).

Adler's customers, but that the necessity for rebutting our construction of the Customer Agreement did not arise until we granted the trustee's motion. They say that because the trustee did not make the "no contract formed" argument in his summary judgment motion, or in his Local Rule 7056–1 statement of material facts, we cannot rely on it as the basis for granting him summary judgment. Thus, they contend that the trustee's motion was procedurally defective and that we denied them a full opportunity to be heard on it.

The trustee maintains that the Claimants had a full opportunity to address his "no contract formed" argument and, in any event, denies that under Rule 54(b), we can "revise" *Ensminger II* to deny him summary judgment. He also says that the Claimants' request for relief is procedurally defective because it is in the nature of a Local Rule 9023–1 motion for reargument, and they have not cited the matters or controlling decisions that we allegedly did not consider in granting his summary judgment motion. In part, Local Bankruptcy Rule 9023–1 mandates that the motion "set forth concisely the matters or controlling decisions which counsel believes the Court has not considered." We think Rule 54 is the appropriate vehicle for the Claimants to revise *Ensminger II*, although we question whether we can do so to the extent that the Claimants request. We note that motions for reargument must satisfy a more exacting standard of review than a Rule 54(b) motion. *See Fayetteville Investors v. Commercial Builders Inc.*, 936 F.2d 1462, 1472 (4th Cir.1991). However, irrespective of the standard for review that we must apply, and even assuming, *arguendo*, that the relief the Claimants seek is available under Rule 54(b), the Claimants have not raised any issue that compels us to alter our decision in *Ensminger II*.

During the argument of that motion, the Claimants protested the manner in which the trustee raised the "no contract formed" argument. However, no Claimant sought leave to submit additional or other arguments and/or evidence in response to it, either during the hearing or the time that the motion was *sub judice*. In contrast, during the hearing that day on their motion to dismiss the Complaint, the Claimants asked for, and obtained, leave to submit additional materials in support of their assertion that Adler guaranteed the Challenged Trades. *See Ensminger I*, 218 B.R. at 708–09. As filed, the summary judgment motion plainly raised the issue of when Adler created binding contracts with the Claimants. If the Claimants had evidence supporting their assertion that Adler did so other than by its delivery of written confirmations, they were required by Bankruptcy Rule 7056 to supply it. The Claimants were not prejudiced because they had ample opportunity to submit legal and factual support for their opposition to the trustee's "no contract formed" argument, but failed to do so. Thus we find that the Claimants are not entitled to relief from our decision in *Ensminger II*.

Still, the legal and factual matters that the Claimants have raised do not support their request for relief. They say that there is overwhelming evidence that Adler and the entire securities industry treats securities contracts as binding from the trade date, and does not require delivery of written trade confirmations. However, the "evidence" they cite purportedly supports their assertion that Adler guaranteed to them Hanover's performance of the Challenged Trades. *See* Claimants' Proposed Finding of Fact ¶¶ 24–25, 34, 61, 64. We have already determined that Adler did not do so, *see Ensminger I*, 218 B.R. at 708–09, and, as we will discuss, there is no basis for us to alter that determination. As such, it does not rebut, or call into question, the evidence we relied on in finding that delivery of the confirmations was essential to form a contract, even for those Claimants who did not execute Customer Agreements. *See Ensminger II*, 218 B.R. at 24–25. Next, they say that in finding an

absence of completed or executory contracts for the February 24 Challenged Trades, we misconstrued paragraph 8(a) of the Customer Agreement to condition the formation and existence of the parties' contract on the customers' receipt of written confirmations. That paragraph states that:

> The confirmation of the receipt or execution of an order shall be conclusive and binding upon the undersigned if the undersigned does not object thereto in writing within five business days after Adler Coleman has sent the confirmation to the undersigned by mail or otherwise.

*Id.* at 24 (quoting Customer Agreement ¶ 8(a)). According to them, that paragraph creates a condition only to the binding effect on customers of written trade confirmations, not to the formation or existence of a contract between the parties or its binding effect on Adler or Hanover. Citing *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415 (N.Y.1995),[29] the Claimants say that under New York contract law, two conditions precedent are (i) acts which must occur before a party is obligated to perform under a contract and (ii) acts which must occur before the contract is formed. They contend that in *Ensminger II*, we erred in holding that no securities contract could have been formed under applicable law unless and until a customer received written confirmation of its trades from Adler, *see* 218 B.R. at 25, because the customer's receipt of written confirmation of a trade is not a condition

precedent to the formation of a contract with Adler, but merely a condition as to the enforceability of the contents of the written confirmations against customers. According to them, paragraph 8(a) does not condition an obligation to perform and, therefore, cannot constitute a condition precedent under New York law. Rather, they say that the language of that paragraph only conditions the effect of a written confirmation against customers. Thus, they say that the word "if" does not condition the contract itself, but rather, it conditions whether the "[t]he confirmation of the receipt or execution of an order shall be conclusive and binding on the undersigned". They say that under paragraph 8(a), the customer is bound by the terms of the confirmation, only "if the undersigned does not object thereto in writing within five business days after Adler Coleman has sent the confirmation to the undersigned by mail or otherwise". They note that the structure of paragraph 8(a) parallels that of paragraph 8(b), which similarly binds customers to the contents of their account statements, unless they make a written objection within ten days,[30] and that we cannot construe paragraph 8(a) to provide a precondition to the formation or existence of a contract. They also assert that like N.Y.U.C.C. § 8–319(c), paragraph 8(a) is properly construed to apply to situations where a broker seeks to enforce a trade against a customer, not vice versa. Thus, they say that the principle enunciated in *Schwartz v. Greenberg*, 304 N.Y. 250, 254, 107 N.E.2d 65 (1952), is inapplicable, and that we erred in relying on it. *See En-*

---

**29.** In *Oppenheimer,* the court stated, as follows:

> Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself.... In the latter situation, no contract arises "unless and until the condition occurs."

86 N.Y.2d at 690, 660 N.E.2d 415 (citations omitted).

**30.** Paragraph 8(b) of the Customer Agreement states:

> A statement of any of the undersigned's accounts shall be conclusive and binding upon the undersigned if the undersigned does not object thereto in writing within ten days after Adler Coleman has sent the statement of account to the undersigned by mail or otherwise.

Customer Agreement ¶ 8(b) (Trustee Ex. 66).

*sminger II*, 218 B.R. at 24–25.[31] We disagree with the Claimants' construction of the Customer Agreement. It plainly states that Adler is not obligated to clear and settle any trade until (a) the customer receives a written confirmation, and (b) he or she fails to object in a timely fashion, *see* Customer Agreement ¶ 8(a), and that is precisely what we found. *See Ensminger II*, 218 B.R. at 21.

The Claimants also maintain that in *Ensminger II*, we erroneously assumed that for the Claimants to have preferred customer claims under the Series 500 Rules, they must have executory or completed contracts with Adler for the purchase and/or sale of the securities. They say that the rules require only that the securities in question be the subject of "a" completed or executory contract, and that if the SEC or SIPC had intended that the requisite contract be with the debtor, they could have expressly imposed such condition, as they had in the case of who must send the required written confirmation.[32] However, the Series 500 Rules and SIPA address claims against a debtor and its fund of customer property. The Claimants simply cannot have an enforceable preferred claim against a debtor under SIPA—which diminishes the asset pool available to pay all of that debtor's customers and creditors—without possessing an enforceable obligation against the debtor.

They also say that the Challenged Trades became the subject of various completed or executory sale or purchase contracts. Citing SIPC Rules 300.501(a)(2) and 300.502(b)(2), they assert (i) that the Challenged Sales became the subject of completed or executory contracts "for sale for" the Claimants accounts between, first, themselves and Hanover, as broker, and second, between Hanover and Adler, as clearing broker; (ii) that the Challenged Sales became the subject of a contract with Hanover, the buyer regarding the Challenged Sales, for "purchase from" their accounts; and (iii) that Adler had a primary obligation to them as third-party beneficiaries of the Clearing Agreement, to clear and settle the Challenged Sales and, therefore, those sales became the subject of yet another executory or completed contract "for sale for" their accounts. They make similar arguments regarding the Challenged Blue Chip Buys. Citing SIPC Rules 300.501(b)(2) and 300.502(a)(2), they maintain that (i) they contracted with Hanover, as broker, Hanover, as broker, contracted with Adler, as clearing broker, and Alder contracted with NSCC, as clearing agency, "for purchase for" their accounts; (ii) the NSCC contracted to provide the Blue Chips "for sale to" their accounts, as did the contra broker; and (iii) Adler had an obligation to them to deliver the Blue Chips once Adler accepted to clear and settle the trades from Hanover; a contract "for purchase for" their accounts.

Thus, the Claimants maintain that securities contracts form on the trade date, rather than the settlement date, whether or not the clearing broker (or presumably any broker effecting the trade) actually confirms it. For support, they cite to certain SEC Rules which purport to establish when a transaction "settles" or is "completed" but do not determine as a matter of law when an enforceable contract comes into existence.[33] Moreover, nowhere is there any indication that those Rules

---

**31.** In relevant part, *Schwartz* held that the existence of a signed writing, in the absence of delivery to the person seeking enforcement, is insufficient when the parties intend to be contractually bound only when a writing had been delivered. *See* 304 N.Y. at 254, 107 N.E.2d 65. They say that *Schwartz* is inapplicable because delivery of the written confirmations was not a condition precedent to the existence of a securities contract.

**32.** As noted, the Series 500 Rules provide that a customer has a claim for cash or securities if "the Debtor has sent written confirmation to the customer" of the trade in question or if the trade is the subject of a completed or executory contract. *See* 17 C.F.R. §§ 300.501 and 300.502.

**33.** The Claimants rely on SEC Rule 15c6–1, which they contend is insightful for revealing when securities contracts form in the industry even though it was not effective until June 1,

somehow pre-empt N.Y.U.C.C. § 8–319's requirements for contract formation and enforceability. *See Ensminger II*, 218 B.R. at 25 (§ 8–319 mandates that the Claimants have received written confirmation of their trades to satisfy New York's statute of frauds applicable to securities transactions). There is no basis for finding that the Claimants could form a contract with Adler through Hanover's unilateral act of imputing trades into Adler's computer system. We deny the Claimants any relief respecting our ruling in *Ensminger II*.

We now consider whether the Claimants have established that they hold claims for

cash and/or securities under the Series 500 Rules. None of the Hanover brokers had blanket discretionary authority to trade in the Claimants' accounts. Under the Clearing Agreement, Hanover had to notify Adler whenever a Hanover customer conferred upon a Hanover broker the discretion to trade in his or her account. *See* Trustee Ex. 771 (Clearing Agreement) ¶ 5(f). Neither the Claimants nor Hanover notified Adler of such a delegation of authority, and none of the Claimants conferred such authority upon a Hanover broker.[34] The trustee maintains, and the Claimants do not dispute, that under our

---

1995 and does not apply to the events in question. That rule, which establishes a universal three-day settlement rule supplanting the settlement rules that varied from market to market, provides that "a broker or dealer shall not effect or enter into a contract for the purchase or sale of a security ... that provides for the payment of funds and delivery of securities later than the third business day after the date of the contract unless otherwise expressly agreed to by the parties at the time of the transaction." 17 C.F.R. § 240.15c6–1 (effective June 1, 1995). They also cite to SEC Rule 15c1–1, which in defining certain terms relevant to over-the-counter markets, provides that "the completion of the transaction" means "[i]n the case of a customer who sells a security through or to a broker, dealer or municipal securities dealer ... if the security is in the custody" of the broker or dealer "at the time of the sale, the time when the broker, dealer or municipal securities dealer transfers the security from the account of such customer." 17 C.F.R. § 240.15c1–1(b)(1). Also, they note, in the case of a customer who purchases securities and payment is effected by a bookkeeping entry, "completion of the transaction" is defined as "the time when such bookkeeping entry is made by the broker, dealer, or municipal securities dealer for any part of the purchase price." *Id.* Based upon these rules, Claimants assert that a securities contract is formed on trade rather than settlement date. We disagree. The rules promulgated under § 15(c)(1) of the 1934 Act require only that a broker disclose certain facts to its customer at or before the completion of a transaction as defined by Rule 15c1–1. *See* 17 C.F.R. §§ 240.15c1–5, 240.15c1–6, 24015c2–1(c), 240.10b–10(d)(2). Rule 15c1–1 has no relevance to contract formation and enforceability. Rule 15c6–1 is similarly irrelevant. It

merely prescribes terms that certain securities contracts must contain.

34. *See* Cl. Exs. 66, 269, 316, 317, 364 and 695 (Claimants' Account Agreements); Trustee Exs. 143, 148, 152, 155, 159, 162, 165, 172, 184, 187, 190, 194, 198, 201, 205, 208, 212, 215, 219, 220, 223, 228, 232, 236, 245, 249, 252, 255, 263, 273, 276, 279, 283, 286, 292, 296, 300, 304, 310, 313, 318, 326, 334, 339, 251, 355, 358, 370, 376, 381, 393, 407, 412, 429, 435, 438, 454, 458, 461, 469, 475, 481, 485, 490, 495, 504, 513, 532, 539, 544, 549, 558, 567, 572, 581, 587, 591, 596, 600, 609, 613, 620, 631, 639, 644, 650, 658, 669, 670, 673, 692, 700, 735, 743, 747, 750 and 761 (various Claimants' responses to interrogatories); Trustee Exs. 19, 20, 31, 32, 45, 134, 137, 140, 146, 150, 153, 157, 160, 163, 167, 181, 191, 196, 199, 203, 306, 210, 213, 216, 221, 226, 230, 234, 237, 239, 241, 242, 246, 250, 253, 260, 271, 274, 277, 280, 284, 287, 294, 297, 301, 307, 311, 314, 324, 331, 336, 340, 342, 348, 353, 356, 362, 365, 372, 377, 379, 383, 386, 390, 394, 399, 404, 408, 413 (letter attached to claim form reflecting that broker had no discretion), 418, 423, 427, 430, 433, 436, 441, 446, 448, 451, 455, 459, 462, 464, 467, 470, 472, 476, 478, 482, 486, 491, 496, 499, 502, 505, 507, 509, 511, 517, 519, 521, 523, 525, 527, 529, 536, 540, 542, 545, 547, 550, 552, 556, 559, 561, 563, 565, 568, 570, 573, 575, 577, 579, 582, 588, 590, 592, 594, 598, 602, 603, 610, 614, 616, 618, 621, 623, 625, 627, 632, 633, 635, 640, 642, 646, 648, 651, 657, 661, 662, 663, 676, 685, 686, 687, 690, 697, 702, 705, 707, 709, 716, 717, 718, 732, 738, 744, 748, 751, 759, 764 and 775 (Claimants' claim forms response to question 8).

September Order,[35] for the Claimants to make a prima facie case that they authorized the Challenged Trades, they must submit a declaration averring that they gave their brokers advance authorization to effect the Challenge Trades, and explaining why they did so. *See* September Order p. 4.

The trustee concedes that some Claimants have shown that they gave advance authorization to their Hanover brokers to sell their House Stocks. *See* JPO ¶ 20 p. 19.[36] He is correct that other Claimants failed to adduce any evidence that they authorized the Challenged Trades. We uphold his determinations denying their

claims.[37] *See* September Order p. 11; 17 C.F.R. §§ 300.501 and 300.502. The trustee also contends that ten Claimants failed to rebut his contention that circumstantial evidence shows that they did not authorize the Challenged Trades.[38] We disagree with the trustee and find that they adduced sufficient evidence to rebut his contentions. However, we note that in *Ensminger II*, we disallowed the claims of some of those Claimants.[39]

Some Claimants admit that they did not authorize the House Stock sales and/or Blue Chip purchases in advance, and for that reason we grant the trustee judgment disallowing their claims.[40] Oth-

---

**35.** The "September Order" is our September 30, 1997 Third Amended Order Pursuant to Federal Rule of Bankruptcy Procedure 7016 Establishing Procedures for a Hearing on Trustee's Application for an Order Upholding the Trustee's Determinations Denying Claims of Certain Customers and Expunging Objections with Respect to those Transactions.

**36.** Those Claimants are Paul Alter, Gary Anderson, Joel Black, Donald T. Bliss, Charles Zalis Family Ltd. Partnership, William Christian, Abe and Gloria Cooperman, Allan Corn, Leonard and Mary Constantino, David Cotcher, W. Scott Creasman, Dan Dougherty, Richard M. DuBois, Larry Eisenstein, Erna and Herman Ettlinger, James J. Finn, Dr. David E. Friedman, Barbe M.L. Gold, Howard Hersch, H. Clark & Joanne C. Island, Judy P. Johnson, Kenneth E. Johnson, Ann D. Kusch, Joel Leisch, Norman Long, Kenneth Look, Dr. Geoffrey Mann, Morgan Brook, Inc., Marvin Nelson, August Nigro, Joseph Notaro, Sanjiv Panchal, Herbert Paschen Jr., Thomas Pearce, Michael Pelligrino, Givanni Pilla, Stanley M. Rosen, Thomas Russell, Karen Schiff, Richard Schneider, Mel Schneiderman, Max Schwimmer, Leona Seidlitz, Jerome Shinkay, Boris Stephen, William Thompson, Edward Wasserman and Shirt Factory and Sporting Goods, Inc. Nonetheless, in *Ensminger II*, we upheld the trustee's determination to deny SIPA priority treatment to the claims of Gary Anderson, Donald Bliss, Davis Cotcher, Morgan Brooke, Inc., Jerome Shinkay, Boris and Irene Stephen and William and Janeen Thompson, because even though they authorized their Final Week trades, Adler never confirmed them. *See* 218 B.R. at 24–26.

**37.** Those Claimants are Gerald Begley, Robert Brooks, Wayne Castronovo, Barbara

DeAngelo, David Dugan, Vincent Falcone, Morris Fink, George Gardiner, Louis Grandelli, Richard Johnson, Gary Posner, Yigal and Nancy Schwartzberg, Randy Ashenfarb, Thomas McGann and Sydney Vickers. We note that we upheld the trustee's determinations disallowing the claims of Gerald Begley, Robert and Marilyn Brooks, Wayne Catronovo, Morris Fink, Thomas and Theodora McGann, Gary Posner and Sons, Inc. Defined Benefit Pension Plan and Sidney Vickers, because Adler never sent them confirmations for their Final Week trades. *See Ensminger II*, 218 B.R. at 24–26.

**38.** Those Claimants are Dr. Eugene Austin, Michael L. Barnes, Patrick Cleveland, Barbara Flora, Georgios Kapsalis, Raymond Kralovic, Herbert B. Robins, Dr. Morris Sulman, Robert Terranova and Steven D. Tough.

**39.** In *Ensminger II*, we granted the trustee summary judgment disallowing the claims of Patrick Cleveland, George and Maria Kapsalis, Raymond Kralovic, Herbert Robins and Dr. Morris Sulman. *See* 218 B.R. at 24–26.

**40.** Those Claimants are Donald Bliss, Jay Harris, Jerome Shinkay, Spartan Establishment, Michael and Laura Polselli, Yigal and Nancy Schwartzberg, Robert Terranova, Dr. Eugene Austin, Jean Kelly and Boris Stephen. *See* Trustee Ex. 28 (letter from Donald Bliss); Bliss Dep. 17:4–18:17; Trustee Ex. 28 (letter from Jay Harris, Harris Decl. ¶ 5); *id.* (Shinkay Decl. ¶¶ 6–7, Shinkay letter); Shinkay Dep. 9:19–8:9; Trustee Ex. 689 (letter from Spartan Establishment denying authorization of challenged sales); Trustee Ex. 355 ¶ 8(d) (interrogatory responses from Michael and Laura Polselli); Trustee Ex. 601 (claim form

er Claimants have submitted documents which, according to the trustee, contain admissions that they were unaware that Hanover booked the Challenged Trades in their accounts. We agree with his analysis and disallow those claims.[41]

■ The remaining Claimants submitted affidavits and miscellaneous documentation to support their contentions that they authorized the Challenged Trades.[42]

of Yigal and Nancy Schwartzberg); Trustee Ex. 475 ¶ 8(d) (interrogatory responses from Robert Terranova); Trustee Ex. 495 ¶ 8(d) (interrogatory responses from Dr. Eugene Austin); Trustee Ex. 665 (letter from Jean Kelly); Trustee Ex. 413 (claim form of Boris Stephen). We note that in *Ensminger II*, we upheld the trustee's determinations regarding all but two of these Claimants (*i.e.* Jean Kelly and Robert Terranova).

41. Those Claimants are Boris Stephen, Michael Bopal, Robert and Marilyn Brook, John Calabrese, Gilbert Engholm, Gary Bravstein, Paul Koehn, Charles Parks and Brian Cook. Boris Stephen filed a claim form claiming House Stocks but stating that he was "informed by Lembo that there's $43,437.50 cash in my account from the sale of Panax prior to 2/27/95". *See* Trustee's Tr. Ex. 413 (Bris Stephen claim form). Michael Bobal made a claim for Ford stock, but requested Microsoft in a letter amending his claim form. *See* Trustee Ex. 248 (Bobal claim form and letter). We upheld the trustee's determinations regarding both of their claims in *Ensminger II* because Adler never confirmed their Final Week trades. Robert and Marilyn Brook, John Calabrese, Gilbert Engholm, Charles Parks and Gary Bravstein originally filed claims for House Stocks only to amend them to assert claims for Blue Chips. *See* Trustee's Ex. 451 ¶ 2 (Brooks claim form); Trustee's Ex. 454 ¶¶ 7–8 (Brooks' response to trustee's interrogatories changing his position by stating that he instructed his Hanover broker to sell all his House Stocks). However, we upheld the trustee's determination regarding the Brooks' claim in *Ensminger II* because Adler never confirmed their Final Week trades. Trustee Ex. 662 ¶ 2 (Calabrese claim form); Trustee Ex. 663 ¶ 2 (Engholm claim form); Trustee Ex. 676 ¶ 2 (Parks claim form); Trustee Ex. 451 ¶ 2 (Brooks claim form); Trustee Ex. 707 ¶ 2 (Koehn claim form); Trustee Ex. 661 ¶ 2 (Bravstein claim form claiming House Stock but of Eagle Vision unaware that buy was canceled on February 24, 1995). Finally, Brian Cook and Gary Bravstein failed to claim the securities that were booked in their accounts on the strength of the Challenged Blue Chip Buys. *See* Trustee Ex. 651 (Cook claim form indicating unaware of $ 278,273 purchase of Ford); Trustee Ex. 661 ¶ 2 (Bravstein claim form claiming House Stocks and indicating unaware that switched· to $147,221 in Blue

Chips). Sparten voluntary withdrew its claim. In *Ensminger II*, we upheld the trustee's determination of the claims of Boris Stephen, Michael Bopal, and Robert and Marilyn Brooks. *See Ensminger II*, 218 B.R. at 22–24.

42. Those Claimants are Allan Abelson, Michael and Brian Bobal, Steven Anzalone, Norman Bennet, John T. Cumberlidge, Donald Doty, Patricia Fochi, David Jackson, Robert Jurgensmeyer, Richard Matthews, Arthur Midili, Jeffery Schwartz, Linda Soreff Siegel, Margaret Spevak, Richard Kuhlman, Peter Berkman and Robin Bullock. *See* Trustee Ex. 136 ¶ 2 (Allan Abelson); Trustee Ex. 248 ¶ 8 (Michael and Brian Bobal); Trustee Ex. 150 ¶¶ 2, 8 and 10 (Steven Anzalone); Trustee Ex. 152 ¶¶ 8 and 10 (Norman Bennet); Trustee Ex. 172 ¶ 2 (John T. Cumberlidge); Trustee Ex. 184 ¶¶ 2 and 8 (Donald Doty); Trustee Ex. 187 ¶ 2 (Patricia Fochi); Jackson Dep. 30:7–18, 30:19–31:2, 31:3–15, 31:23–32:3, 32:8–34:21, 55:19–56:23, 57–59, 60:6–61:2, 63:24–65:23, 62:17–63:18, 70:14–71:3, 85:16–86:9 (David Jackson); Def. Ex. 139 (Robert Jurgensmeyer); Matthews Dep. 26:15–27:22, 28:14–29, 32:4–20, 51:16–52:9, 83:20–84:19 (Richard Matthews); Def. Ex. 219 (R. Matthews Decl.); Trustee Ex. 194 ¶¶ 2 and 8 (Arthur Midili); Trustee Ex. 218 ¶¶ 3–5 (Mendl Siegel on behalf of 16 Hanover favored customers); Trustee Ex. 201 ¶ 10(a) and (d) (Jeffrey G. Schwartz); Trustee Ex. 205 ¶ 10(a) and (d) (Jeffrey G. Schwartz Segregated Rollover IRA); Trustee Ex. 200 ¶ 10(a) and (d); (Linda Soreff Siegel Trustee f/b/o Moon Family GST Trust); Trustee Exhibit 208 ¶ 10(a) and (d) (Linda Soreff Siegel IRA); Trustee Ex. 232 ¶ 10(a) and (d) (Margaret M. Spevak); Trustee Ex. 236 ¶ 10(a) and (d) (Margaret Spevak IRA); Trustee Ex. 139 ¶ 2 (Richard Kuhlman); Trustee Ex. 148 ¶ 10(a) and (d) (Peter Berkman); Trustee Ex. 155 ¶ 10(a) and (d) (Robin Bullock); Trustee Ex. 160 ¶ 10(a) and (d) (Robin Bullock Custodian for Eric Lee Bullock); Trustee Ex. 162 ¶ 10(a) and (d) (Robin Bullock Custodian for Emily A. Bullock); Trustee Ex. 165 ¶ 10(a) and (d) (Robin Bullock IRA). In addition, Claimants' proposed findings of fact detail the circumstances allegedly surrounding the authorization of trades by Claimants who did not receive confirmation of their trades, even though in *Ensminger II*, we granted summary judgment upholding the trustee's disallowance of their claims.

They do not deny that in the Final Week there was an unprecedented amount of trading activity, both on an individual account basis and for Hanover as a whole. They concede that Claimants holding $12.5 million of securities associated with the $31.5 million of Blue Chip Buys in the Final Week abandoned their SIPA claims, because it is likely that they did not authorize their brokers to purchase those securities. However, they contend that when we eliminate those unauthorized buys, the volume of buys during the Final Week is only slightly greater than that of an average week at Hanover. Further, some Claimants maintain that the House Stock sales were above average because the illegal short selling of House Stocks put downward pressure on House Stock prices,[43] others contend that poor performance depressed the House Stock prices[44] and many say that they heard negative rumors about Hanover from other brokers and about the Short Selling from their brokers.[45] Thus, they contend that it is not surprising that they sold their House Stocks. Many also maintain that they had been trying to sell their House Stocks for weeks before the Final Week—a fact that the trustee's expert concedes. *See* Tr. (Norris) 472:10–13. Next, they contend that while many Claimants had not purchased Blue Chips through Hanover before the Final Week, it is not surprising that they did so once they sold their House Stocks, rather than leaving the cash in their accounts, and criticize the trustee's objections to their claims as both illogical and contrary to SIPC's goal of encouraging public confidence in securities investments. They also point out that many of the Claimants ordered the Blue Chip buys prior to February 24 and that they had legitimate reasons for buying the same group of Blue Chips, and that others relied on their Hanover broker's recommendations in selecting those stocks. As to the latter, they are correct that this does not affect the non-discretionary nature of the Final Week trades. *Hotmar v. Lowell H. Listrom & Co.*, 808 F.2d 1384, 1385–86 (10th Cir.1987).

We agree with the trustee that the fact that many Hanover customers admit that their brokers engaged in unauthorized trading during the Final Week undermines, rather than supports, the Claimants' contentions that they authorized their buys, given the unprecedented level of Blue Chip buys during that week and the fact that Hanover booked 80% of them during the 40 minutes that Hanover operated on February 24, 1995. Given that volume of trading and the acknowledged existence of unauthorized trades, the trustee has a reasonable basis to question the

---

43. *See, e.g.,* Trustee Ex. 143 ¶¶ 2 and 8(d) (Anzalone interrogatory responses); Trustee Ex. 263 ¶ 2(A)(4) (Darneille interrogatory responses); Trustee Ex. 194 ¶¶ 2 and 8(d) (Midili interrogatory responses); Trustee Ex. 461 ¶ 8 (Robins interrogatory responses); Trustee Ex. 435 ¶¶ 2 and 8(d) (Seidlitz interrogatory responses); Trustee Ex. 407 ¶ 8(d) (Gelles interrogatory responses).

44. *See, e.g.,* Trustee Ex. 438 ¶ 8 (Vicker interrogatory responses); Trustee Ex. 255 ¶ 8 (Crowfoot interrogatory responses); Trustee Ex. 376 ¶ 8 (Lehmkuhl interrogatory responses).

45. *See* UF ¶ 34; Trustee Ex. 143 ¶¶ 2 and 8(d) (Anzalone interrogatory responses); Trustee Ex. 148 ¶ 8(d) (Berkman interrogatory responses); Trustee Exs. 155 ¶ 8(d), 159 ¶ 8(d), 162 ¶ 8(d), 165 ¶ 8(d) (Bullock accounts interrogatory responses); Trustee Ex. 139 ¶ 8(d) (R. Kuhlman interrogatory responses); Laskey Dep. 22:23–23:5; Trustee Ex. 339 ¶¶ 2 and 8 (Leech interrogatory responses); Trustee Exs. 198 ¶ 8(d), 208 ¶ 8(d), 212 ¶ 8(d) (Linda Seigel accounts interrogatory responses); Trustee Exs. 286 ¶ 8(d), 296 ¶ 8(c) (Marks account interrogatory responses); Trustee Ex. 358 ¶ 8(d) (Matthews interrogatory responses); Trustee Exs. 201 ¶ 8(d), 205 ¶ 8(d) (Schwartz interrogatory responses); Trustee Exs. 215 ¶ 8(d), 219 ¶ 8(d), 255 ¶ 8(d) (Mendel Siegel accounts interrogatory responses); Trustee Exs. 232 ¶ 8(d), 236 ¶ 8(d) (Spevak interrogatory responses); Trustee Ex. 469 ¶ 8(d) (DeAngelo interrogatory responses); Trustee Ex. 313 ¶ 8(d) (Stoyka interrogatory responses); Trustee Ex. 351 ¶ 8(d) (Polselli interrogatory responses); Trustee Ex. 194 ¶¶ 2 and 8 (Midili interrogatory responses).

*bona fides* of those transactions. Moreover, we find that the fact that some Claimants originally filed claims for House Stocks, only to amend them to assert claims for Blue Chips, and that some failed to claim the Challenged Blue Chip Buys that the Hanover Brokers booked into their accounts, certainly calls into question whether the other Claimants were aware that their brokers had booked the Blue Chips into their accounts during the Final Week.

The trustee contends that we should reject the Claimants' assertions regarding the prices of the House Stocks and their professed concerns about the Short Sellers because the House Stock prices did not fall during the Final Week, *see* Trustee Ex. 72 (price charts), and because there was no adverse publicity about Hanover or the House Stocks during that period. Tr. 647:10–14; Trustee Ex. 55 (transcript of Dorfman report). Still, the posted prices of some of the House Stocks declined during the period from January 1 through February 24, 1995. Trustee Ex. 72 (reflecting decline in prices of All Pro Products units, American Toys stock, Envirometrics stock, Mister Jay stock, Panax units, and Porter McLeod stock). He also characterizes the Claimants' alleged motivation to sell their securities as unbelievable because they sold far more House Stocks during the Final Week than at any other time, some of them purchased Blue Chips which they had not purchased before from Hanover and most of them did so on February 24, 1995. The trustee concedes that it is difficult to demonstrate that a particular Claimant did not authorize a particular Challenged Trade, but he maintains that there is compelling circumstantial evidence that the Claimants did not authorize the trades, and learned about them from their brokers after the fact. He is correct that as factfinder we can draw critical inferences favorable to one party from circumstantial evidence

and reject direct evidence to the contrary, essentially for lack of credibility. *See Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir.1982); *see also United States v. Casilla*, 20 F.3d 600, 606 (5th Cir.) (stating that factfinder can reject testimony based on the incredibility of the explanation), *cert. denied*, 513 U.S. 892, 899, 949, 115 S.Ct. 240, 130 L.Ed.2d 163 (1994).[46]

To be sure, there is circumstantial evidence contradicting the Claimants' assertions that they authorized the Challenged Trades. The Hanover brokers clearly encouraged the Claimants to sell their House Stocks in Hanover's final days and to shift their investments into Blue Chip holdings and cash in amounts protected by SIPA. Even considering the circumstances, the fact that the Claimants shifted their holdings from House Stocks to Blue Chips en masse, particularly when their brokers were now actively recommending the trades, does not compel us to make the credibility determination that the trustee asks us to make, and to reject the Claimants' sworn testimony that they gave advanced authorization for the Challenged Trades. Thus, we find that the remaining Claimants have satisfied their burden of demonstrating that they authorized the Challenged Trades.

■ We turn to the trustee's contentions regarding the Challenged Blue Chip Buys. There is no dispute that Adler carried and maintained Hanover's proprietary accounts and that it cleared and settled Hanover's trades where Hanover was the buyer or seller. Moreover, there is no dispute that Hanover purported to buy all of the House Stocks underlying the Challenged Trades. Further, Adler's books and records show that Adler (i) debited the House Stocks out of the Claimants' accounts and into Hanover's proprietary account; and (ii) debited the cash (repre-

---

**46.** Thus, we reject Claimant Norman Bennett's assertion that we cannot disregard sworn testimony on the suspicion that the

person is lying. *See* Post–Trial Brief of Defendant Norman R. Bennett Br. at p. 6.

senting the price paid) out of Hanover's proprietary account and into their accounts. Still, the trustee contends that we must disallow the claims for the Blue Chips because the Claimants have not established that they had sufficient funds in their accounts to pay for the securities.

The trustee says that notwithstanding the entries in Adler's books and records, the Claimants did not have cash in their accounts to pay for the Blue Chips. He says that Hanover's scheme involved cash expected from the Challenged Sales (upon settlement) to "pay" for the securities, and, as such, there was no cash. He maintains that even if there had not been any fraud, the expected cash proceeds from the Challenged Sales would amount to a "claim for cash" under SIPC Rule 300.501(a), not cash in fact as required by SIPC Rule 300.502(a). Quoting the Congressional Record, he says that "when a customer sells securities, his claim from that time until settlement and delivery of the funds is a claim for cash." [47]

The Claimants acknowledge that under the Customer Agreement, customers purchasing securities had to have "previously uncommitted, immediately available funds in an amount sufficient to pay the purchase price" of the securities they were purchasing. *See* Trustee Ex. 66 (Customer Agreement) ¶ 4(b). They contend that Adler's books and records prove either that the cash necessary to purchase the Blue Chips was "uncommitted" and "immediately available" upon the "sale" of the House Stocks to Hanover, or, for those Claimants who executed Customer Agreements, Adler waived the condition. We find no merit to the Claimants' second

contention because waiver is the "intentional relinquishment of a known right", *see Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and the Claimants adduced no evidence showing that Adler knowingly or intentionally relinquished any provision under the Customer Agreements.

They also argue that the trustee is distorting the manner in which financial institutions maintain accounts by assuming a system of segregation and identification that does not exist. They contend that the House Stocks are "book-entry securities" that are maintained in Adler's name at securities depositories, and that a customer holds cash in his account because Adler entered a cash credit on its books and records in the customer's name, not because it has placed U.S. currency in a box labeled with the customer's name and account number. They say that cash never actually arrives to the customer's account and, as such, a "cash" entry in Adler's books is a "delivery" for purposes of determining whether the Claimants held cash in their accounts. In making this argument, they acknowledge that during the Final Week there was a five-day settlement rule in effect; *i.e.* the seller had to deliver the securities and the buyer had to pay for them within five business days. They say that while delivery by a seller had to be made on or before the fifth business day following the date of the transactions for trades to be completed in the regular way, the seller was not precluded from delivering securities prior to the settlement date and receiving cash if the buyer accepted the securities. [48] They maintain that this is what happened between the Claimants and

---

**47.** *See* Hearings Before the Subcommittee on Consumer Protection and Finance in Interstate and Foreign Commerce, 85th Cong. 1st Sess. 233 (1997) (testimony of the SEC).

**48.** It is undisputed that during the Final Week, the NASD rules provided for delivery of securities from the seller within five business days following the date of the transaction, *see* NASD Uniform Practice Code § 12(b), CCH NASD Manual, Uniform Prac-

tice Code ¶ 3512 (July, 1994), although the seller had the right to deliver securities prior to the day set for final settlement, subject to the buyer's acceptance. *Id.* § 12(d). Respecting the time for payment, the rules provided that the "party making delivery shall have the right to require the purchase money to be paid upon delivery by certified check, cashier's check, bank draft or cash." *Id.* § 13.

Hanover.[49] Citing *Murray v. McGraw (In re Bell & Beckwith)*, 821 F.2d 333 (6th Cir.1987), they say that the trustee misplaces his reliance upon the settlement date for the Challenged Sales to argue that no "cash" could have been held in the accounts.

The record does not support the Claimants' assertion that there was cash in their accounts before the settlement date of the trades. The evidence shows—and the Claimants' expert concedes—that the cash proceeds of the sale of a security are not available until the settlement date. *See* Tr.(Press) 49:15–50:11 (explaining settlement process), 50:12–19; 1997 Piazza Dep. 115:23–25, 198:8–11; Pallante Dep. 115:19–25; Tr.(Lowry) 576:15–16, 574:18–575:10 (Claimants' expert acknowledging that customer who sells securities is paid for securities on settlement date, and that while trade date balance in Adler's accounting records reflects pending transactions, settlement date balance indicates actual balance posted to customer account as of settlement date). Moreover, although the Claimants assert that the proceeds were in Adler's account because the rule does not preclude settlement of the trades and delivery of the House Stock proceeds prior to the expiration of the five-day period, they adduced no evidence to show that any of the Challenged Trades settled, and the experts agree that none of the Challenged Trades booked in the usual way settled. *See* Tr.(Press) 57:18–22; Tr.(Lowry) 665:17–667:8; Norris Decl. ¶ 71 n.13. They also agree that Adler's accounting records merely show pending transactions and that the booking of a transaction does not mean that the transaction had settled. *See* Tr.(Press) 49:15–50:11; Tr.(Lowry) 576:15–16, 574:18–575:10.

The Claimants also argue that it is irrelevant whether Hanover's proprietary account had a negative balance when it was debited for the purchase of the House Stocks because Adler was and had been for weeks keeping Hanover in business by financing all of its House Stock purchases. They contend that Adler paid for the Challenged Trades by increasing Hanover's outstanding debit to it by debiting Hanover's then negative proprietary account, and delivering the cash to the Claimants by making cash credits to their accounts. In essence, the Claimants suggest that Adler financed Hanover's acquisition of the House Stocks from them, and that the proceeds of those loans were the "cash" in their accounts that they used to purchase Blue Chips. This argument is unavailing. Even if Adler could be deemed to have financed Hanover's acquisition of the House Stocks from the Claimants, Hanover's promise to repay those loans was clearly of little value under the circumstances. Thus, for the same reason that we can avoid Adler's obligation to pay for the Challenged Trades as a fraudulent conveyance (which we discuss below), so too can Adler's extension of financing to Hanover in exchange for Hanover's worthless promise to repay those funds.

Finally, the Claimants argue that the trustee's position that no cash had been delivered to their accounts creates an "absurd" distinction directly contrary to the purpose of SIPA and the Series 500 Rules; *i.e.*, a customer has a legitimate expectation to receive the cash proceeds after ordering the securities sold, but no legitimate expectation to receive securities if he orders both the sale of the securities and the purchase of securities using the proceeds. Again citing *Bell & Beckwith*, they say that SIPC enacted the Series 500 Rules to insure that a customer's legitimate expectations in making a trade would be satisfied. Thus, they maintain that even if Adler did not effectuate the delivery of actual cash to them, the credit of cash entered by Adler constitutes "cash in

---

**49.** Thus, they maintain that Hanover effected delivery by debiting the House Stocks from the Claimants' accounts and crediting them to Hanover's proprietary accounts. Accepting delivery, Hanover allegedly paid for the House Stocks through a debit to its account and a corresponding cash credit to the Claimants' accounts, both maintained by Adler.

the account" for purposes of SIPC Rule 300.502. They say that in this way even multi-faceted trades will be treated as completed and preserve for customers the benefit of the bargain. They assert that while the trustee proposes to make the distinction between a credit and delivery to deny their claim to the Blue Chips, the language of the rule does not impose such a requirement, since it references on "cash in the account". Moreover, they say that the distinction defeats the purpose of SIPA and the Series 500 Rules. The Claimants argue that the bargain that they arranged prior to the Filing Date should be treated as if the trades had been completed and thereby leave them, as much as possible, unaffected by Hanover and Adler's collapse.

 SIPA protection is limited. *See* SIPA § 78fff–3(a) and *supra* n. 2; *see also In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 273–74 (Bankr.S.D.N.Y.1996) (SIPA protects customers against losses occasioned by a broker's liquidation but was not designed to compensate a customer for market losses suffered during the pendency of a SIPA liquidation). Rule 300.502 refers to "cash", not expected cash in the form of a contingent credit. Under Rule 300.501, a customer who sells securities has a "claim for cash". *See* 17 C.F.R. § 300.501(a); *see also* Hearings before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 233 (1977) ("when a customer sells securities, his claim from that time until settlement and delivery of the funds is a claim for cash"). The Claimants misplace their reliance on *Bell & Beckwith*,

821 F.2d 333, to support their contention that we must deem the credits posted into their accounts on the trade date to be the equivalent of "cash" for purposes of Rule 502. That case does not address the issue before us—whether a customer has a claim for securities if he simultaneously sold stocks and purchased other stocks with the expected proceeds. It does stand for the proposition that the status of a claim— either for cash or for securities—is generally fixed upon the filing of the SIPA proceeding.[50]

Although certain Claimants have made a prima facie showing that they hold preferred SIPA customer claims for "cash" representing the proceeds of the Challenged Sales, they have not established the prima facie validity of their claims for "securities" in the form of the Blue Chips because the Challenged Sales never settled. A "claim for cash" is not "cash" within the meaning of SIPC Rule 300.502.

### Avoiding The Challenged Trades As Fraudulent Transfers Under The Bankruptcy Code

 Even assuming, *arguendo*, that all Claimants could make *prima facie* showings that they hold preferred SIPA claims for the cash and Blue Chips in their accounts, we agree with the trustee that he can avoid the Challenged Trades as intentionally and constructively fraudulent transfers under the Bankruptcy Code. Indeed, as we will discuss, one court in this district confronted almost identical facts and circumstances, and concluded, as we do, that trades booked by unscrupulous brokers seeking to maximize SIPA protection for certain customers are avoidable

---

**50.** In *Bell & Beckwith*, the claimants sold securities, their brokerage firm failed before settlement of the trades, and because the securities thereafter increased in value, the customers wanted the securities back. Thus, they argued that they had a "claim for securities" (*i.e.* the securities they sold) rather than a "claim for cash". *Id.* at 334–35. The court held that the customers had a claim for cash. *Id.* at 340. The securities they were selling were already in their accounts. Thus, there

was no question as to their performance. The mere fact that the SIPA filing intervened before the settlement date did not unwind the customers' sell orders. Although this case predates the promulgation of the Series 500 Rules, the result would be the same under those rules. Under Rule 501(a)(1), a customer has a claim for cash in his account "held securities" and the debtor had sent written confirmation that he securities had been sold.

under §§ 548 and 544 of the Bankruptcy Code. *See SEC v. S.J. Salmon & Co.,* 72 Civ. 560, slip. op. (S.D.N.Y. Aug. 8, 1973) ("*Salmon # 1*"); *SEC v. S.J. Salmon & Co.,* 72 Civ. 560, slip. op. (S.D.N.Y. Feb. 5, 1974) ("*Salmon # 2*").

### Fraudulent Conveyance under 11 U.S.C. § 548(a)(1)(A) [51]

Section 548(a)(1)(A) of the Bankruptcy Code states that a trustee

> may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor ... if the debtor voluntarily or involuntarily ... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred, [or] indebted

> \* \* \* \* \* \*

11 U.S.C. § 548(a)(1)(A). Under § 550 of the Bankruptcy Code,

> to the extent that a transfer is avoided under section ... 548 ... of [title 11], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of the property, from—
>
> (1) the initial transferee of the transfer or the entity for whose benefit such transfer was made . . . .

*Id.* § 550(a).

■ Thus, to prevail on this claim, the trustee must show that (i) Hanover intend-

ed to hinder, delay or defraud Adler's creditors or SIPC, (ii) Hanover dominated or controlled Adler's disposition of its property, and (iii) the Claimants are responsible under applicable law for Hanover's fraudulent acts as the ultimate beneficiaries of the final week trades. *See Ensminger I,* 218 B.R. at 705. Irrespective of the burden of proof to be applied,[52] we find that the trustee is entitled to judgment under §§ 548 and 550 of the Bankruptcy Code avoiding the Challenged Trades.

### Hanover Intended to Hinder, Delay or Defraud Adler's Creditors

■ The evidence shows that during the Final Week, Hanover's principal brokers (Ageloff, Catoggio, DiBella, Lembo, Mancino, Scarfone, Wolf, Ashenfarb and Danny Garber) sold House Stocks and purchased Blue Chips for themselves and their family and friends, to insure that when Hanover failed, they would hold preferred SIPA claims. For example, those brokers historically held large amounts of House Stocks, but liquidated substantially all their securities and acquired Blue Chip securities during the Final Week. Trustee Ex. 803 (summary exhibit showing when certain brokers owned House Stocks). They went to great lengths to do the same for their friends and family, and for the most part, booked the Blue Chip buys in accounts where it was expected that the proceeds from the House Stock sales would exceed $100,000 in cash. *See* Trustee Ex. 805 (trading summary by broker);

---

**51.** The trustee's application seeks relief under § 548(a)(1) of the Bankruptcy Code. However, after this matter was submitted, Congress amended the statute and § 548(a)(1)(A) replaced § 548(a)(1). *See* Religious and Charitable Donation Act of 1998, Pub.L. No. 105–183. There is no substantive difference between the two sections.

**52.** Courts disagree as whether a party seeking to avoid a transfer under § 548(a)(1)(A) must prove the elements of his claim by clear and convincing evidence or merely a preponderance. *See, e.g., Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408,

418 (Bankr.D.Ariz.1994) (preponderance); *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.),* 130 B.R. 170, 179 (Bankr.D.Vt. 1991) (clear and convincing). However, particularly because fraudulent intent is seldom susceptible to direct proof, *see Salomon v. Kaiser (In re Kaiser),* 32 B.R. 701, 704 (S.D.N.Y.), *aff'd,* 722 F.2d 1574 (2d Cir.1983), we will look to the totality of the circumstances to infer whether fraudulent intent exists. *See Hirsch v. Steinberg (In re Colonial Realty Co.),* 226 B.R. 513, 522 (Bankr. D.Conn.1998) (citing *Salomon,* 722 F.2d at 1582).

Cl. Ex. 54 (trade files); Cl. Ex. 55 (activities file).[53] Those brokers were aware of the nature and extent of the protection SIPA offers to customers of failed broker-dealers. *See* Trustee Ex. 53 (sample broker study guide for registered representative accreditation which includes section setting forth the specific SIPA coverage limitations); Trustee Ex. 65 ¶ 14 (customer monthly statement which includes notice of the SIPA coverage for cash and securities); *see also* Tr.(Lowry) 695:5–25, 697:11–16, 698:11–699:14 (Claimants' expert Lowry acknowledging that evidence shows that at least some Claimants were told by their Hanover brokers that they needed to shift their holdings to maximize SIPA coverage). After Hanover closed, some of them admitted that they took their actions to vest the customers with preferred SIPA claims. Norris Decl. ¶¶ 76–82; Trustee Ex. 28 (customer admissions).[54]

---

**53.** For example, on February 14, 1995, DiBella sold all of the House Stock positions of Joan Henning, who he was then dating and is now his spouse. Trustee Ex. 805 ¶ 1; 1995 DiBella Dep. 97:13–16, 98:3–16. On February 21, he wired all of the cash ($136,000) out of his Hanover account and booked a purchase of 1,500 shares of Ford stock into Henning's account. Trustee Ex. 805 ¶ 1. That same day he sold all of the House Stock of his best friend Steve Anzalone, wired $50,000 out of Anzalone's account and booked a purchase of $265,000 of Ford in the account. *Id.;* Anzalone Dep. 27:18–28:9. Likewise, on February 17, 1995, Hanover broker John Lembo sold the House Stocks in his Hanover account as well as the account of Associated Auto Salvage, which was owned or controlled by his father. On the next business day, February 21, Lembo (i) used the proceeds from his own House Stocks sales and other cash in his account to purchase $137,123 in Birmingham Steel stock, (ii) used the proceeds from the sale of Associated Auto Salvage's House Stocks to purchase $78,777 of Birmingham Steel and sold all of the House Stocks in Janice Lembo's account, generating $13,267 in cash. Trustee Ex. 805 ¶ 14; Tr. 316:3–9; Lembo Dep. 50:16–24 (Janice Lembo is related to John Lembo).

On February 17, 1995, Hanover broker Mark Mancino attempted to transfer $160,000 out of his Hanover account. Over the next two business days, February 21 and 22, he sold all of the House Stocks in the account of his mother Leona Seidlitz. Just prior to February 22, Mancino stopped a check in the amount of $134,000 that he sent to Adler, resulting in a $57,000 debit in his Hanover account. That debit was transferred to a Hanover proprietary account the day before Hanover closed. Trustee Ex. 805 ¶ 27; Trustee Ex. 435 ¶ 2 (Seidlitz interrogatory response acknowledging that Seidlitz is Mancino's mother).

Broker Randy Ashenfarb sold $33,000 in House Stocks held in the account of his stepmother Barbara De Angelo on February 21, 1995 and used the proceeds to purchase IBM stock. The next day, he sold all of the House Stocks in his personal accounts (one in his own name and one as trustee for the benefit of his daughter) and the remaining House Stocks in De Angelo's account, and purchased $9,200 in Blue Chips in his daughter's account. Trustee Ex. 805 ¶ 34; Trustee Ex. 469 ¶ 16 (De Angelo interrogatory response indicating that De Angelo is Ashenfarb's stepmother). Hanover broker Chris Wolf had no House Stocks in his account on and after February 17, 1995. However, on February 21, he attempted to transfer $55,000 out of his account and on February 22, he sold a bond out of his account. Wolf purchased 1,916 shares of IBM for his account on February 24, 1995. Trustee Ex. 805 ¶ 44. Hanover broker Joseph Scarfone sold all of the House Stocks in his personal account on February 21, 1995. *Id.* at ¶ 51.

Hanover trader Robert Catoggio booked a purchase of 1,100 shares of IBM in the account of his mother Mildred Catoggio on February 21, 1995. *Id.* at ¶ 59; Catoggio Dep. 59:17–21 (Mildred Catoggio is Robert Catoggio's mother). He also sold all the House Stocks in the accounts of his boyhood friend Anthony Siclari's children, and used all but $9,400 of the cash held in Siclari's personal account to purchase almost $400,000 in Amgen stock. Trustee Ex. 805 ¶ 60; Nov.1996 Siclari Dep. 19:13–22 (Catoggio is a childhood friend of Anthony Siclari).

**54.** For example, in a letter to the trustee, Jay Harris stated:

I must call the following to your attention which I have no way of confirming except what was said to me by the Hanover Sterling broker who handled my account, and that is prior to Hanover/Adler ceasing business, he liquidated all my remaining holdings at Hanover to protect me on price ... and to further protect me, he placed an order to purchase Dell Computer to cover any cash that might be in the account, since if the transactions were consummated, my

cash would exceed the insured maximum if $100,000.

Trustee Ex. 28 (customer admissions; April 14, 1995 Harris letter). In a subsequent declaration, Harris confirmed that he did not have a discretionary account and that his Hanover broker, Danny Garber, purchased the Dell stock without his authorization. *Id.* (November 15, 1996 Harris Decl. ¶ 6).

Jerome Shinkay stated on several occasions that brokers DiBella and Scarfone had revealed that the criterion for Blue Chip buys was whether the account had a cash position in excess of $100,000. In letter objecting to the trustee's determination of his claim, Shinkay stated that Scarfone:

> told me that Hanover Sterling had closed their doors, and that my money would be put in either I.B.M. or Ford Motor Co.... [A]pproximately 30 days later, he mentioned that since my proceeds were less than $100,000, that my money would remain in a cash account, and would remain safe and insured.

Trustee Ex. 303 (March 21, 1996 letter from Shinkay). Several months later, Shinkay executed a declaration confirming that (i) Scarfone initially told him Ford or IBM had been bought for his account, (ii) Scarfone later told him "because the proceeds of the sale of [his House Stocks] was less than $100,000, there was no need for [him] to purchase Ford or IBM" and therefore that the House Stock sale proceeds had been left in cash, (iii) Scarfone said that his practice as well as DiBella's practice during Hanover's final days was to leave sales proceeds in cash if they were less than $100,000, but to buy Ford or IBM is the cash position was greater than $100,000 because of the insurance limitations, and (iv) DiBella confirmed what Scarfone had told Shinkay. Trustee Ex. 305 (November 1996 Shinkay Decl.). Shinkay confirmed all of the foregoing at his deposition. *See* Shinkay Dep. 14:5–8, 67:20–58:10, 60:22–23.

David Sulman, attorney-in-fact for Claimant Dr. Morris Sulman, stated that Scarfone told him that "stock had been purchased ... in [Sulman's] account so as to maximize SIPC protection." Trustee Ex. 318 ¶ 2. Scarfone also reportedly told Sulman that "Hanover had seen the short raid coming and that as a defensive maneuver they had sold client positions and purchased Blue Chip stocks." *Id.* Mr. Sulman confirmed his interrogatory responses at his deposition. Sulman Dep. 59:15–20.

John Cumberlidge testified that DiBella discussed with him the need to stay within the SIPA cash limit shortly before Hanover went out of business, and then called him again shortly after Hanover's collapse to go over the system of SIPA coverage again. Cumberlidge Dep. 114:20–115:15. Donald Bliss testified

during his deposition that DiBella called him the day after Hanover closed to inform Bliss that DiBella had sold his House Stock positions and bought Ford stock with the proceeds. Bliss Dep. 17:4–18:7. As noted previously, Bliss had not ordered the sale of his House Stocks or the Ford purchase. *Id.* It later turned out that Bliss' account was actually booked with a purchase of Apple stock, which Bliss had not authorized either. Trustee Ex. 769 (favored customer trade file for account no. 37–001084). According to Bliss, DiBella said that his "actions were intended to protect my account." Trustee Ex. 245 ¶ 2(1) (Bliss interrogatory responses). Bliss testified that DiBella indicated that it was urgent that Bliss' House Stocks be sold: [T]he urgency related to the collapse in value of these stocks that he had recommended that I purchase and that I had purchased....[a]nd he had acted quickly to sell them before they lost their value. Bliss Dep. 32:21–33:2. Either in this telephone call or a later one, DiBella "made reference to limits of SIPC protection for securities and cash." Trustee Ex. 245 ¶ 2(1); Bliss Dep. 19:18–20:6, 25:18–26:7. Bliss' brokers were DiBella and Scarfone. Trustee Ex. 245 ¶ 1. After Hanover closed, they urged him to open a new account with them. Bliss Dep. 42:18, and "[t]hey did believe that I should be appreciative of the fact that they had taken action to sell these stocks and protect my account at Hanover." *Id.* at 19–21.

Dennis Crowfoot testified that he telephoned DiBella on February 24, 1995 and after DiBella recommended that he purchase Cisco Systems stock, Crowfoot, who did not have sufficient cash to do so, directed DiBella to sell his House Stocks and use the proceeds to purchase Cisco. Crowfoot Dep. 24:19–25:12, 37:1 3–21. After Hanover closed, Crowfoot wrote in a letter to DiBella:

> Joe, after your last telephone call I *now* appreciate what you have done for me ... But looking at it from *my* point of view. My last statement from Hanover Sterling was December *1994*. I had also not heard from anybody, it was as if Hanover Sterling and you had disappeared? ? ?. I could find out *nothing*. Imagine my panic? ? ?. On eventually talking to a member of the New York Stock Exchange did I find out what had happened. They offered to help me with my claim. What was I to do? You then eventually contacted me with your explanation. To say the least I was confused on what to do. I now have decided to transfer my account to that major wire company who is a member of the New York Stock Exchange for them to rescue my money and return it to me in the U.K. I will *not* forget you Joe, and as soon as my Note

Moreover, after Hanover closed, many of the brokers went to work for one of four firms: The Heritage Group, Euro Atlantic Securities, Norfolk Securities and PCM Securities. They solicited at least 34 of Hanover's former customers in an effort to retain their business.[55] Further, all of the Hanover principals and the brokers whose customers allegedly benefitted most from

position has been sorted out and my finances settled *I shall contact you again.*
Trustee Ex. 258 (original all capitalized). DiBella, who had then left Hanover, responded in relevant part as follows:

[L]et's put this disheartening experience behind us, and look forward to a more exciting future. And by the same token, Dennis, let's not forget that no other broker would have done what I did for you in order to protect your investments. . . .

Trustee Ex. 259 (June 19, 1995 letter). Crowfoot's account was booked with a sale of $356,556 during Hanover's final week of business and a $261,823 Blue Chip buy on Hanover's final day of operations. Trustee Ex. 769 (favored customer trades file, account no. 37–002460). At his deposition, Crowfoot testified that his letter to DiBella was designed primarily as a polite way to get rid of him, and that he in fact had no further contact with DiBella. Crowfoot Dep. 54:15–19, 55:22–25.

**55.** Those former customers are Allan Abelson, Gary Anderson, Donald Bliss, Michael Bobal, Brewster Carroll, Abe Cooperman, Scott Creasman, Thomas Crouch, Dennis Crowfoot, John Cumberlidge, Hopewell Darneille, Barbara De Angelo, Donald Doty, Steve Ellenburg, Barbara Fochi, Joseph Ganem, Raymond Gehris, Mike Gelles, David Jackson, Robert Jurgensmeyer, Daniel Kodsi, David Laskey, Kenneth Leech, Daniel Leiss, Giovanni Pilla, Myron Reiser, Leona Seidlitz, Jerome Shinkay, Mendl Siegel, Stuart Smith, Dr. Michael Stoyka, Dr. David Sulman and William Thompson. *See* Trustee Ex. 136 ¶¶ 2 and 14 (Allan Abelson); Trustee Ex. 370 ¶ 2 (Gary Anderson); Trustee Ex. 245 ¶ 2(3) (Donald Bliss); Trustee Ex. 249 ¶¶ 2 and 14 (Michael Bobal); Carroll Dep. 57:4–18 (Brewster Caroll); Trustee Ex. 609 ¶ 2 (Abe Cooperman); Trustee Ex. 639 ¶¶ 2 and 14 (Scott Creasman); Trustee Ex. 252 ¶ 2 (Thomas Crouch); Crowfoot Dep. 52:17–22 (Dennis Crowfoot); Trustee Ex. 172 ¶ 2 (John Cumberlidge); Trustee Ex. 263 ¶¶ 2 and 14 (Hopewell Darneille); Trustee Ex. 469 ¶ 2 (Barbara DeAngelo); Trustee Ex. 184 ¶¶ 2 and 14 (Donald Doty); Trustee Ex. 273 ¶ 2 (Steve H. Ellenburg); Trustee Ex. 276 ¶ 2 (Barbara Fochi); Trustee Ex. 279 ¶¶ 2 and 14 (Joseph Ganem);

their actions refused to testify about their activities and instead, invoked their Fifth Amendment privileges against self-incrimination,[56] and some of them have pleaded guilty to, or have been convicted of, violations of the securities laws, including, among other things, market manipulation of House Stock prices.[57]

Trustee Ex. 283 ¶ 2 (Raymond Gehris); Trustee Ex. 407 ¶¶ 2 and 14 (Mike Gelles); Jackson Dep. 99:4–100:3 (David Jackson); Trustee Ex. 326 ¶ 14 (Robert Jurgensmeyer); Trustee Ex. 669 ¶ 2 (Daniel Kodsi); Laskey Dep. 33:16–34:3 (David Laskey); Trustee Ex. 339 ¶ 14 (Kenneth Leech); Trustee Ex. 190 ¶¶ 2 and 14 (Daniel Leiss); Trustee Ex. 194 ¶¶ 2 and 14 (Arther Midili); Trustee Ex. 429 ¶ 2 (Giovanni Pilla); Trustee Ex. 300 ¶ 2 (Myron Reiser); Trustee Ex. 435 ¶ 14 (Leona Seidlitz); Trustee Ex. 304 ¶ 14 (Jerome Shinkay); Siegel Dep. 29:10–17, 125:13–22 (Mendl Siegel); Trustee Ex. 310 ¶ 14 (Stuart Smith); Trustee Ex. 313 ¶¶ 2 and 14 (Dr. Michael Stoyka); Trustee Ex. 318 ¶ 2 (Dr. David Sulman); Trustee Ex. 658 ¶ 2 (William Thompson).

**56.** *See generally* Ageloff Dep.; 1997 Ashenfarb Dep.; Catoggio Dep.; 1997 DiBella Dep.; D. Garber Dep.; R. Garber Dep.; Lembo Dep.; Mancino Dep.; Rusnak Dep.; Scarfone Dep.; Wolf Dep. Lowell Schatzer, Hanover's titular head, similarly refused to testify concerning the events in question, effectively absconded and allowed a $50 million default judgment to be entered against him. Trustee Ex. 772 (Lowell Schatzer default judgment and supporting affidavits).

**57.** On September 21, 1995, the SEC barred Catoggio from the securities industry and fined him for his role in manipulating the price of All Pro Products, Inc., one of the House Stocks. Trustee Ex. 43 (SEC administrative release, file no. 3–8824, September 22, 1995; hereinafter referred to as the "SEC All Pro Release"). On October 10, 1995, an NASD arbitration award was entered against Wolf in favor of a customer in connection with a dispute over unauthorized trading and account related errors or overcharges. Trustee Ex. 43, Bates No. NASD PUBLIC 0032–36 (NASD notice). On December 18, 1996, Earl Rusnak was fined and censured by the NASD for conducting a securities business without maintaining minimum net capital requirements. On October 5, 1995, and NASD arbitrator awarded a customer $2,078 due to Rusnak's failure to execute trades. Trustee Ex. 43, Bates No. NASD PUBLIC 0014–15 (NASD Notice).

That furthers our conclusion that Hanover and its brokers intended to defraud Adler and its customers. *See Ensminger IV*, 1998 WL 160036, *8–12 (admitting in part evidence of brokers' prior misconduct to show intended to defraud Adler and SIPC in connection with Challenged Trades); *Ensminger V*, 1998 WL 182808, *6–9 (admitting evidence of brokers' invocation of Fifth Amendment for purpose of drawing inference that they intended to defraud by their actions).

No one disputes that the stability of the House Stocks prices notwithstanding the illegal short selling is persuasive evidence of a massive market manipulation, and that Hanover engaged in criminal violations of the federal securities laws to avoid being closed by Adler. Likewise, no one disputes that while Hanover's brokers' immediate purpose was to deceive Adler, they plainly intended for Adler's creditors, including SIPC, to be the ultimate victims of their fraud. That is because, to the extent that we do not uphold the trustee's determinations regarding the Challenged Trades, SIPC will have to pay for them, subject to its statutory limits. It would then be subrogated to the Claimants' claims against Adler's estate, as it is already subrogated to the claims of other former customers that it has paid to date. *See Ensminger I*, 218 B.R. at 695–96 (citing SIPA §§ 78fff–3(a) and 78fff–2(c)(1)). In accordance with § 548(a)(1)(A), SIPC qualifies as an "entity to which the debtor ... became ... after the date that such transfer was made or such obligation was

---

On June 24, 1992, the NASD ordered Catoggio to pay an award to a customer who accused him of misrepresentation and unauthorized trading. On February 28, 1991, Catoggio was fined and suspended after the NASD found that he had effected transactions in customer account without their knowledge or consent. Trustee Ex. 43, Bates No. NAS 0109–0111 (NASD Catoggio notice). In an indictment filed May 1, 1997 in the United States District Court for the Eastern District of New York, Catoggio was charged with mail and wire fraud, criminal violations of SEC Rule 10b–5 and commercial bribery in connection with a fraudulent scheme to manipulate the market in the securities of First Colonial Ventures, Ltd. Catoggio's co-defendants included Joseph DiBella. Trustee Ex. 68 (indictment). In response to that indictment, on January 26, 1998, Catoggio pleaded guilty to securities fraud, stating:

> I conspired with Joseph DiBella to violate the securities law of the United States by agreeing to manipulate the price of the stock of First Colonial Ventures, Ltd., a publicly-traded company. The way I did it was by agreeing to pay someone, who I later learned was an F.B.I. agent, to buy the stock on behalf of his customers. This would create a demand for the stock and artificially inflate the price of the stock. I did this knowingly and willfully, knowing that it would violate the securit[ies] law.

Trustee Ex. 69 p. 43:18–44:2 (guilty plea allocution). At the same hearing, Catoggio's attorney stated that DiBella and Catoggio "caused the market price for [the same publicly traded company] to be inflated by market manipulation." *Id.* at 44:15–16. As noted,

DiBella was indicted along with Catoggio. He also pleaded guilty to securities fraud:

> I conspired with Joseph DiBella to violate the securities law of the United States by agreeing to manipulate the price of the stock of First Colonial Ventures, Ltd., a publicly-traded company. The way I did it was by agreeing to pay someone, who I later learned was an F.B.I. agent, to buy the stock on behalf of his customers. This would create a demand for the stock and artificially inflate the price of the stock. I did this knowingly and willfully, knowing that it would violate the securit[ies] law.

*Id.* at 24:17–25:1.

On May 6, 1997, the NASD barred Ronan Garber from the securities industry and fined him $50,000 for using manipulative, deceptive and other fraudulent practices in connection with trading in the House Stock Eagle Vision. The NASD found that Ronan Garber, along with Catoggio and Schatzer, made numerous misstatements over a three month period, that the misstatements were part of a larger scheme to manipulate the market for the stock, and that the misrepresentations as to the market for the stock were material. Trustee Ex. 48, Bates No. NAS 0098–0106 (NASD Eagle Vision order). Ronan Garber was also barred from the industry for his participation in the All Pro stock manipulation. Trustee Ex. 48 (SEC All Pre Release). On July 15, 1997, Christopher Wolf had his license revoked by the State of Georgia for making untrue statements in an application for registration as a broker. Trustee Ex. 43, Bates No. NASD PUBLIC 0033–36 (NASD notice).

incurred, indebted." *See Gibson v. United States (In re Russell)*, 927 F.2d 413, 419 (8th Cir.1991) (noting § 548(a)(1) is satisfied by intent to hinder, delay or defraud future creditors); *European Amer, Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 938 (Bankr.S.D.N.Y.1993) (same). Hanover plainly intended to hinder, delay and/or defraud Adler's creditors.

***Hanover Dominated or Controlled Adler's Disposition Of Its Property***

 After joining Adler's roster of introducing brokers in early October of 1994, Adler created a direct computer link with Hanover. Norris Decl. ¶ 19. Hanover brokers wrote trade tickets for their customers and then bought them to Hanover's trading desk. Thereafter, the clearing and settlement process varied depending upon whether the trade involved House Stocks or other securities. For House Stocks, Hanover's trading desk entered the information on the trading tickets into the computer and automatically transmitted the trading information to Adler. *Id.* Hanover entered trades involving Blue Chip securities (i.e. any security other than a House Stock), into Adler's system in one of two ways. If the security was listed on NYSE or the American Stock Exchange, the Hanover trading desk called Adler's trading desk for the price, and Adler's trading desk executed and entered the trade into its computer system. For all unlisted Blue Chip securities (*i.e.* stock traded through NASDAQ), Hanover independently obtained a price for the securities, and then entered and executed the trade through its computer. *Id.* Those trades were not booked into Hanover's customers' accounts until the evening of the day on which Hanover made them, and were reflected in Adler's computer system the next morning. *Id.* and n. 2. Thus, at a mechanical level, Hanover controlled what Adler knew about its customers' trading. *See id.* ¶ 19–21. Adler did not select the Hanover trades which were entered on its books and did not monitor the trades on a real time basis. *See* Cohan Dep. 111:8–11; Sanacore Dep. 45:2–46:12; W. Giordano Dep. 119:7–22. Unless Adler took affirmative steps otherwise, the trades Hanover unilaterally input automatically settled. *See* 1997 Piazza Dep. 118:20–25, 199:5–8.

No one disputes that Adler's processing of trades was largely automatic upon Hanover's submission of trading data to Adler. The trustee contends that Hanover's domination and control of Adler is inherent in the clearing process and maintains that it was the automatic registration of the securities in Adler's trading system, coupled with Hanover's ability to book the Challenged Trades during the Final Week, that enabled Hanover to dominate and control the process that left cash and Blue Chip entries in the Claimants' accounts.

 Although § 548(a)(1)(A) speaks of the debtor's intent to hinder, delay or defraud creditors, we will impute to the debtor the fraudulent intent of a transferee of the debtor's property when the transferee is in a position to dominate or control the debtor's disposition of its property. *See Ensminger I*, 218 B.R. at 704. Adler and Hanover had different officers, directors, shareholders and employees and none of Hanover's principals, brokers or traders were Adler insiders. The Claimants contend that on those undisputed facts alone, we must conclude that Hanover did not dominate or control Adler's clearing of the Challenged Trades. However, in *Ensminger I*, we held that the fact that Hanover is not an "insider" of Adler, does not preclude us from imputing Hanover's fraudulent intent to Adler, provided that it dominated and controlled the disposition of Adler's property. 218 B.R. at 704. We find no basis to alter that conclusion because the critical consideration under § 548(a)(1)(A) is whether the transferee dominates and controls the disposition of the debtor's property, not whether it holds a particular title or position of authority at the debtor. *See, e.g.,* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1], at p. 548–24 (15th ed. rev.1999) ("When the transferee

or obligee is in a position to dominate or control the debtor's disposition of his property, however, his intent to hinder, delay, or defraud creditors many be imputed to the debtor so as to render the transfer fraudulent within section 548(a)(1), regardless of the actual purpose of the debtor transferor"); *see also Young v. Higbee,* 324 U.S. 204, 210, 65 S.Ct. 594, 89 L.Ed. 890 (1945) (the purpose of the Bankruptcy Code, and particularly its avoidance provisions, is to bring about a ratable sharing among creditors in estate property); *Pereira v. Goldberger (In re Stephen Douglas, Ltd.),* 174 B.R. 16, 19 (Bankr.E.D.N.Y. 1994) (same). Moreover, none of the cases that the Claimants cite holds that the transferee must be an insider of the debtor for the court to impute its fraud to the debtor.[58]

**58.** Claimants rely on cases decided under both the Bankruptcy Code and the former Bankruptcy Act. In each case, the court avoided a conveyance of a debtor's property as a fraudulent transfer, after imputing the fraud of an insider who dominated and controlled the disposition of that property to the debtor. They cite the following Code cases: *Consove v. Cohen (In re Roco Corp.),* 701 F.2d 978, 984 (1st Cir.1983) (imputing to debtor fraudulent intent of transferee of $300,000 promissory note and security interest because "as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property"); *Carmel v. River Bank America (In re FBN Food Services, Inc.),* 175 B.R. 671, 686–88 (Bankr. N.D.Ill.1994) (shareholder of debtor through its representative dominated and controlled two other shareholders one of which was debtor's president in order to direct transfer of money to its subsidiaries), *aff'd,* 185 B.R. 265 (N.D.Ill.1995), *aff'd and remanded,* 82 F.3d 1387 (7th Cir.1996); *Hunter v. Society Bank & Trust (In re Parker Steel Co.),* 149 B.R. 834, 855 (Bankr.N.D.Ohio 1992) (individual who was debtor's 50% shareholder and actively involved in debtor's operations directed repayment of debtor's loan which he had guaranteed "was in a position to control the disposition of the Debtor's property and benefitted from Debtor's repayment of the line of credit and term note"); *Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats),* 144 B.R. 451, 459 (Bankr.D.N.D.1992) (noting that "[t]his situation normally arises is situations where the transferee is the Debtor's sole or dominant shareholder" and that "vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee"); *Freehling v. Nielson (In re F & C Services, Inc.),* 44 B.R. 863, 868 (Bankr.S.D.Fla.1984) ("Where principals of a debtor attempt to transfer corporate assets to a newly credited corporate entity, which they also control, the transaction is fraudulent when the new corporation is a mere continuation of the debtor, controlled by the same persons, and made up essentially of the same assets and resources as the old corporation"); *Moore v. Grasso (In re Formaggio Mfg., Inc.),* 23 B.R. 688, 690–91 (Bankr.D.R.I.1982) (where president and sole shareholder caused the debtor to issue two checks to him, his fraudulent intent was imputed to debtor); *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.),* 22 B.R. 166, 182 (Bankr.E.D.N.Y.1982) (fraudulent intent found "where a transferee in a position to dominate or control the debtor's position of its property has arranged for the corporation to incur an obligation many times greater than and benefit received, the result of which was the corporation's insolvency"). They rely on the following Act cases: *Tatle v. Schmidt (In re Peacock Food Markets, Inc.),* 108 F.2d 453 (7th Cir.1939) (mortgagee's actual intent to hinder, delay or defraud imputed to debtor where insisted upon mortgage at time when knew debtor was insolvent), *cert. denied,* 309 U.S. 676, 60 S.Ct. 714, 84 L.Ed. 1021 (1940); *Lincoln Theatres Corp. v. Fleming,* 66 F.2d 441 (4th Cir.1933) (where part owner and director of corporation who was endorser on its notes and knew of corporation's insolvency arranged to substitute claimant corporation owned by him and family for bankrupt as debtor on notes and to secure claim by trust deed lien on bankrupt's assets, thus releasing director from indorsement, incurrence of obligation by corporation held to be actual fraudulent conveyance); *Lytle v. Andrews (In re Pollard Oil Co.),* 34 F.2d 252 (8th Cir.1929)(intent of former stockholder who retained ability to dominate and control corporation's disposition of assets imputed to debtor corporation); *Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966) (where officer of corporation who by reason of his domination and control caused corporation to execute and deliver to him a chattel mortgage to secure an antecedent debt of doubtful legitimacy at time when he knew corporation was insolvent, officer's intent to hinder, delay or defraud imputed to debtor); *Langan v. First Trust & Deposit Co.,* 293 N.Y. 604, 59 N.E.2d 424 (N.Y.1944) (actual intent of defendant bank to hinder creditors of debtor company in realizing their claims could be imputed to company where bank controlled debtor company's disposition of property and caused debtor to dispose of it to bank at fraction of its market value).

The case that the Claimants principally rely upon in support of their contention that a contractual relationship cannot rise to the level of domination and control is *In re Cushman Bakery*, 526 F.2d 23, 31–32 (1st Cir.1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976). In that case, the debtor was in financial straits and entered into an arms-length deal with a trade creditor which, because of the creditor's bargaining power, resulted in the conveyance of a security interest to the creditor on terms very favorable to it. The First Circuit held that the creditor did not dominate and control the debtor in connection with the creation of the security interest. *Id.* at 32 (noting "uncontradicted evidence that [the debtor] was 'strapped for cash' prior to taking the security interest, the [the trade creditor] had stopped shipments because of the defaults by [the debtor] in payments immediately before the security agreement was consummated and that the bargain was, on the whole, very favorable to [the trade creditor]", but finding that [t]hese facts, however, do not establish that [the trade creditor] dominated [the debtor's disposition of its property]). The Claimants' reliance is misplaced. Hanover was in a position to control Adler's disposition of its property because of the automatic nature of the clearing process and the steps that Hanover brokers took to keep their actions secret.

Next, the Claimants assert that Adler acted independently of Hanover. They maintain that from January 1995 through the Final Week, Adler chose to continue to clear Hanover's purchases of the House Stocks even though it knew that Hanover (i) had no cash, (ii) was fighting the illegal short selling, and (iii) was supporting the price of the House Stocks through improper means. They deny that Adler relied on any representations by Hanover and contend that it continued to clear trades during the Final Week based upon its own ability to recover from the Short Sellers and/or Hanover by conducting a buy-in, with full knowledge that it could terminate its clearing relationship with Hanover at any time.[59] Thus, they say that far from

---

59. The Claimants cite the following deposition testimony of Charles Sanacore, as head of correspondent services and chairman of Adler's Risk Management Committee:

Q. Had Adler made the decision to carry Hanover under the circumstances that you described, that put at risk the entire business of those 30 or 40 introducing firms; is that a fair statement?
A. What Adler, Coleman was confronted with at that point in time, was because of the time frame in which we were operating in, if you were to cancel the clearing agreement, they have to find another agent to clear through. And in shutting them down immediately, we still had the customer liability of Hanover Sterling's clients. So I mean, it really, it behooved us in most cases to try to perpetuate and make whole, so we can like save the client.
Q. But Adler assumed the risk continuing to do business with Hanover to avoid that liability?
[Objection]
Q. Or in hopes of avoiding that liability?
[Objection]
A. My gut feeling and my—I shouldn't say my gut feeling. My knowledge of what was transpiring then, always felt that we were going to make the client whole, meaning the client's client.
Q. Did you think Hanover could outlast the shorts?
A. I thought so.
Sanacore Dep. 197:20–198:3. Moreover, they say that Sanacore knew that if Adler could outlast the Short Sellers, it could conduct a buy-in and "reap the gold". *Id.* 195:3–12. Further, they say that both Adler's chairman and president confirmed Adler's knowledge to terminate Hanover's purchases of House Stocks, and its decision not to do so. *See* Cohan Dep. 87:23–88:2 ("We could terminate, yes."); Giordano Dep. 61:3–22 ("Anything could have been done at any time," including terminating the computer links), 86:12–17. Indeed, they say that several Adler officers met with senior Hanover officers early in the Final Week and discussed terminating Hanover's trading in an effort to pressure Hanover to deliver more cash to Adler. Sanacore Dep. 190:10–192:16 ("Well, what we told them was, at this juncture, if the infusion of capital that they had stated to us was not valid and forthcoming, we would have to be forced, because of not, you know, just not having enough money to support their general trading, to suspend them from trading.")

being "dominated and controlled" by Hanover, Adler made an independent business decision to "play" the illegal Short Sellers to get as much cash for the firm as possible. However, as we will discuss, the evidence shows that Adler did not know of or otherwise countenance Hanover's fraud. Moreover, Sanacore denied that Adler and Hanover devised any strategy to deal with the Short Sellers, worked together to effect such a plan, or that there was ever such a plan in his mind. Sanacore Dep. 194:22–196:6. Indeed, rather than exploiting the Short Sellers' open positions through a buy-in or otherwise, Adler asked regulators at a February 24 meeting to cancel those positions and in effect, undo the Final Week trading. W. Giordano Dep. 42:3–4, 45:24–46:3, 68:12–69:3. The regulators rejected that request. In any event, if the Claimants could show that Adler did so, they would further the trustee's cause because he would not have to impute Hanover's fraud to Adler to obtain relief under § 548(a)(1)(A).[60]

They also say that in arguing that domination and control is inherent in the clearing relationship, the trustee is ignoring Adler's daily review of Hanover's trading records and ever ballooning debit balances and Adler's ability to terminate the relationship at any time. However, those safeguards were of no use to Adler because Hanover concealed its true financial position from Adler. Moreover, the Claimants maintain that there is no legal support for the trustee's theory and that his proposition renders any contractual relationship obligating the debtor to transfer property,

one of "domination and control." Thus, they contend that where trades clear through the NSCC, the broker submitting the trade would necessarily "dominate and control" the NSCC, and any supplier of goods obligated by contract to deliver upon the request of a customer "dominates and controls" the customer. However, that argument ignores the facts of this case. Hanover fabricated millions of dollars of "trades" to defraud Adler and its creditors, and particularly, SIPC. There is no "slippery slope" here. Hanover's fraud is unprecedented and on the facts of this case, we do not hesitate to find the domination and control necessary to avoid the Challenged Trades. Hanover plainly dominated and controlled Adler because once Hanover input the data into the computer, the trades were electronically and automatically posted in the Claimants' accounts. Those trades automatically settled unless Adler took affirmative steps to prevent it.

Finally, the Claimants deny that we can apply the "domination and control" doctrine to avoid the obligations incurred to them. For the Claimants, that doctrine is an exception that derives the intent required to satisfy § 548(a)(1)(A) from the transferee or the transferee's alter ego. Because the Claimants, not Hanover, were the beneficiaries of the obligations that the trustee seeks to avoid, and because the trustee allegedly has not shown that the Claimants are the same person or the alter egos of Hanover, they maintain that the narrow exception is inapplicable. As we will explain, Hanover acted as the Claim-

**60.** *See, e.g., Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336 (10th Cir.) (estate entitled to money judgment against debtor's nondebtor spouse for amount representing one-half allowance for jointly owned vehicle that couple traded in for vehicle titled in spouse's name alone approximately two weeks prepetition; transfer of debtor's interest in first vehicle was made to insider, immediately before he declared himself insolvent and after judgment in favor of sole listed creditor was entered, and debtor concealed transfer by not disclosing it in bankruptcy schedules), *cert. denied*, 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998);

*Teitelbaum v. Parameswaran (In re Parameswaran)*, 50 B.R. 780 (S.D.N.Y.1985) (debtor husband's transfer to nondebtor wife of his interest in New York property owned by the entireties made with actual intent to enter, delay or defraud creditors and conveyance could be set aside by debtor's trustee, with discharge denied, where transfer was made within three months of filing chapter 7 petition, consideration paid on transfer was $10,-000 and wife had previously agreed to assume existing mortgage and spouses continued to reside in the premises).

ants' agent when it booked the Challenged Trades on their behalf, and that Hanover's knowledge and fraudulent intent can be imputed to the Claimants.

On these facts, we impute Hanover's fraudulent intent to Adler for purposes of § 548(a)(1)(A). The trustee has established that Hanover dominated and controlled Adler to the extent necessary to process the Challenged Trades.

### The Claimants Are Responsible for Hanover's Acts

The trustee contends that under straightforward agency principles, the Claimants are responsible for Hanover's fraud. The Claimants concede that the Challenged Sales were fraudulent: Hanover purported to sell House Stocks to itself at prices far above what a buyer would have been willing to pay in an unmanipulated market. While they admit that Hanover was their agent and was authorized to execute the Challenged Trades, they deny that Hanover committed fraud while acting as their agent. The Claimants contend that they authorized Hanover to effect the Challenged Trades for them and controlled Hanover only to the extent that Hanover submitted their names to its trading desk. They say that the only representation that Hanover made as their agent was their offer to sell their House Stocks at market prices, and for some, to purchase certain Blue Chips at market prices, and that in causing Hanover to do so, they were exercising their legitimate rights to sell and buy stock, without falsehood or deception. Since the relationship between a customer and its broker under New York law is that of a principal and agent, the Claimants say that when they instructed Hanover to bring about those transactions, they manifested their intent for Hanover to do so on their behalf and in their names, thereby defining the scope of that authority. They assert that they ordered their individual brokers at Hanover to sell their House Stocks, that those brokers, as their agents, merely entered the information on the trade tickets and submitted it to Hanover's

trading desk, and that Hanover's brokers obtained the price that Hanover, as dealer, was prepared to pay for those securities and entered that information on the trade tickets. However, they say that Hanover purchased the House Stocks in its own name, as a dealer/market maker—not as their agent—and executed those transactions through Adler as principal. For them, Hanover made representations as to the price of the House Stocks in its capacity as a dealer/market maker and acted as principal for its own account. As to the Challenged Blue Chip Buys, the Claimants maintain that when they instructed their brokers to purchase the securities, their brokers merely entered the information of the type and amount of shares to be purchased on a trade ticket and delivered it to Hanover's trading desk. If it was a NYSE security, the trader called Adler for the price and Adler's trading desk executed and entered the order into the computer system. If it was a NASDAQ stock, the Hanover broker obtained the price and executed the trade.

Thus, the Claimants assert that only they could create the scope of Hanover's actual and apparent authority, that they employed Hanover only to execute the Challenged Trades and that Hanover did so without committing any fraud. They say that they are not responsible for Hanover's misrepresentations because Hanover made them while acting as a market maker, trading as a principal for its own account, and ostensibly acting as a broker for other customers, rather than as their agent. They deny that they consented to Hanover taking those actions in their names, or that they could control Hanover in doing so. They argue that if we hold them liable for Hanover's actions, any customer who sells securities in a market manipulated by his broker's market making firm can be held liable for the fraud, and deny that there is any authority to support the imposition of such liability. However, the trustee only seeks to hold the Claimants accountable for their bro-

kers actions to the extent that they seek to benefit from those actions.

▪ We need not address the Claimants' contentions regarding the scope of Hanover's apparent authority because, as we will explain, Hanover committed fraud while acting within the scope of its authority. We find no merit to the Claimants' attempt to separate Hanover as market maker from Hanover as trader. We have already determined that a broker can act in a dual capacity as a dealer/principal for its own account and also as a broker on behalf of its customer, and we see no reason to alter that determination. *See Ensminger I*, 218 B.R. at 705 (citing *In re Merrill Lynch Secs. Litig.*, 911 F.Supp. 754, 760 (D.N.J.1995)), *rev'd on other grounds*, 135 F.3d 266 (3d Cir.1998); *Gammage v. Roberts, Scott & Co.*, No. 71–480–T, 1974 WL 437, at *8 (S.D.Cal. June 13, 1974). That is precisely what Hanover, a broker-dealer, did in this case. When it purchased the House Stocks it simultaneously acted as the Claimants' agent and as principal for its own account. Indeed, if the Claimants did not authorize Hanover, as their agent, to agree to the prices that Hanover, as buyer, offered to pay for their House Stocks, there could not be any securities transactions at all, and the Claimants would have no claim herein. Under New York's version of the Statute of Frauds in effect in 1995, there could not be a binding securities contract absent the inclusion of the price term in the signed writing. *See Ensminger II*, 218 B.R. at 23 (quoting N.Y.U.C.C. § 8–319). Thus, although the Claimants concede that they authorized

Hanover to "effect" the Challenged Trades on their behalf,[61] Hanover could not have done so without agreeing to the price of the securities. For the Claimants to assert any right to the cash and/or Blue Chips in their accounts, they had to authorize Hanover to complete trades for them. That is, they had to have given Hanover authority to agree to a price and to report it and other data to Adler. Even the authorities that the Claimants cite demonstrate that the scope of a broker's agency must be broad enough to permit the broker to complete the transaction.[62]

▪ As a general rule, "[a] principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent, even though he had no knowledge thereof and intended no fraud". *See* 3 N.Y. Jur.2d AGENCY AND INDEPENDENT CONTRACTORS § 256 (1980) (footnotes omitted). The Claimants concede that Hanover attempted to deceive the illegal Short Sellers, Adler, SIPC, the regulators or some combination of those entities by maintaining the value of the House Stocks through the Fake Buys, Fake Short Sales and other means. The Claimants do not deny that when Hanover was manipulating the price of the House Stocks, it realized that it was insolvent, that the Fake Buys would not realize the cash they appeared to create in Hanover's proprietary account and that without that cash, Hanover could not pay for its "purchases" of House Stocks from the Claimants. *See* Norris Decl. ¶¶ 98–113 (describing role of Fake Buys and Fake Short Sales in Hanover's insolvency and

---

61. *See* Cl. MOL at 54; Gary Anderson's Proposed Findings of Fact and Conclusions of Law ("Anderson PCOL") dated July 17, 1998 p. 3, ¶ 2.

62. The Claimants cite *Ensminger I* for the proposition that "(the relationship of agent and principal ... terminates when the transaction is complete"). Cl. MOL at p. 54 (quoting *Ensminger I*, 218 B.R. at 705 (quoting *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir.1972))).

They also state that "([t]he scope of affairs entrusted to a broker is generally limited to the completion of the transaction"). Cl. MOL at p. 55 (quoting *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 947 (S.D.N.Y.1979), *overruled on other grounds by Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir.1994)); *see also* Anderson PCOL ¶ 2 ("the relationship of agent and principal ... terminated when the transaction was complete") (quoting *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith*, 732 F.2d 859, 862 (11th Cir.1984)).

net capital deficiency). The trustee has proved that the Hanover Brokers balanced the specific Challenged Sales against specific Fake Buys, *see* Trustee Ex. 777 (matching sales of Claimants' securities with Fake Buys), and that Hanover's brokers systematically attempted to book Challenged Blue Chip Buys in the accounts of the Claimants' whose Challenged Sales proceeds exceeded $100,000. *See* Trustee Ex. 805 ¶¶ 8, 22, 44, 66, 93–94 (trading summary by broker); Norris Decl. ¶¶ 76–82. Thus, the trustee proved that Hanover did not merely manipulate the price of the House Stocks in an effort to deceive Adler, SIPC and others. Rather, in addition, Hanover's brokers effected the Fake Buys and Fake Short Sales to create the appearance that their "purchases" of the Claimants' House Stocks were *bona fide* transactions that reflected the true market value of those securities. Had Hanover not taken those actions, the House Stock market would have collapsed under the illegal short selling, *id.* ¶¶ 87–113, Hanover would have been shuttered, *id.* ¶ 107, and its brokers could not have purchased the Blue Chips booked into the Claimants' accounts. Thus, all those actions were part of an integrated scheme which culminated in the execution of the Challenged Trades, but whose end was to vest the Claimants with preferred SIPA claims in the inevitable liquidation proceeding. In *United States v. Russo*, 74 F.3d 1383 (2d Cir.), *cert. denied*, 519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996), the defendants worked at an introducing broker that underwrote IPOs for stocks to be traded on the NASDAQ OTC system and acted as a market maker for the stocks following the IPOs. *Id.* at 1386. The introducing broker's ability to comply with its net capital requirements was severely threatened by downward pressure on the prices of the broker's house stocks, and in particular, insufficient demand at the prices quoted by the broker. *Id.* at 1386–87. To maintain the appearance that

the stocks were worth the prices it was quoting, the broker embarked upon a scheme that included dumping the stocks in customer accounts through unauthorized buys. *Id.* at 1387. Effectively out of capital, the broker also needed to find a source of cash to pay for the house stocks that it was buying from customers. *Id.* at 1387–88. It generated cash credits by engaging in short sales for its own account of blue chip stocks, thereby taking advantage of an error in the clearing broker's accounting process that made the "cash" generated by the short sales available to the introducing broker without freezing the proceeds to ensure coverage of the short position. *Id.* at 1388. As here, the defendants claimed that these fraudulent short sales, which directly involved only blue chip securities, were not made in connection with the separate transactions in which the introducing broker purchased house stocks from its customers. *Id.* at 1390. The Second Circuit disagreed:

> While the short sales did not affect the markets for Lopat and EAS [the house stocks] through actual trading, they enabled K & C [the introducing broker] to create a false impression of demand for the stock and to shield prices form the realities of the market.... [The defendants] analogize their practice to that of an investor who lied on his home loan application in order to get more money to buy stock. We find this analogy inapposite. K & C was the market maker for Lopat and EAS stock—there was no 'open market' on which it could trade except for the one it created, and it could not have continued to make this market without the money generated by the short sales.... K & C could not separate its fraud from its purchase of Lopat and EAS stock.

*Id.* at 1391. As the Claimants' broker with authority to sell the House Stocks, Hanover had a duty to find a buyer.[63] There would have been no "buyers" for the

---

63. *See* BLACK'S LAW DICTIONARY 193 (6th ed. 1990) (defining "broker" as "[a] person whose business it is to bring buyer and seller together").

House Stocks without Hanover's fraudulent scheme. Thus, the Claimants cannot divorce Hanover's Fake Buys, Fake Short Sales and other fraudulent acts from its purchase of the Claimants' House Stocks. The Claimants acknowledge that they authorized their brokers to sell those securities. Because the brokers committed fraud within the scope of their agency, the Claimants are liable for their fraud. *Ensminger I*, 218 B.R. at 706 (citing 3 N.Y. Jur.2d AGENCY § 256 (1980)).

■ As a matter of law, whenever the knowledge of an agent is important to the act that the agent is authorized to perform, we impute the agent's knowledge as of the time it carries out the authorized acts, to the principal. *See* RESTATEMENT (SECOND) AGENCY § 272 cmt. A (1958); *see also Russell v. Prudential Ins. Co. of Am.*, 176 N.Y. 178, 186, 68 N.E. 252 (1903) ("The rule is, that the knowledge of the agent is the knowledge of the principal"); *Reynolds v. Snow*, 10 A.D.2d 101, 109, 197 N.Y.S.2d 590 (N.Y.A.D.) (holding agent's knowledge that agent had duty to buy shares for third party was imputed to principal for whom agent bought shares instead and stating that "[g]enerally, an agent's knowledge, and even fraud, is imputed to his principal"), *aff'd* 8 N.Y.2d 899, 204 N.Y.S.2d 146, 168 N.E.2d 822 (1960). The rule applies when the agent's knowledge is relevant to a claim for rescission of a contract. RESTATEMENT (SECOND) AGENCY § 272; cmt. b. Hanover's knowledge of its inability to pay, and its intention not to pay for the House Stocks, was clearly of importance in its booking and execution of proprietary trades that the Claimants say they authorized. Equally important was Hanover's knowledge that it was manipulating the market for the House Stocks and that those securities were not worth the price that Hanover reported to Adler as both the market price and the price at which Hanover was willing to purchase the Claimants' House Stocks. *See id.* illus. 2 ("In selling a horse to T [third party], A [agent] makes a representation that it is sound. A's principal, P, is affected by A's knowledge that the horse is unsound"). Thus, even assuming that the Claimants only authorized Hanover to sell the House Stocks, and Hanover's fraudulent scheme was outside the scope of it's agency, we will impute to the Claimants Hanover's knowledge of its fraud at the time it sold the stocks. *See Willcox v. Goess*, 92 F.2d 8, 11 (2d Cir.1937) ("if the principal must avail himself of a transaction entered into by the agent on his behalf, the guilty agent's knowledge will be imputed to him"), *cert. denied*, 303 U.S. 647, 58 S.Ct. 646, 82 L.Ed. 1108 (1938). The Claimants simply cannot retain the Blue Chips and/or cash in their accounts and simultaneously disclaim Hanover's fraud. *See Fineberg v. Stone (In re Brainard Hotel Co.)*, 75 F.2d 481, 482 (2d Cir.1935) (where hotel employee stole $1,500 from register in his charge, then stole $6,400 from hotel guest, and redeposited $1,500 of the latter amount into the hotel register, hotel was not bona fide purchaser of money employee deposited into till; "In depositing the money he acted as the hotel's agent, and the hotel had notice of the theft because he knew it himself"); *Cathay Pacific Airways, Ltd. v. Fly And See Travel, Inc.*, 3 F.Supp.2d 443, 445 (S.D.N.Y.1998) ("Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge"); *Angerosa v. White Co.*, 248 A.D. 425, 428, 290 N.Y.S. 204 (N.Y.A.D.1936) ("A principal who gives his agent authority to solicit a sale and accepts the fruits of his efforts will be held responsible for the fraudulent as well as the fair means by which the contract was obtained, if such instrumentalities are in line with the accomplishment of the object of the agency"), *aff'd*, 275 N.Y. 524, 11 N.E.2d 325 (N.Y.1937).

■ Citing *Deyo v. Hudson*, 225 N.Y. 602, 122 N.E. 635 (N.Y.), *rearg. denied,*

226 N.Y. 685, 123 N.E. 851 (N.Y.1919),[64] and various portions of the Restatement of Agency, the Claimants contend that they can enjoy the benefits of the Challenged Trades and are not liable to the trustee for the damages occasioned by Hanover's fraud, because they have not ratified Hanover's fraudulent acts. They say that they cannot ratify them because Hanover did not profess to be their agent when it engaged in the fraud. However, their argument is unavailing and *Deyo* is irrelevant because the trustee is seeking to rescind the Challenged Trades, not to recover damages occasioned by Hanover's fraud from the Claimants. Even if the trustee could not recover damages from the Claimants, he can rescind the Challenged Trades. The rule in New York is that if a principal authorizes a transaction and its agent commits a fraud while effecting that transaction, the principal cannot enforce the transaction against the defrauded party, even if the principal did not authorize the fraud itself. *See Harriss v. Tams,* 258 N.Y. 229, 237, 179 N.E. 476 (N.Y.1932) (where agent for seller falsely represented that boat could attain speed of 28 mph, and agent was not authorized to make that representation, buyer could rescind); *Abrams v. Forman,* 22 A.D.2d 824, 825, 255 N.Y.S.2d 62 (N.Y.A.D.1964) (where agent made material misrepresentations to buyer that oil reserves were 13.5 million barrels instead of $3.5 million, fact that principals themselves were innocent of the misrepresentation constituted no defense for them in buyer's action for recession, since "they received the fruits and product of the transaction"); *Zanoni v. 855 Holding Co.,* 96 A.D.2d 860, 861, 465 N.Y.S.2d 763 (N.Y.A.D.1983) (imputing agent's fraud to principal in action for rescission of stock transaction), *aff'd,* 62 N.Y.2d 963, 479 N.Y.S.2d 341, 468 N.E.2d 296 (N.Y. 1984);[65] 2A N.Y. Jur.2d, AGENCY § 194

---

**64.** In *Deyo,* the plaintiffs were senior partners in a law firm. A junior partner in the firm stole client funds and then lost them speculating in the stock market. The plaintiffs sued the brokerage firm that invested the monies for tort damages arising from the alleged fraud of a brokerage firm employee who concealed from the senior partners that the junior partner was speculating. *Id.* at 606, 122 N.E. 635. They did not seek restitution, but to be compensated in damages for the entire amount stolen by the junior partner. Thus, the case does not address whether a principal can retain the benefits of an agent's ultra vires fraud once the fraud is brought to light, but concerns whether an innocent principal (the brokerage firm) can be forced to pay damages occasioned by someone else's loss. In fact, the entire discussion in *Deyo* on this point is dicta. The holding of the case is that the brokerage employee's misrepresentation was not the proximate cause of the law firm's damages. *Id.* at 615–17, 122 N.E. 635 ("The stealing rather than the speculation was the immediate cause of plaintiffs loss"). Claimants' reliance on *Clayton v. Edwards,* 225 Ga. App. 141, 483 S.E.2d 111 (1997), is similarly misplaced. That case was a tort action seeking damages for personal injury and has no bearing on whether Claimants can retain the benefits of transactions that are tainted by Hanover's fraud.

**65.** The Restatement contains a similar rule. *See* RESTATEMENT (SECOND) AGENCY § 298 (1958) ("The other party to a contract made by an agent on behalf of a disclosed or partially disclosed principal has all the defenses which he would have had against the principal if the principal had made the contract under the same circumstances"); *id.* § 298 cmt. a (noting that defenses subject to rule include rescission for the agent's fraud); *id.* § 259 (stating that one who is induced to enter into a contract by reliance on an agent's untrue representations is entitled to rescind it); *id.* § 63 cmt. f & illus. 8–11; *id.* § 263 ("Unless he has changed his position, a principal whose servant or other agent has fraudulently acquired property for him, holds it subject to the interests of the defrauded person"); *id.* § 263 illus. 1 ("A, agent for P, steals chattels from T, sells them, and places the proceeds in his principal's account. P is subject to liability to T for the proceeds"); *id.* § 63 illus. 5 ("P authorizes A to sell, to local buyers, distant farm land. A represents to one of the buyers, T, that the land has rich sandy loam, that the country is rolling and that oil has been struck within ten miles of it. None of these statements is true. A is authorized to make the first two statements if he reasonably believes them to be true; he is not authorized to make the last statement. If A has no reason to believe them true, P is subject to liability for the first two statements but not for the last statement. The transaction is subject to rescission by T if any of the statements are untrue") (citations omitted).

(1998) ("If an agent procures a contract by fraudulent or corrupt practices, by claiming the benefit of the contract, the principal must take it tainted as it may be with such practices, even though the principal may not have been privy in any way to such conduct by the agent."); *id.* § 190 ("Where a person acts for another who accepts or retains the benefits or proceeds of these efforts with the knowledge of the material facts surrounding the transaction, the latter must be deemed to have ratified the methods, as this party may not, even though innocent, receive or retain the benefits and at the same time disclaim responsibility for the measures by which they were acquired").

Another court faced with substantially identical circumstances reached the same conclusion we do. In *Salmon # 1*, the debtor, a market maker in penny stocks, was being investigated by the NASD because it was facing a severe net capital deficiency. Knowing that "the liquidation of its business was both inevitable and imminent and that the quoted values of [its house stocks] would dip sharply with its withdrawal as a market maker for those securities," the debtor purported to sell its customers' house stocks and to put the customers into cash credit balances so that their cash claims would be paid with advances to be made by SIPC. *Salmon # 1* at 9–10. Specifically, on the final day the debtor conducted business, nine of its customers sold some 43,150 shares of their house stocks to the firm's proprietary account. Two days prior to the sales, the NASD had advised the debtor's principals that there were no buyers in the market for the shares at the prevailing market price and that, as a consequence, the firm's

capital position was illiquid. *Id.* at 6–8. According to the court, there was "no room for doubting that the ... transactions were intended by the debtor to place favored customers in a position so that instead of finding themselves possessed of securities that would shortly be severely depressed in value, they would appear to have cash credit balances at preliquidation prices." *Id.* at 14. The court concluded that it was a deliberate attempt to defraud SIPC, and that the trades were made with "actual intent to hinder, delay or defraud existing creditors or future creditors" within the meaning of § 67d(2)(d) of the former Bankruptcy Act. *Id.* at 13–14. It also found the trades to be constructively fraudulent under §§ 67(d)(2)(a),(b) and (c) of the former Bankruptcy Act. *Id.* at 21–24. The bankruptcy judge reaffirmed his conclusions to that effect in *Salmon # 2. Salmon # 2* at 11.

The *Salmon* court found the transactions in question were intentionally as well as constructively fraudulent. *See Salmon # 1* at 13–14; *Salmon # 2* at 11. The statute under which it found actual intent to defraud, § 67d(2)(d) of the former Bankruptcy Act, is for all intents and purposes indistinguishable from § 548(a)(1) of the Bankruptcy Code.[66] *See Estate of Klein v. Klein (In re Klein)*, No. 86 B 19937, 1991 WL 242169, at *8 (Bankr. N.D.Ill. June 21, 1991) ("[t]he language [of § 548(a)(1)] is derived primarily from former Section 67 of the Bankruptcy Act of 1898 and thus the cases decided under § 67 of the Act demonstrate the proper application of § 548(a)(1)"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.LH[1] at 548-89 (15th ed. rev.1999) (discussing history of § 548(a)(1) ranging as far back as

---

**66.** That section provided as follows:

(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent

\* \* \* \* \* \*

(d) as to then existing and future creditors, if made or incurred with actual intent as

distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.

11 U.S.C. § 67d(2) (repealed 1979).

the Statute of Elizabeth, 13 Eliz., ch. 5 (1571)). In *Ensminger I*, 218 B.R. at 707, we held that the *Salmon* decisions are entirely consistent with the Series 500 Rules, §§ 546(e) and 548 of the Bankruptcy Code, SIPA and subsequent decisions construing these rules and statutes.

The only distinction of any import between this case and the *Salmon* cases is the involvement of a clearing broker. This distinction makes no difference in the outcome of this case. In substance, *Salmon* involved a broker, knowing that it was insolvent and that securities for which it made a market would plummet in value, "buying" those securities from certain customers for the purpose of maximizing their SIPA claims. The same fraud was perpetrated here, and we will not permit it to succeed merely because Hanover cleared its trade through another broker.

### Constructive Fraud under 11 U.S.C. § 548(a)(1)(B) [67]

■ As a preliminary matter, the Claimants contend that pursuant to § 546(e), the trustee cannot avoid the Challenged Trades and return the House Stocks to their accounts under § 548(a)(1)(B), because those transactions constitute either settlement payments or margin payments.[68] Section 546(e) states, in relevant part, as follows:

> Notwithstanding section[ ] ... 548(a)(1)(B) ... of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 · or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).[69]

The trustee denies that § 546(e) is applicable. First, he correctly notes that in *Ensminger I*, we held that if the trustee could prove that there were no payments of any kind for the Challenged Trades, there could be no "settlement" or "margin" payments, regardless of how broadly we defined those terms. *See* 218 B.R. at 703–

---

67. The Complaint seeks relief under § 548(a)(2) of the Bankruptcy Code. After this matter was submitted, Congress amended the statute and § 548(a)(1)(B) replaced § 548(a)(2). *See* Religious and Charitable Donation Act of 1998, Pub.L. No. 105–183.

68. A "settlement payment" is

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar commonly used in the securities trade.

11 U.S.C. § 741(8). The Claimants say that the Challenged Trades are settlement payments to the extent that their House Stocks were on deposit with Hanover when they instructed their brokers to sell them, and that in furtherance of the settlement process, Adler: (i) debited the stocks from their accounts and credited the cash proceeds; (ii) obtained the cash proceeds allegedly paid to them, by debiting the cash from Hanover's proprietary account, which Adler maintained; and (iii) delivered the House Stocks to Hanover by crediting them to Hanover's proprietary account. They say that as to the Blue

Chip buys, Adler debited cash representing the purchase price from the accounts of the corresponding Claimant and credited the Blue Chips to those accounts.

> A "margin payment" is
>
> payment of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency.

*Id.* § 741(5). The Claimants say that some of the Challenged Trades are margin payments because: (i) the House Stocks or their proceeds secured the payment of a participant in a securities clearing agency; (ii) the Challenged Blue Chip Buys were reported to, and except for the February 24 trades, cleared through the NSCC; and (iii) Adler held the House Stocks or their cash proceeds as security for their obligation to pay for the Blue Chips.

69. Section 546(e) was amended in 1998 to reflect the addition to § 548 of a new subsection (a)(2) and the designation of former § 548(a)(2) as § 548(a)(1)(B).

04. He maintains that the evidence conclusively proves that there were no payments and, as such, § 546(e) is inapplicable.

Second, he contends that the plain reading of the term "settlement payment" is a payment upon the settlement of a trade, and that because none of the Challenged Trades booked in the regular way settled, there were no settlement payments for those Challenged Trades.

Third, he argues that applying § 546(e) to the Challenged Trades would defeat the purpose of the statute. He says that the specific purpose of the statute is to prevent the insolvency of one securities firm from spreading to other securities firms and possibly threatening the collapse of the affected market, and that its broader goal is to protect the smooth working of the securities markets. For the trustee, the statute protects the purchase and sale of securities in the ordinary course of business and that when trading occurs outside the ordinary course of business, such as massive market manipulation, § 546(e) should not protect it. He maintains that protecting the Challenged Trades will not serve either the specific or broader goals of the statute. He notes that the Challenged Trades were cleared only through Adler and there was no contact with other clearing firms and the general securities clearing network for these transactions. He argues that canceling the Challenged Trades will hardly spread insolvency to other brokerage houses and, in fact, will not have an impact on other brokerage houses at all. Among other things, as support, the trustee cites *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656 (D.R.I.1998). There, in noting that the purpose of § 546(e) is to prevent the insolvency of one firm from infecting the entire securities clearing system, the court explained that this danger was the by-product of the guarantees given by the participants in that system.

The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain.... If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to the other parties in the chain, threatening a collapse of the entire industry.

*Id.* at 676 (citations omitted). The trustee says that in the clearing system, other entities such as the NSCC guaranteed Adler's performance of its obligations that were cleared through the system and that if he were able to recover settlement payments made by Adler to the NSCC, NSCC would be deprived of cash paid to it by Adler, but still be obligated to guarantee Adler's performance. In that scenario, the trustee says that Adler's bankruptcy would cause a ripple effect in the system. Indeed, he says that this is what happened to Adler: Hanover could not perform its obligations to NSCC, so its liabilities effectively were transferred to Adler as NSCC's guarantor. He says that there is no such systemic effect of any payments sought from the Adler estate by the Claimants. According to the trustee, because the domino effect that § 546(e) seeks to prevent is linked to the chain of guarantees, and no one contends that any other participant in the clearing system further guaranteed Adler's performance of that guarantee, if the trustee avoids the Challenged Trades, no other participant in the clearing system, let alone the system itself, will be affected. More broadly, he contends that to the extent the Challenged Trades were trades at all, they were not "ordinary course" trades that need to be preserved to protect investor confidence, especially because many of the Claimants allegedly did not know of the transactions until after Adler closed. He also maintains that, as the Challenged Trades were part of a scheme to defraud Adler and SIPC, if we enforce

them, we will be providing others seeking to defraud SIPC a blueprint to do so.

Finally, the trustee contends that SIPA nullifies § 546(e). He notes that the Bankruptcy Code applies to SIPA liquidations only to the extent it is consistent with SIPA, *see* SIPA § 78fff(b),[70] and, citing *SIPC v. Charisma Securities Corp.*, 506 F.2d 1191 (2d Cir.1974), he contends, in substance, that a Bankruptcy Code provision is inconsistent with SIPA if it impairs the effective and efficient operation of SIPA.[71] He says that SIPA is designed to protect only customer assets that were entrusted to broker-dealers in the ordinary course of business, and that, as such, § 546(e) could not mandate SIPA protection for fraudulent transactions that were never protected by SIPA in the first place. He contends that we will dramatically curtail SIPA's purpose of protecting investor confidence and protecting customer property if we apply § 546(e) to protect the Challenged Trades. He says that not only would this perpetuate a fraud, but it would limit the fund of customer property that might be available to other customers—of Adler or other failed firms—in need of SIPA protection.

The Claimants argue that because § 546(e) bars a trustee from avoiding transfers made in furtherance of securities transactions even if intentionally fraudu-

lent under state law and preserves only the avoidance power in the case of intentional fraud by the debtor under § 548(a)(1)(A), it is strong evidence that Congress intended to satisfy securities customers' legitimate expectations that executed trades will be completed. They maintain that § 546(e) works in harmony with the Series 500 Rules and SIPA to sustain confidence in the securities market by providing that transactions will be disturbed in only extremely limited circumstances.

The Claimants say that even if Hanover effected the Challenged Trades to defraud Hanover and SIPC, that is no basis for us to find, as the trustee and SIPC urge, the trades "never happened" or "were not real". They say that the factual predicate for that argument is that the ultimate buyers of the House Stocks underlying the Challenged Trades were buyers who had not authorized their purchases, and that it is factually wrong because they sold their House Stock to Hanover, not the unauthorized buyers. They also allege that the trustee has acknowledged that fraudulent trades "exist" by enforcing pre-Final Week Fake Buys against the alleged "buyers" of the underlying securities, and enforcing the illegal short sales against the Short Sellers.[72] They deny that application of

---

**70.** Section 78fff(b) states:

To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with [various provisions of the Bankruptcy Code, including chapter 5].

15 U.S.C. § 78fff(b).

**71.** In relevant part, *SIPC v. Charism Sec. Corp.* states that a provision of the Bankruptcy Code is not consistent with SIPA

if it conflicts with an explicit provision of the Act or if its application would substantially impede the fair and effective operation of SIPA without providing significant countervailing benefits.

506 F.2d at 1195.

**72.** They say that the trustee had enforced the unauthorized buys against the unauthorized buyers claiming that, although the buys of House Stocks had not been authorized by the

customer into whose account Hanover had booked the trade, the trade did occur, a broker put the order through, it was received and it was transacted and the debit was incurred. They say that the trustee determined that the net equity in the unauthorized buyers' accounts included the unauthorized buys, thereby enforcing them against those "buyers". They made that argument in support of their motion to dismiss the Complaint, and we rejected it. In doing so, we stated, among other things, that

trades reflected in debtor's records must be recognized in determining a customers rights under SIPA, even though those trades were not authorized, because debtor did not have a fiduciary relationship with Hanover's customers and the Clearing Agreement with Hanover allocated to Hanover the risk of unauthorized trading. However, [the trustee] has never argued

§ 546(e) depends upon the existence of a participant's guarantee, and contend that in making that argument, the trustee is asking us to make an exception to § 546(e) where Congress has not done so. In any event, they contend that the Challenged Trades became the subject of various obligations and guarantees to deliver.[73] Thus, they argue that the trustee's sole recourse is under § 548(a)(1)(A) of the Bankruptcy Code.

The Claimants are correct that the definitions of "settlement payment" and "margin payment" in § 741 of the Bankruptcy Code apply herein, because § 546(e) applies and incorporates them by reference, even though the provisions of subchapter III of chapter 7 do not apply to SIPA cases; and that many courts define the term "settlement payment" broadly to include any transfer made toward completion of the settlement process, whether made on trade date, the scheduled settlement date, or any other date. *See Ensminger I,* 218 B.R. at 704 (citations omitted). However, we disagree with their view of the applicable facts and law, find no basis to alter our determination in *Ensminger I* regarding the applicability of § 546(e) in this case, and conclude that the trustee has shown that § 546(e) does not apply herein.

Contrary to the Claimants' assertion, the trustee does not assail the Challenged Trades merely because they were not authorized. He has done so because he says that they are the result of a scheme to defraud Adler and SIPC, and he has proved as much. He has established that Hanover hatched a plan to create fraudulent SIPA claims, not bargained-for exchanges of cash and securities. He has proved that in the Final Week, Hanover's House Stock "buys" were false, and that Hanover dictated which of its customers could "sell" their securities. Moreover, he has established that the Challenged Sales could not have occurred without the Fake Buys, since Hanover would not have had any "money" to pay the Claimants their cash and Blue Chips. Indeed, the trustee has established that Hanover was not even attempting to trade stocks. Its brokers engaged in criminal and other wrongful acts in booking the Challenged Trades, and they did so to enhance the SIPC claims of the Claimants, not to have the trades performed.

---

that debtor's books and records are immutable for all purposes. *Ensminger I,* 218 B.R. at 698. The Claimants contend that they never claimed that Adler's books are immutable for all purposes and that they do not dispute the trustee's authority to avoid as actual fraudulent transfers under § 548(a)(1)(A) transfers of Adler's property that would have been "customer property" absent that transfer. However, they say that the trustee is not satisfied with that and would rather pretend that the Challenged Trades "never happened". They contend that there is no such "to disappear" claim for relief, and the position is directly counter to the trustee's enforcement of the Fake Buys against the unauthorized buyers (except the Fake Buys during the Final Week). They say that we should preclude the trustee from disputing that the debtors records must be rec-

ognized in determining a customer's rights under SIPA. For the reasons that we stated in *Ensminger I,* we find no merit to the Claimants' estoppel argument.

**73.** They say that once the Challenged Trades were executed, Adler became obligated and guaranteed to them to deliver the price. They say that Adler in fact delivered the price by crediting the proceeds to their accounts, and debiting the cash from Hanover's proprietary account. Since the Blue Chips cleared through the NSCC, Hanover guaranteed to Adler, and Adler guaranteed to NSCC the Claimants' delivery of the price. They say that the contra-brokers extended similar guarantees and that by both contractual agreement and NASD rule, the Challenged Sales were to have cleared through the NSCC and thus make them entitled to the protections afforded thereby.

■ Although SIPC Rule 300.503 was created to exclude claims based on fraud,[74] we disagree with the trustee that SIPA nullifies § 546(e). We need not resolve the parties' disputes over the construction of the terms "settlement payment" and "margin payment" because irrespective of how broadly we define those terms, § 546(e) does not protect the Challenged Trades from the trustee's claims under § 548(a)(1)(B) of the Bankruptcy Code. The Challenged Trades are the result of Hanover's massive fraud, not ordinary course transfers, and the statute simply does not insulate transactions like these from attack under § 548(a)(1)(B) of the Bankruptcy Code. *See Wider v. Wootton,* 907 F.2d 570, 573 (5th Cir.1990)(in authorizing a trustee to recover, as preferences, payments made to third parties as a result of a fraudulent scheme pursuant to which a broker sent out false confirmation slips that represented fictitious securities purchases, court rejected the defendants' assertion that § 546(e) protected the transactions, stating, in part, that it "will not implicitly authorize fraudulent business practices through an unjustified extension of the stockbroker defense"); *see also In re Integra Realty Resources,* 198 B.R. 352, 360 (Bankr.D.Colo.1996) (court determined that § 546(e) was inapplicable because there was not really an exchange of securi-

ties and the recipients of the securities paid no consideration for their shares). Further, without addressing the parties' contentions regarding the role of "guarantees" under § 546(e) (except to reiterate that Adler did not guarantee the Claimants' Challenged Trades), we agree with the trustee that any other result is contrary to the goals of § 546(e) because it will undermine, not protect or promote investor confidence, since we will be endorsing a scheme to defraud SIPC.

■ To prove that we should avoid the Challenged Trades under § 548(a)(1)(B), the trustee must show that: (i) Adler received less than reasonably equivalent value in exchange for the obligations it purportedly was placed under and/or the transfers it purportedly effected in connection with the Challenged Trades; and (ii) Adler was either insolvent at the time of the Challenged Trades, was engaged in, or about to engage in, a business or transaction for which the property remaining constituted unreasonably small capital, or intended to incur, or believed it would incur, debts beyond its ability to pay when they matured. 11 U.S.C. § 548(a)(1)(B).[75] For these purposes, the term "value" means "property, or satisfac-

---

**74.** That rule states as follows:

(a) Nothing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law.

(b) Nothing in these Series 500 Rules shall be construed as limiting the right of the Securities Investor Protection Corporation, in a direct payment procedure under section 10 of the Act, to reject a claim for cash or a claim for securities if such claim arose out of a securities transaction which could have been avoided in a liquidation proceeding under the Act.

17 C.F.R. § 300.503.

**75.** Section 548 provides in relevant part as follows:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that

was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \* \* \* \*

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548.

tion or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor". 11 U.S.C. § 548(d)(2)(A). Outside of the foreclosure context, reasonably equivalent value means something similar to fair market value. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *see also Davis v. Suderov (In re Davis),* 169 B.R. 285, 299 (E.D.N.Y.1994) (" 'Absent unusual circumstances, [fair market value] will typically be the controlling consideration' ") (citations omitted). Other factors considered include the nature of the property in question and its relative marketability, and the number of persons appearing and bidding on it. *Davis,* 169 B.R. at 299 (citation omitted); *accord Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997) ("[T]he formula for determining reasonable equivalent value is not a fixed mathematical formula; rather, the standard for '[r]easonable equivalence should depend on all of the facts of each case,' an important element of which is fair market value") (quoting *In re Bundles,* 856 F.2d 815, 824 (7th Cir.1988)); *Cooper v. Ashley Comm., Inc. (In re Morris Communications NC, Inc.),* 914 F.2d 458, 466 (4th Cir.1990); *see also Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 149 (3rd Cir.1996) (" 'The touchstone is whether the transaction conferred realizable commercial value on the debtor' ") (citation omitted).

The Claimants say that Adler received "reasonably equivalent value" for the cash it credited to their accounts in connection with the Challenged Sales (and thus, the obligation to pay the Claimants if Hanover did not) in a variety of ways. They contend that they gave value by their enforceable promise to deliver the House Stocks to Adler which, once delivered, stood as security for the purchase price, and that Adler received value in the form of the $18 fee it received for every transaction that it cleared and that Adler contracted to re-

ceive those fees for clearing Hanover's trades as compensation for the risk inherent in acting as a clearing broker. They also argue that Adler acquired the future value of the House Stocks in a cornered market where a buy-in of the illegal short sales would "reap the gold", "crush" the illegal short sellers, and make Adler "quite wealthy". They maintain that Adler had been financing Hanover's purchase of House Stocks for weeks while its inventory grew by huge amounts, and that it did so knowing that it could use those stocks for a buy-in not only to cover Hanover's debt, but also to profit handsomely. They say that the validity of that decision was proven three weeks later when the trustee effected a buy-in of the House Stocks which netted $17 million for Adler's estate.

 By definition, the Claimants alleged "promise" to deliver securities to Adler cannot constitute "value". *Cf.* 11 U.S.C. § 548(d)(2) ("value" does not include an "unperformed promise to furnish support to the debtor"). In any event, the value of that promise was worth no more than the underlying securities which, as we will discuss, were practically worthless. The fees that Hanover agreed to pay as a charge for clearing trades represented a service fee, not funds for the purchase of goods. *See* Trustee Ex. 771 Ex. A ¶ 10 (stating in Clearing Agreement that "[Hanover] agrees to pay [Adler] for its services pursuant to his Agreements the amounts set forth at Exhibit A"). Moreover, since Adler closed before any of the trades effected during the Final Week could settle in the ordinary course, Adler was not paid any fees for clearing the Challenged Trades.

 Contrary to the Claimants' assertions, and as we have explained, Adler did not intend to "reap the gold". Moreover, unlike state fraudulent conveyance law, which expressly incorporates an element of "good faith" in defining "fair consideration", *see, e.g.,* N.Y. Debt. & Cred. L. § 272, § 548 is not so qualified in assess-

ing whether the transferor received reasonably equivalent value. *See R.M.L.*, 92 F.3d at 148–49 (footnote omitted); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.05[1][b] at p. 548–324 (15th ed. rev.1999) ("In a significant change from the 'fair consideration' standard [under New York law and the Uniform Fraudulent Conveyance Act], 'reasonably equivalent value' does not contain a good faith component"). *But see Barber v. Golden Seed Co., Inc. (In re Ostrom–Martin, Inc.)*, 191 B.R. 126, 130 (Bankr.C.D.Ill.1996) (employing a totality of the circumstances test, including an assessment of the good faith of the transferee, in determining whether a debtor received reasonably equivalent value under § 548(a)(1)(B)), *aff'd*, 129 F.3d 382 (7th Cir.1997); *Washington v. King William County (In re Washington)*, 232 B.R. 340, 342 (Bankr.E.D.Va.1999) (same). Thus, in assessing whether Adler received reasonably equivalent value for the Challenged Sales, we look only to the fair market value of the House Stocks, not to Adler's good faith in receiving the stocks. Adler's alleged intent to use the House Stocks to effect a buy-in of the illegal short sales is irrelevant. So too are the prices at which the trustee bought in those securities. In effecting the March 1995 buy-in of the House Stocks and thereby closing out Adler's "fail to receive" positions in those securities, the trustee did not purport to effect the buy-ins at market prices—he merely charged the same prices at which the securities were originally sold short.[76]

The Claimants say that Adler received value in connection with the Challenged Blue Chip Buys in the form of: (i) cash in their accounts used to purchase the Blue Chips; (ii) the House Stocks and their proceeds as security for Hanover's obligations to pay for the Blue Chips; (iii) their legal obligation to pay for the Blue Chips; (iv) a lien on any Blue Chips purchased to secure their obligation to pay the

purchase price; and (v) fees for clearing the transactions.

■ Disregarding the "proceeds" of the Challenged Sales, no Claimant had sufficient cash in his or her account to pay for the Challenged Blue Chip Buys. In the aggregate, the Claimants who purchased Blue Chips had less than $400,000 in their accounts as of the close of business on February 16. Hanover booked a total of $13.3 million in Blue Chip buys into their accounts during the Final Week. *See* Trustee Ex. 770 (activity files for favored customers). The Challenged Sales were phony and thus the "proceeds" of those fake transactions provided no security to Adler. The Claimants contend that they have paid for the Blue Chips. Thus, their purported obligation to do so is not "value" to Adler. Moreover, their lien theory of value assumes that the Blue Chips were delivered to them or Adler, which they were not. *See Ensminger I*, 218 B.R. at 27 (finding that the trustee's records do not indicate that the Blue Chips were ever received by the Adler estate). Finally, as discussed previously, the fees that Adler would have been paid in connection with the Blue Chip purchases were nothing more than a service charge.

■ We agree with the trustee that, at bottom, the only "value" Adler received in connection with the Challenged Trades was the House Stocks. We consider the extent of that value. The trustee says that even assuming, *arguendo*, that Hanover never violated its net capital requirement, the House Stock prices it posted were artificially high since it was conducting a massive market manipulation to inflate the prices, and that those prices could not have existed without its market manipulation. Thus, he says that by definition, Adler would have paid out much more than the House Stocks were worth when these

---

**76.** In any event, even if the market price of the House Stocks had risen as of late March of 1995, their value at the time of the transfer (*i.e.* when the Challenged Blue Chip Buys were booked) is the only value that has any bearing for purposes of § 548. *See Morris Communications*, 914 F.2d at 466.

trades settled. As support, he points to, among other things, the fact that once Hanover was out of business and unable to manipulate the market, the prices dropped precipitously. He says that there is no one to whom Adler could have sold the House Stocks for anything close to what Adler is purportedly obligated to pay the Claimants for them and that we should take that into account in determining whether Adler received "reasonably equivalent value" in connection with the Challenged Trades. He says that in valuing the House Stocks, we should utilize the market prices that would have existed absent Hanover's fraud, but assuming that Hanover had not been closed on February 16, or we should use the market prices that would have existed if Adler had been closed on February 16. In either event, he says that the prices that actually existed on February 27 most accurately reflect the House Stock values as of February 16, because they are unaffected by Hanover's market manipulation. He maintains that using those prices, it is clear that Adler did not receive "reasonably equivalent value" in exchange for the House Stocks.

The Claimants say the House Stocks are reasonably equivalent value for the cash and Blue Chips credited to their accounts, and criticize the trustee's methodology as unprecedented and unsound.[77] Citing *Morris Communications*, they say that we need look no further than the posted market price of the House Stocks during the Final Week to determine whether Adler received reasonably equivalent value in exchange for the transfers of cash and Blue Chips to the customers' accounts. They say that where, as here, the House Stocks were the subject of two illegal manipulations, one forcing the price down from its published market price and one, in defense, maintaining the previously unmanipulated market price, we should use the market price during or before the self-canceling manipulations. They contend that Lowry did precisely that, and criticize the trustee's methodology in selecting the February 27 House Stock prices for determining whether Adler received "reasonably equivalent value" for the House Stocks. They say that the trustee myopically focuses solely on the market prices for House Stocks published by a handful of short selling broker/dealers on February 27, while, in contrast, their expert examined all prices at the critical time to determine value.[78] They say that Lowry's analysis takes into account the prices that ready, willing and able buyers (including Adler) were paying for the House Stocks in February 1995, even through the Final Week. They maintain that even as the trustee assumes a fact that does not exist, *i.e.* that Hanover was out of business and

---

77. They criticize the trustee's position as resting on the following allegedly fallacious syllogism. *One:* Hanover was out of net capital compliance on February 16 and should have been shut down by the regulators on that date. *Two:* Assuming Hanover was shut down by the regulators on that date, the market prices of the House Stocks would have fallen to the prices published by the market makers on the first day Adler was actually shut down. *Three:* Therefore, for purposes of § 548(a)(1)(B), the February 27 prices represent the best indicator of fair value for the House Stocks on February 16.

78. During the trial, Lowry testified, as follows:
 A. My first—my first task was to obtain and review the NASDAQ audit trail for the House Stocks for that time period.
 Q. What is a NASDAQ audit trail?
 A. The audit trail is a document that's produced by NASD, NASDAQ, and it details purchases and sales by broker/dealers in each of the stocks that have been described as [H]ouse [S]tocks.
 Q. What did you find when you looked at the NASDAQ audit trail?
 A. I found that there was activity in the [H]ouse [S]tocks at other broker/dealers and that the activity at those broker/dealers, the prices were consistent with the prices I found at Hanover Sterling and I found that the price of the [H]ouse [S]tocks sold by the customers claim[ing] in this case were consistent with the prevailing market price I found in the audit trail.
 Tr.(Lowry) 603:15–24.

not making a market for the House Stocks on February 16, 1995, he fails to consider the affect on the market price of the House Stocks caused by any manipulations, including the illegal short selling, the negative publicity planted by the Short Sellers, the negative publicity caused by shutting down Hanover and Adler, the future demand for the House Stocks created by the illegal short selling, Adler's ability to remain in business if Hanover had actually closed on February 16, and any other factors which could have affected the market price of the House Stocks during the Final Week.[79] Finally, they assert that the trustee's expert, Joel Press, belies his contention that because Hanover should have been shut down for net capital violations on February 16, all subsequent trades can be ignored, because he testified that he has had numerous experiences where broker-dealers engaged in questionable or illegal activities that disguised net capital problems and trades were booked and honored anyway, *see* Tr.(Press) 105:16–106:12, and that brokers routinely discover net capital violations on the part of their introducing firms. *Id.* 99:15–100:9. Moreover, they contend that because the Short Sellers did not own (and did not arrange to borrow) those stocks, every short sale that Hanover purchased created an opportunity for a buy-in by Adler. They assert that, at a minimum, that buy-in would have netted the Final Week prices. Further, they maintain that Adler was not concerned about the Fake Buys and the Fake Short Sales because its plan all along was to effect a buy-in at market prices.

 Contrary to the Claimants' assertions, we are not bound by the posted prices of the House Stocks in the Final Week. In *Salmon,* the court upheld the NASD's finding "that although other broker-dealers were also publishing quotations with respect to debtor's securities, debtor could not have liquidated its securities" at the posted prices. *Salmon # 1* at 23. This approach, the court noted, "was justified by subsequent events which saw the collapse of the [house stock] prices when the debtor closed its doors." *Id.* Moreover, neither *Morris Communications,* nor the case it cites, *United States v. 100 Acres of Land, More or Less, in Marin County, State of California,* 468 F.2d 1261 (9th Cir.1972), *cert. denied,* 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973), valued an asset under § 548 where the underlying transaction was tainted by fraud. However, in *Morris Communications,* the Fourth Circuit found that the lower court should not have disregarded an exchange made "without any fraud or improper action by either party" and held that when there is an arms-length transaction by parties that have equal knowledge, a court should not substitute its own view of a fair market price. *See* 914 F.2d at 465, 474–75. The Challenged Trades were tainted with fraud; they were hardly arms length transactions. The Claimants have not established that Adler intended to effect the buy-in and, in any event, the buy-in is irrelevant. Moreover, Press testified unequivocally that Hanover should have been closed down on February 16. Tr.(Press) 66:25–68:2. Indeed, all the experts agree that Hanover was out of net capital on February 16 and should have been closed. Tr.(Press) 66:25–68:2; Norris Decl. ¶ 45; Tr.(Lowry) 714:12–17. So did the NASD's representative. *See* LaFond Dep. 10:8–13, 19:22–21:9. Despite a tremendous supply and little or no demand

---

79. They also contend that the trustee is arguing that when an introducing broker is knowingly in violation of a rule whose purpose is to protect investors like them, the clearing broker can close its eyes and continue to do business with the introducing broker, yet when those investors seek to enforce the trades booked by the knowledgeable clearing broker, it is appropriate to fictionally shut down both the introducing and clearing brokers and ignore the trades. Claimants criticize that position as being inconsistent with the custom in the industry and abhorrent to the dictates of SIPA, the securities laws and bankruptcy law. We find no merit to those assertions because, as we will explain, Adler and SIPC were not aware of Hanover's fraud.

110

for the House Stocks at the posted prices, during the Final Week, the prices remained stable. Hanover was virtually the only willing buyer at those prices ("purchasing" $61.5 million of House Stocks), and by the Final Week it knew that it was never going to pay for its purchases. Meanwhile, there was no shortage of sellers at Hanover's posted prices—$24 million from February 13 through 16, and $64.1 million during Hanover's final week. *See* Norris Decl. ¶¶ 22–65, 94 and 110. Even Lowry agrees that the stability in the prices was a hallmark of massive market manipulation. Tr.(Lowry) 707:17–708:10, 708:20–23. Thus, we disagree with the Claimants that the manipulated House Stock prices during the Final Week are the appropriate measure for determining reasonably equivalent value under § 548(a)(1)(B) of the Bankruptcy Code.

Once Hanover was out of business and no longer manipulating the securities market, the House Stocks prices dropped precipitously. On February 27, the business day after Hanover closed, those prices dropped more than 75%. Norris Decl. ¶ 108. While we can attribute some of that decline to the fact that Hanover was no longer acting as a market maker for the stock, *see* Tr.(Press) 714:18–715:3, we find that it was largely attributable to the fact that Hanover was no longer creating the illusion of demand. Norris Decl. ¶ 107.

Based upon all of the forgoing, we conclude that the posted prices of the House Stocks during the Final Week—a time when Claimants acknowledge that Hanover was actively manipulating the market—is not an appropriate measure of their value for purposes of § 548(a)(1)(B). Rather, we find that the posted prices of the House Stocks on February 27 are a more accurate reflection of their value.

Claimants also assail the selection of February 27 prices because they claim that the date assumes that Adler would have been forced to liquidate all of the House Stocks on one day. Neither Hanover nor Adler was open for business on February 27, 1995. Trustee Ex. 52, Bates No. AREG 0005 (February 26, 1995 letter from NYSE prohibiting Adler from conducting business); Trustee Ex. 87, Bates No. 000024 (N.Y.SE timeline). Claimants concede that Adler held the majority of the House Stocks, including the entire issue of many of the securities. *See* Cl. MOL at p. 1. Accordingly, the "market price" on February 27 reflects a date when none of the shares could be sold even though many (if not all) of Hanover's thousands of customers would have wanted to sell at that point. If they could have done so, the downward pressure would have further reduced the market prices of the House Stocks. *See* Tr.(Norris) 460:3–9. Finally, the fact that the House Stock prices were still subject to downward pressure exerted by the Short Sellers on February 27 is immaterial in light of the fact that one-and-a-half years after Hanover closed, when the market was no longer tainted by Hanover and the Short Sellers, the prices were still less than 25% of the February 27 prices. *See* Trustee Ex. 72. As Judge Herzog noted in *Salmon # 1,* "if the subsequent decline [in stock prices] indicates the true value of the securities on the critical date, a finding of unfair consideration may rest on the values which subsequently come to light." *Salmon # 1* at p. 17.

Section 548(a)(1)(B) also requires that Adler have been insolvent at the time of the Challenged Trades, or have operated or have been about to operate with unreasonably small capital as a consequence of the trades. 11 U.S.C. § 548(a)(1)(B). A company is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A); *R.M.L.,* 92 F.3d at 154–55 (a company is insolvent when its debts exceed its assets).

■ In the context of a going concern, "fair valuation" is determined "by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *Lawson v.*

Ford Motor Co. (In re Roblin Industries, Inc.), 78 F.3d 30, 35–36 (2d Cir.1996) (citing Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 995 (2d Cir.1981); Syracuse Engineering Co. v. Haight, 110 F.2d 468, 471 (2d Cir.1940); Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 666–67 (Bankr.S.D.N.Y.1992)). The key difference between liquidation value and fair market value is that the latter involves a reasonable time frame. See Travelers International v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 203 B.R. 890, 895 (D.Del.1996) (citing DuVoisin v. Anderson (In re Southern Industrial Banking Corporation), 71 B.R. 351, 356 (Bankr.E.D.Tenn.1987)), rev'd on other grounds, 134 F.3d 188 (3d Cir.), cert. denied, 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

■■■ However, where a company is on its "deathbed", we will value its assets according to what could be obtained at a liquidation sale and not give them a "going concern value." See Coated Sales, 144 B.R. at 667;[80] accord In re Taxman Clothing Co., 905 F.2d 166, 170 (7th Cir. 1990) ("going concern value is not the proper standard if the business is 'on its deathbed' ") (citation omitted); Langham, Langston & Burnett v. Blanchard, 246 F.2d 529, 532 (5th Cir.1957) (not proper to give "going concern" value to assets of business that was " 'financially dead or mortally wounded' ") (citation omitted); Foley v. Briden (In re Arrowhead Gardens, Inc.), 32 B.R. 296, 299 (Bankr. D.Mass.1983) (interpreting § 547 and stat-

ing " '[u]nless a business is on its deathbed . . . the "fair value" of its assets . . . is the going concern value or fair market price' ") (citation omitted), appeal dismissed, 776 F.2d 379 (1st Cir.1985). "Deathbed" indications include ongoing fraud, struggling to stay in business before fraud is discovered, fraud used in an attempt to alleviate cash flow problems and an inability to reorganize post-bankruptcy. See Coated Sales, 144 B.R. at 667–68; see also In re Art Shirt Ltd., 93 B.R. 333, 341 (E.D.Pa. 1988) (the business must be "wholly inoperative, defunct or dead on its feet for the deathbed application").

■■ We may consider evidence uncovered after the advent of bankruptcy to determine the value of the debtor's assets at the time the alleged insolvency occurred. "[A]lleged 'credits' " and "creative accounting" that "have the effect of grossly overstating [a company's] financial condition [ ] cannot be the basis of a court's solvency analysis." R.M.L., 92 F.3d at 156. When valuing what a potential buyer would pay for the assets of a business, we should assume that the buyer would have knowledge of "massive business-wide fraud" that was only discovered after the bankruptcy. Coated Sales, 144 B.R. at 668. After all, "fair market value entails a hypothetical sale, not a hypothetical company." Id.

The trustee's experts both testified that Adler and Hanover were insolvent by the close of business on February 16—before any of the Challenged Trades took place. See Tr.(Press) 60:8, (Norris) 317:23–318:7; Trustee Ex. ¶ 47.[81] The Claimants' expert

80. Coated Sales actually addresses solvency for the purposes of determining whether a preference is voidable under § 547, but the test for solvency is no different than that under § 548. Although, Claimants cite to it for the general rule that "[f]air value is not synonymous with a forced sale or the value of a continuing unhampered business", 144 B.R. at 667, they seem to overlook the court's later caveat regarding deathbed businesses:

However, if a company is only nominally extant, to treat it as a going concern would be misleading and would "fictionalize the

company's true financial condition." In re Randall Constr.[, Inc.], 20 B.R. [179,] at 184 [(N.D.Ohio 1981)]. Therefore, unless a business is on its deathbed, the fair valuation of its assets pursuant to 547(b) is the going concern value or the fair market price. In re Utility Stationery Stores, Inc., 12 B.R. 170, 176 (Bankr.N.D.Ill.1981). Coated Sales, 144 B.R. at 667.

81. In Ensminger III, we found that Norris is qualified to opine on the solvency of Adler and Hanover, including the valuation of their assets, based upon, among other things, his

objected to their use of February 27 market prices for the House Stocks in computing solvency, but did not otherwise object to their methodology in any meaningful way. All of the experts agree that by the close of business on February 16, Hanover was out of net capital compliance, and should have been closed. Tr.(Press) 64:9–22, 66:13–24, (Lowry) 710:25–711:14, 714:2–11; Press Decl. ¶¶ 30–36. Moreover, as noted previously, NASD would have closed Hanover down on that date had it known of the broker's true financial condition. Finally, there is no dispute that the closure of Hanover would have caused the prices of the House Stocks to drop. The trustee urges that the House Stock prices on February 27 are the best measure of their value in a marketplace in which Hanover did not participate, because they demonstrate what actually occurred after Hanover closed. Using those prices, the value of Hanover's House Stock positions on February 16 is $10.3 million, yielding a negative net worth of $16.9 million. The trustee maintains that the following considerations support his assertion that the value of the portfolio would have fallen. First, that is what the prices fell to on Hanover closed on February 27, 1995. Second, prices for the securities would have fallen dramatically even absent the fraud because they always fall when the major market maker for thinly capitalized stocks like the House Stocks drops out of the market. Third, even if Hanover had not closed, the law of supply and demand would have driven the prices below their posted level on February 16 since no one would have bought the stocks had they known about the fraud. Fourth, the House Stocks were worth less than $10.3 million because there was little or no substance to the companies involved. Fifth,

the House Stocks on February 16 were worth less than $10.3 million because that figure assumes that Hanover could have sold them, and in some cases, it owned the entire float.

We agree with the trustee's position that Hanover's net capital should be calculated to account for Fake Buys and buys that were later canceled by Hanover. As noted previously, at the close of business on February 16, Hanover recorded a $15.2 million cash debit in its proprietary accounts. However, this recorded debit fails to account for the $13.1 million in Fake Buys and subsequently canceled buys. After erasing these trades (*i.e.* putting the securities back into the proprietary accounts and removing the cash "credit" generated by the sale of these securities), Hanover's actual cash debit on February 16 is $28.3 million. Norris Decl. ¶ 104. To offset this debit, Hanover's only material assets were the House Stocks. *Id.* ¶ 108. With these adjustments, Hanover's net capital violation deepens to $6 million. Tr.(Press) 85:18–86:7; Press Decl. ¶¶ 38–43. Given Hanover's lack of net capital, there is also no serious dispute that Hanover would have been closed had regulators been aware of its status. Tr.(Press) 66:25–68:2, (Lowry) 714:12–17; Press Decl. ¶ 45; La-Fond Dep. 10:8–13, 19:22–21:9. Finally, the trustee and Claimants agree that because Hanover was the dominant market maker for the House Stocks, its closure would have resulted in a drop in the price of the securities. Tr.(Lowry) 714:18–715:3. The price depression would have been heightened when Hanover ceased purchasing House Stocks for its own account and booking fake buys or buys that would later be canceled. Norris Decl. ¶ 107.

advanced degree in finance, 16 years' experience as a forensic accountant, experience in reconstruction of the books and records of defunct companies in the financial industry involving allegations of fraud, and his experience in analyzing the influence of corporate disclosures on NASDAQ prices. *See Ensminger III*, 1998 WL 160039, *5–8. Norris

was assisted in his endeavors by Mr. Press, who is a certified public accountant with three decades of experience auditing broker-dealers, including clearing firms, and consulting for the securities industry. *See* Tr.(Press) 34:17–44:18; Press Decl. ¶¶ 1–2; Trustee Ex. 39.

Based upon all of the forgoing, any solvency analysis as of the close of business on February 16, 1995 must ascribe a lesser value to the House Stocks than those posted by Hanover. That price should reflect as nearly as possible a market untainted by Hanover's manipulation. We agree with the trustee that the February 27 prices are the most appropriate measure of the value of the House Stocks in a Hanover-less marketplace. *See id.* ¶¶ 107–08; Tr.(Press) 71:24–72:12, (Norris) 458:7–459:12; Press Decl. ¶ 45. That value does not assume that Hanover was rapidly required to liquidate its portfolio of House Stocks—the methodology employed under the "deathbed" standard. *See* 2 COLLIER ON BANKRUPTCY ¶ 101.32[4] at p. 101–116 (15th ed. rev.1999) ("liquidating value should be used" for business on its deathbed). By using February 27, 1995 prices (a day when Adler was not trading), the trustee's experts did not account for the market input of massive selling by Hanover customers whose holdings were tied up in this liquidation proceedings. While the Claimants' expert maintains that it is unprecedented to find a broker-dealer insolvent by using post-fling date prices to value securities, Tr.(Lowry) 604:24–605:14, that is precisely what the court did in *Salmon # 1*. *See Salmon # 1* at pp. 5–7, 17, 20.

Using February 27 prices, the value of Hanover's February 16, 1995 portfolio of House Stocks shrinks to $10.3 million. At those prices, Hanover's net worth was negative $ 16.9 million as of February 16, 1995:

| | |
|---|---|
| Cash debit (proprietary accounts) | $ (15.2 million) |
| Fake and canceled buys | (13.2 million) |
| Proprietary account securities (House Stocks at 2/27 prices) | 10.3 million) |
| Cash (Hanover bank accounts) [82] | 1.2 million) |
| Net worth (Net deficiency) | $ (16.9 million) |

According to Adler's January 27, 1995 FOCUS Report, the company had a net worth on January 27 of $11.1 million. *See* Norris Decl. ¶ 115. The trustee's expert opined that leaving aside losses related to Hanover, there is no evidence to suggest that Adler's net worth increased in any material way between January 27 and February 16. Jay Zaremba, Adler's chief operating officer, senior vice president and operator of the "cage" which monitors cash and security flow in an out of the company, testified that he was not aware of any activity during that period, outside of Hanover, that would have had any material impact on Adler's net worth. *See* Trustee Ex. 36.

The Claimants maintain that Norris was not even retained to perform a true insolvency analysis, and that his mechanical reliance upon the January 27 FOCUS report and the testimony of Mr. Zaremba to determine Adler's net worth is "absurd." *See* Cl. MOL pp. 105–106. However, Mr. Press' 25 page report, *see* Press Decl., is an insolvency analysis rendered by an expert qualified to render insolvency opinions, and it is supported by the detailed factual study conducted by Mr. Norris. *See* Norris Decl. As noted previously, the Claimants' expert, who never conducted a solvency analysis of his own and is not an expert in that field, *see* Tr.(Lowry) 616:22–24; Cl. MOL p. 105, found no problem with the methodology of Press and Norris other than its reliance on February 27 prices.[83]

The Claimants also argue that the February 27 House Stock prices are inappropriate because stock prices always go down when the dominant market maker ceases making a market. Their complaint ignores the reality of the situation. Had Hanover closed on February 16, as it should have, the prices of the House Stocks would have plummeted.

---

**82.** Adler never recovered this amount, which was withdrawn by unknown parties.

**83.** The Claimants belatedly attempt to proffer their own insolvency analysis in their post-trial brief. *See* Cl. MOL pp. 107–108. That analysis does not indicate that it was performed by an expert certified by this (or any other court) and is not part of the record.

Finally, Mr. Lowry maintains that the January 18, 1995 House Stock prices are a more reliable indication of their value than that suggested by the trustee because it reflects an unmanipulated market. We disagree. The IPO for the House Stock Panax—a company that had no assets and no plants yet had a market capitalization of $23 million—took place on January 18, 1995. In light of Lowry's acknowledgment that those circumstances "certainly could be" the hallmarks of market manipulation by Hanover, Tr.(Lowry) 724:22–725:1, we view his selection of January 18 as a manipulation free benchmark skeptically at best.

We have already rejected the Claimants' contentions regarding the enhanced value supposedly inherent in the House Stocks due to Adler's ability to reap profits from a buy-in that never took place.

Based upon all of the forgoing, we find that Adler had a nearly $6 million negative net worth at the close of business on February 16, 1995. *See* Norris Decl. ¶ 116; Press Decl. ¶ 46. It was therefore insolvent for purposes of § 548(a)(1)(B).

Even if Adler were not insolvent by February 16, the Challenged Trades would have rendered it so. There is no dispute that Adler was insolvent by the end of the Final Week, nor is there any dispute that Adler's insolvency was caused by losses created by Hanover's trading. Hanover's $21.4 million in House Stock purchases from the Short Sellers triggered Adler's obligations to NSCC. Assuming Adler was not already insolvent, those obligations to NSCC were themselves $10 million in excess of Adler's net capital. *See* Norris Decl. ¶ 116 (indicating that Adler's apparent net worth as of February 16 was $11.1 million); Press Decl. ¶ 46. As a consequence, Adler had insufficient capital to

engage in any business at all. *See Salmon # 1* at pp. 18–24.

■■■■ The Claimants' allegation that Adler was negligent or assumed the risk has no bearing on the trustee's § 548(a)(1)(B) claim. The statutory purpose of that section is the same as that of § 548(a)(1)(A)—to permit all creditors to share ratably in the proceeds of the estate, notwithstanding pre-bankruptcy transfers that tend unfairly to favor one creditor over another. *See Pereira v. Goldberger (In re Stephen Douglas, Ltd.)*, 174 B.R. 16, 19 (Bankr.E.D.N.Y.1994). The questions under § 548(a)(1)(B) are objective: whether the debtor was insolvent, rendered insolvent, or possessed of unreasonably small capital; and whether it received less than reasonably equivalent value in exchange for the assets transferred. *See* 11 U.S.C. § 548(a)(1)(B). Whether the debtor was negligent or knowing is irrelevant to this analysis.

We find that the trustee has satisfied his burden of demonstrating that the Challenged Trades were constructively fraudulent as to Adler creditors, including SIPC, under § 548(a)(1)(B).

### Avoidability of Trades under 11 U.S.C. § 544(b) and New York Debtor and Creditor Law

Pursuant to § 544(b) of the Bankruptcy Code, the trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowed] unsecured claim" against debtor. 11 U.S.C. § 544(b). For these purposes, applicable law includes the New York Debtor and Creditor Law. *See Ensminger I*, 218 B.R. at 702 (citing *In re Harvard Knitwear, Inc.*, 193 B.R. 389, 392 (E.D.N.Y.1996)).[84]

Under the New York Debtor and Creditor Law, creditors can avoid actually

---

**84.** In *Ensminger I*, we held that because the Bankruptcy Code avoidance sections clearly incorporate other applicable law, the trustee may avoid, "rescind" or "cancel" the Challenged Trades pursuant to any applicable law, including, but not limited to, SIPA, the Bankruptcy Code, and New York's Debtor and Creditor Law, N.Y. DEBT. & CRED. LAW §§ 270–81 (McKinney 1990). *Id.*

fraudulent transfers, *see* N.Y. Deb. & Cred. L. § 276,[85] as well as constructively fraudulent transfers. *See* N.Y. Deb. & Cred. L. §§ 273–74 (McKinney 1999);[86] *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 124–25, 508 N.Y.S.2d 17 (N.Y.A.D.1986), *appeal dismissed*, 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (N.Y.1987). In either case, the remedy is to "reestablish [ ] the status quo *ante*". *Id.* at 132, 508 N.Y.S.2d 17; *see also* N.Y. DEB. & CRED. §§ 278–79.

The trustee contends that by taking $31.5 million out of the estate during the Final Week, when Hanover and Adler were insolvent, Hanover intended the Challenged Sales to defraud Adler's creditors, including SIPC. Relying on *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993), the trustee contends that under § 276 of the New York Debtor and Creditor law, he can avoid the Challenged Sales from the Claimants because Hanover was acting as their agent and the statute permits him to recover from anyone who participates in the fraudulent transfer. Alternatively, the trustee contends that for the same reasons he says he can avoid the

Challenged Trades as constructively fraudulent transfers under § 548(a)(1)(B), he can avoid them under §§ 273 and 274 of the New York Debtor and Creditor Law.

The Claimants contend that to avoid a transfer under § 276 of the New York Debtor and Creditor Law as actually fraudulent, a creditor must demonstrate that the debtor intended to hinder, delay or defraud its creditors. They dispute the trustee's reading of *Stochastic*, and argue that because the trustee has not alleged, let alone proven, Adler's fraudulent intent, he is not entitled to relief under § 276 of the New York Debtor and Creditor Law. They maintain that, contrary to the trustee's assertion, *Stochastic* does not address the issue of "fraudulent intent" under § 276, or even the elements to establish an actual fraudulent conveyance under the statute. They say that the district court had found that there had been a fraudulent conveyance and that the determination was not the subject of the appeal. They maintain that, on appeal, the court only considered whether the remedy of money damages was available against a participant to the fraud, and found that it was. They deny that the court derived the fraudulent intent necessary to establish an

**85.** Section 276 states, as follows:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to present and future creditors.

N.Y. Deb. & Cred. L. § 276.

**86.** Entitled "Conveyances by insolvent", N.Y. DEB. & CRED. L. § 273 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. DEB. & CRED. L. § 273. Under § 274, "[e]very conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to

other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." Section 272 defines "fair consideration" as follows:

> Fair consideration is given for property, or obligation,
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y DEB. & CRED. L. § 272. Finally, under § 271, "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. DEB. & CRED. L. § 271.

actual fraudulent conveyance under § 276 from a participant other than the debtor. Thus, they argue that *Stochastic* does not relieve the trustee from adducing clear and convincing evidence of the debtor's fraudulent intent to establish an actual fraudulent conveyance under § 276 of the New York Debtor and Creditor law.

■ We disagree with the Claimants' reading of that case. In *Stochastic*, the transferee, a lawyer who was not the debtor, was also the transferor. He masterminded the fraudulent transfers and retained some of the transferred assets for himself. 995 F.2d at 1172. Contrary to the Claimants' assertion, on appeal, the court considered the fraudulent conveyance claim and held, among other things, that the transferee was liable for a fraudulent transfer. The court stated that:

> The New York Court of Appeals has made it clear that the pertinent provisions of the New York Debtor and Creditor Law provide a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and the beneficiaries of the conveyance .... It follows that [the lawyer] was properly held liable on the fraudulent conveyance claim.

*Id.* Thus, we find that *Stochastic* supports the trustee's assertion. Further, the New York Debtor and Creditor Law, which is New York's version of the Uniform Fraudulent Conveyance Act, *see* 30 N.Y. Jur.2d *Creditor's Rights* § 296 (1997), and § 548 are derived from the statute of 13 Elizabeth. *See* 37 Am.Jur.2d *Fraudulent Conveyances* § 3 (1968); (citations omitted); 5 COLLIER ON BANKRUPTCY ¶¶ 548.01[2] at p. 548–8, 548.LH[2] at p. 548–89 (15th ed. rev.1999). The two statutes devolve from the same source, are founded on the same principles and are designed to effectuate the same purposes. Thus, we fail to see why the intent imputation doctrine would not apply in New York as well, and none of the cases which the Claimants cite hold that it does not apply.

■ We also find that for the reasons we found that the Challenged Trades can be avoided as fraudulent transfers under § 548(a)(1)(B), the trustee is entitled to judgment avoiding them under §§ 273 and 274 of the New York Debtor and Creditor Law.

### Recission of Trades Under Non–Bankruptcy Law

The trustee also has established that we should uphold his determinations and rescind the Challenged Trades because they are fraudulent under New York common law and because they are illegal under the federal securities laws, New York's Blue Sky Laws, and/or the criminal provisions of SIPA.

### A. *Common Law Fraud*

■ Under New York (or federal common) law, the elements of a fraud claim are that: (i) the defendant made a material false representation; (ii) the defendant knew it was false; (iii) the defendant acted with intent to defraud; (iv) the plaintiff reasonably relied on the false representation; and (v) the plaintiff was damaged. *Marcus v. AT & T Corp.*, 138 F.3d 46, 62 (2d Cir.1998) (citing *Pence v. United States*, 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942); *Turtur v. Rothschild Registry Int'l., Inc.*, 26 F.3d 304, 310 (2d Cir.1994); *Gershon v. Hertz Corp.*, 215 A.D.2d 202, 202–03, 626 N.Y.S.2d 80 (N.Y.A.D.1995)). The trustee must establish each element by clear and convincing evidence. *See In re Embers 86th Street, Inc.*, 184 B.R. 892, 897 (Bankr.S.D.N.Y. 1995) (citations omitted). When a contract or conveyance is based on fraud or misrepresentation, the equitable remedies of cancellation or rescission are appropriate. 60 N.Y. Jur.2d *Fraud and Deceit* § 194 (1987); *Davis v. William Rosenzweig Realty Operating Co.*, 192 N.Y. 128, 134, 84 N.E. 943 (N.Y.1908); *Murkofsky v. Jerry,*

152 Misc.2d 141, 142–43, 584 N.Y.S.2d 707 (N.Y.Sup.Ct.1992).

█ It is settled that under New York law, guarantors cannot avoid their obligations absent a clear showing that the obligee was guilty of fraudulent concealment and misrepresentation or any other circumstances inconsistent with a bona fide transaction. *See* 63 N.Y. Jur.2d *Guaranty and Suretyship* § 172 (1987). Moreover, [c]onsistent with the holdings that guarantors may not easily avoid their obligations, courts have also made it clear that duties of inquiry and awareness fall upon the guarantor. *Chemical Bank v. Layne,* [423 F.Supp. 869, 871 (S.D.N.Y. 1976).] Thus, in applying New York law, the court in *Mohasco Industries, Inc. v. Giffen Industries, Inc.,* 335 F.Supp. 493, 497 (S.D.N.Y.1971) stated: "Then obligee is not under an obligation to disclose to a surety information of which the surety has knowledge readily to hand. A surety cannot 'rest supinely, close his eyes, and fail to seek important information' and then seek to avoid liability under the guaranty by claiming he was not supplied such information". *Magee v. Manhattan Life Insurance Co.,* 92 U.S. 93, 23 L.Ed. 699 (1876). *Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1286 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1202 (2d Cir.1980). As a preliminary matter, the Claimants contend that Adler cannot rescind the Challenged Trades under New York law because Adler guaranteed them and all the transfers made in connection therewith, the Claimants did not make any false statements to Adler in connection with those transactions, and Adler had full knowledge of Hanover's unauthorized buying and other machinations engaged to maintain the price of the House Stocks, and continued to guarantee the trades regardless.

Under New York's Statute of Frauds, no "special promise to answer for the debt, default or miscarriage of another person" is enforceable absent a writing signed by the guarantor. N.Y. Gen. Obl. L. § 5–701 (McKinney 1989). The Claimants argue that several documents govern their contractual relationship with Adler. First, they cite to the (i) the Customer Agreement (for those Claimants who signed one); and (ii) the Clearing Agreement, of which the Claimants are third party beneficiaries. They say that because under the Clearing Agreement, Adler agreed "to settle and clear" both the Claimants sales and buys and Hanover's sales and buys, *see* Clearing Agreement, ¶ 3(a)(i)(iii), like the NSCC, Adler stood in the middle between the Claimants, as seller, and Hanover, as the buyer. They contend that because the meaning of the contractual obligation "to clear and settle" is not readily apparent from the Clearing Agreement itself, it can only be understood by reference to the practices of the securities industry. They say that the Customer Agreement and Confirmations incorporate the "customs", "practices" and "usages" of the exchange or market over which Adler executed the trades. Moreover, they argue that interpreting those three writings as an expression of the parties' intention, read in light of the words used and their meanings in the securities industry, and in accordance with the customs, practices and usages of the over-the-counter market, NYSE and NASD, it is clear that Adler was obligated to deliver cash and Blue Chips to the Claimants accounts upon execution of the Challenged Trades. They argue that towards completion of its obligations, Adler debited the House Stocks from the Claimants' accounts and credited the cash proceeds and, for those Claimants who ordered the Blue Chips, Adler debited the purchase price and credited the Blue Chips to then account. They say that all those transfers were in fulfillment of Adler's obligation to "clear" and "settle" for both the Claimants and Hanover, as that obligation is understood by the securities industry. As support for what the practices in the securities industry are, the Claimants rely on their expert, Mr. Low-

ry,[87] statements by Adler's senior offi-

87. The Claimants rely on the following portions of the report that Mr. Lowry submitted herein.

The securities clearing system insures the integrity of securities markets by protecting customers, like the Claimants, from financial risks posed by broker dealers and the failure of contra parties, whose identity the customers usually do not know, to deliver cash or securities on trades. This is true where, as here, the Claimants authorized trades that were executed at market prices and recorded on the books and records of their clearing broker, Adler held those securities and cash.

Lowry Report at 4.

This means that Adler was obligated to deliver cash to Claimants, on their executed sales of House Stocks during the last five days of Hanover's trading ... even if the contra parties to those trades did not perform. It also means that Adler was obligated to deliver securities to Claimants on their purchases of Blue Chip Stocks regardless of whether the contra parties to those trades performed.

Id.

Pursuant to these documents and in accordance with the customs and practices of the securities industry, Adler guaranteed trades by Hanover and its customers.... The trades that Adler guaranteed included Hanover's purchases of House Stocks from Claimants and Claimants purchases of Blue Chip Stocks with the proceeds from their House Stock sales.... Adler was obligated to process and settle these trades.

Id. at 7.

88. They maintain that Charles Sanacore unequivocally stated that "any introducing broker who is buying and selling securities and giving up your name for the settlement of those securities, we have the liability to pay or receive those securities." Sanacore Dep. 44:15–24. They also say that Giordano testified that "the entire risk, in the event that Hanover doesn't have enough money to do the business it is doing 'falls on the clearing firm.'" They also quote him as explaining that "the clearing firm has to guarantee everything that's on the street side or you don't do business. So you must make good for anything on the Street side." Finally, they say that when asked about proprietary trades, he stated that: "You are also responsible there from a customer's view point as well as a regulatory view point. Expose your own capital of the firm." Giordano Dep. 18:24–19:21.

cers,[88] and statements by industry regulators.[89] They say that all of them confirm

89. The Claimants quote Salvatore Pallante, the senior vice president of the member firm regulation division of the NYSE since 1990, as follows:

The risk is really the same, as I mentioned before. I mean, whether you are buying it from the Street or whether you are buying it from the customer, to the extent you are increasing the proprietary position of the correspondent and the correspondent does not have enough money to pay for it, the firm still has the potential for a loss. The firm also has potential for a loss if the customer who is buying doesn't have money in the account and the customer doesn't come in with the money and doesn't pay. The firm's recourse would be if the customer doesn't pay, I look to the assets of the correspondent. If they don't make me whole, again I have a loss.

Pallante Dep. 23:12–24:3. The Claimants say that this is the reason why the NYSE, when it asked Adler to determine its continued viability without the existence of Hanover, asked Adler:

to accumulate then total positions for Hanover in order that we could make that assessment, that if Hanover did in fact go out of business, that [Adler] was on the hook for all their trades, at least for the settlement of those transactions, what would the financial impact be to them ... so that's what we kind of asked them to do, to accumulate the open trades because at that point we didn't have this information available yet.

Id. 29:13–30:3. They say that Pallante was even clearer later on in his testimony. They say that after explaining that Adler was responsible for NSCC trades, he was asked whether Adler was responsible for trades where "a customer sells a stock ... into the Hanover proprietary account ...." They contend that he replied, as follows:

The concern with debits in the customer accounts and the concern with the debit in the proprietary account of Hanover all came back to the same thing with me, which is exposure to the clearing firm from a financial viability point of view. And that it, whether the customer pays or not, and whether Hanover pays or not, the net result is our member still has a financial responsibility to settle and carry those positions. So, if, for instance, the clearing broker took a large position and did not pay Adler, Coleman for it, Adler, Coleman would have to settle that position and they would have to come up with the money if the correspondent didn't.

Id. 58:9–60:15.

that Adler guaranteed the Challenged Trades because it was obligated to deliver the cash and/or securities associated with them.

First, in arguing that we must consult the Clearing Agreement, Customer Agreement and confirmations to find Adler's guarantee, the Claimants apparently disregard the testimony of their expert, Mr. Lowry. He states that the source of the alleged guarantee is paragraph 3(a) of the Clearing Agreement, although he concedes that the paragraph does not use the term "guarantee", and paragraph 3(b) gives Adler the right to cancel the Challenged Sales. Tr.(Lowry) 663:11–23, 664:12–23. We are unpersuaded by Lowry's report and the testimony he gave during trial on this issue. While he testified that it was "customary" for a clearing firm to pay a customer for stock sold by that customer to an introducing firm if the introducing firm itself failed to pay on settlement, Tr.(Lowry) 575:11–576:16, 576:17–20, he was not asked about, nor did he specify, the source of this "customary" obligation, its nature, terms, or even any specific instance it had been complied with or enforced. *Id.* To essentially complete the supplemental evidence on this issue, the trustee's expert testified to the contrary, *see* Tr.(Press) 84:17–18, 82:18–83:17, and that he has spoken to the major clearing firms in this country and was explicitly advised that they "do not guarantee [such] trades." *Id.* 84:19–85:19.

We find Mr. Press' testimony to be more persuasive and in keeping with the plain language of the Clearing Agreement. We have already determined that the agreement is the operative document and that paragraph 3(b) plainly provides that Adler did not guarantee the Challenged Trades since

it gives Adler the right, among other things, to "refuse to confirm a transaction; cancel a confirmation of a transaction; refuse delivery or receipt of any cash securities or other property; [or] refuse to clear any transaction executed by [Hanover]." Clearing Agreement ¶ 3(b).

*Ensminger II*, 218 B.R. at 709. Further, as we have noted, at paragraph 13, the agreement specifically provides that "[Adler] shall have no liability to an Introduced Account for any loss suffered by them." *Id.*

We have reviewed the testimony that the Claimants cite and do not find that it establishes a guarantee where one does not exist. Moreover, Mr. Giordano made it clear that when he was discussing a "guarantee", he was referring to the "street side" transactions, *i.e.,* NSCC cleared trades, *see* W. Giordano Dep. 18:24–19:9,[90] and that Adler did not guarantee non-NSCC trades like the Challenged Trades.[91] Indeed, he testified that after learning of Hanover's fraud, he would have invoked Adler's rights under paragraph 3(b) and canceled all transactions in those House Stocks not related to the Street side. *Id.* 71:25–72:3, 73:4–74:11, 76:11–16. Finally, we do not read the Pallente deposition testimony to support the Claimants' argument. We read it to concern Adler's guarantee of the Street side transactions. Pallente Dep. 138:18–139:25. The Claimants have not cited any evidence that compels us to alter our determination that Adler did not guarantee the Challenged Trades.

The Claimants also contend that Adler has judicially admitted that it guaranteed the Challenged Trades because central to the Complaint is the trustee's allegation

**90.** The trustee admits that Adler guaranteed Street side trades.

**91.** Actually, Giordano testified that Adler did not guarantee the Challenged Sales, as follows:

Q. Now, if a customer authorized the sale of house stocks and the entity that pur-

chased the house stocks couldn't pay, would the customer still get the settlement?

A. No.

W. Giordano Dep. at 71:1–6.

that Adler, as clearing broker, was obligated to pay for Hanover's purchases of House Stocks, including those that the Claimants sold to Hanover. Moreover, they say that in this action, the trustee is seeking to avoid Adler's incurrence of an obligation to pay the Claimants the proceeds of the Challenged Sales. As support, the Claimants cite portions of the Complaint and the memorandum of law that the trustee submitted with the Complaint.[92] They also say that the trustee has made similar admissions in interim reports that he has filed herein,[93] and that the trustee's allegation of Adler's "guarantee" constitutes an essential element of the action that the trustee has commenced the Hanover Brokers for their scheme to defraud Adler.[94] We do not read the documents that the Claimants cite as supporting their position. Rather, as we read

them, they refer to Adler's guarantee of trades with the Street. As we have noted, they are covered by Adler's NSCC guarantee.

The Claimants also contend that the misrepresentation that the trustee alleges Hanover made is that Hanover intended and had the ability to pay the price bid for the Challenged Sales, depending, in part, on the legitimacy of the Fake Buys. While they concede that Hanover had no cash to pay for the Challenged Sales, they deny there was fraud because Adler did not rely on Hanover's representation. They contend that Adler knew Hanover could not pay for the Challenged Sales.

There is no dispute that, through its computer link, Hanover made the following representations to Adler: (a) customers were really purchasing and intended to

92. The Claimants note that the Complaint alleges that:

In an attempt to maintain the price of the House Stocks in the face of this selling pressure, Hanover increased its efforts to sell its House Stocks to its retail customers and it began to record phony "purchases" by retail customers from the Hanover proprietary accounts. While customers did not authorize these "buys", debits were created in their accounts that could never be paid. These debits were secured by the artificially inflated value of the House Stocks. Given that Hanover's customer debits could not be paid and Hanover's collateral had little value, Hanover became insolvent. As the clearing broker guaranteeing Hanover's trades, so did Adler.

Complaint ¶ 8. They note that the Complaint further alleges that: "As a practical matter Hanover was bankrupt. So was Adler because of Adler's guarantee of the phony 'trades' ". *Id.* ¶ 11. They also point out that in the memorandum that the trustee submitted in support of the Complaint, the trustee contended that:

Under the clearing agreement between Hanover and Adler (and, indeed, most clearing agreements), Hanover could direct the disposition of Adler's property, because Adler was obligated to guarantee to third parties any trades it cleared on Hanover's behalf.

Trustee's Memorandum of Law in Support of Complaint at 23. They add that he also argued that "it is patently obvious that Adler did

not receive reasonably equivalent value for the obligations it incurred to the Claimants by confirming the [Challenged] Trades." *Id.* at 26.

93. The Claimants cite to the trustee's Third Interim Report where they quote him as saying that "[a]s Hanover's clearing firm, Adler, Coleman effectively guaranteed all Hanover trading."

94. The Claimants point out that in his complaint against the Hanover Brokers the trustee alleges, among other things, that

When Hanover did close at the end of February, the bill came due for all those fake "buys"—approximately $70 million worth. There were no customers to pay. Hanover had no money. Adler, the clearing firm, was required to stand behind the trades. Unable to sustain those losses, Adler was forced to shut down.

Cl. Ex. 25 (Complaint Against Hanover Brokers) ¶ 8. The Claimants contend, without objection, that the $70 million includes the Challenged Sales. In his complaint, the trustee also alleges that:

Thus, with the true value of the House Stocks taken into account, on February 16 Hanover faced a net loss of $16.9 million on bad debts that were intentionally entered by the Defendants—a loss the Defendants knew that Adler would be forced to absorb. (As the clearing broker, Adler was forced to guarantee Hanover's trades and, in effect, to accept Hanover's trading losses).

pay for $45.1 million in House Stocks; (b) Hanover was going to pay for the $22 million in securities that remained in its proprietary accounts; (c) the prices for the Fake Buys represented the true market price real customers were willing to pay for the House Stocks; and (d) there were assets available from Hanover's customers to pay for the Fake Buys and Fake Short Sales that Hanover booked in the Final Week. We have already determined that Hanover knew that each of those representations was false, and that Hanover made them to deceive Adler.[95]

The Claimants deny that Adler justifiably relied on Hanover's misstatements and omissions. According to them, by the end of January 1995, senior Adler officials knew that Hanover was purchasing ever-increasing amounts of House Stocks to battle the illegal Short Sellers, that Hanover was out of cash with which to pay for these purchases and that Adler's net capital was threatened by this dilemma. They further assert that Adler also knew that Hanover had been engaging in numerous illegal trading practices and that these practices had been ongoing for weeks prior to February 16, 1995. In short, the Claimants maintain that any reliance by Adler under these circumstances would have been unjustified because Adler had prior warning.

Adler supervised and monitored the trading accounts of correspondent brokers, including Hanover, on a daily basis. Sanacore Dep. 40:22–41:24. However, it could not do so on a real time basis because the trades were not reflected in Adler's books and records until the morning after Hanover made the trades. Id. 24:10–16. Still, on a daily basis, Adler received, among other things, Margin Slates, Money Line Reports, Trade Date Exposure Reports, Trader's Daily Activity Reports and Trad-

er's Trade Date Profit and Loss Reports. UF ¶¶ 42–43. Margin Slates measured Adler's financial exposure created by trading in correspondent accounts. Sanacore Dep. 40–46. Money Line Reports were a daily calculation of the net result of the holdings in an account from a trade date and settlement date aspect. Id. 60:13–16. Thus, Adler could review all the trades, trade cancellations and rebooks in customer accounts the day after those transactions took place. Id. 61:18–23; 83:17–84:14.

By February 15, 1995, Adler was providing reports on a daily basis to NASD reflecting Hanover's standing in terms of inventory of House Stocks as well as trading and settlement of trades in those securities. Id. 23:9–24:9. Also by that date, a team of people from NYSE were on Adler's premises on a daily basis to monitor trading by Adler and Hanover and to ensure that they were both in capital compliance. Id. 24–26. Adler had been giving financial information to NYSE on Hanover's condition for approximately two weeks before Hanover closed. Id. 85:22–86:11, 87:8–21. The NASD was also physically on Hanover's premises by February 17, 1995 at the latest. LaFond Dep. 25:14–26:3. About this time Adler NYSE personnel informed Adler that they had received phone calls concerning Hanover customer complaints. W. Giordano Dep. 27:2–28:13. Adler's president William Giordano testified that Adler first became aware of illegal shorting of the House Stocks shortly after the Panax IPO in late January or early February of 1995. Id. 28:20–30:18. As early as December 5, 1994, Adler's Credit Risk Committee was also aware of accusations that Hanover had engaged in "free riding",[96] had ignored 90 day trading restrictions in certain accounts,[97] had been selling positions in cash

---

Id. ¶ 44.

**95.** Claimants deny that Hanover acted as their agent in making those representations. However, for the reasons we have previously stated, we find no merit to that assertion.

**96.** "Free riding" refers to the illegal practice of buying and selling a security without paying for the initial purchase. See Sanacore Dep. 76:16–18.

**97.** NYSE rules prohibit restrict trading in an

accounts that were not long the securities, had requested excessive trading "extensions" for invalid reasons[98] and that the extension rate at Hanover was 6%, which exceeded NYSE limitations. Sanacore Dep. 75–98, 160–62; Cl. Exs. 46–48. In addition, Adler was aware as early as January 23, 1995 that Hanover was the subject of an SEC investigation concerning alleged securities fraud. *See* Cl. Exs. 49–50.

Shortly after learning of the illegality of the Short Sellers' conduct, Adler informed NYSE and NASDAQ, its self-regulatory organizations, of the illegal short selling of the House Stocks, but was referred to NASD by NYSE and received no response from NASDAQ. W. Giordano Dep. 30:19–31:12. Adler could also see from its daily reports, including the Margin Slates and Money Line Reports, that Hanover was supporting the market by buying House Stocks from the Street. *Id.* 31:19–32:15.

Until the day before Hanover closed, the evidence that the NASD had received from Hanover indicated to the NASD that Hanover was in capital compliance. LaFond Dep. 17:18–18:11, 18:24–19:7. The NASD reported to NYSE on February 23, 1995 that Hanover was in net capital compliance. *Id.* 13:15–20; Trustee Ex. 87, Bates No. NYSE 00022–27 (N.Y.SE timeline).

Based upon its conversations with Hanover personnel, Adler had reason to believe that Hanover was or would soon be out of capital, and insisted that Hanover shore up its capital with a $10 million infusion. It also knew as early as December of 1994 that Hanover sometimes engaged in questionable trading practices and, in January of 1995, that it was the subject of an SEC investigation. Also, Adler monitored Hanover's trading on a daily basis. However, there is no evidence to suggest that Adler

knew that Hanover was in fact out of capital. The fact that Adler's shareholders infused $1 million in capital into Adler in an effort to save the brokerage house when its actual negative net worth at the time (as a consequence of Hanover's failure) was many times greater indicates that Adler had no concept of the breadth of Hanover's (or its own) financial status. Adler personnel flatly denied knowledge of Hanover's fraudulent scheme. Chairman and CEO Edward Cohan testified that the first time he thought Hanover had dome something illegal was the evening of February 23, 1995, when he learned that Hanover had bribed the Short Sellers and was contemplating doing it again. Cohan Dep. 62:18, 166:12–15, 182:4–183:9, 185:21–187:4, 206:8–207:8. He immediately reported the bribery to the NYSE. *Id.* at 207:20–209:10. Even after Hanover ceased operating, Cohan did not think that Adler would be forced to go out of business as well. *Id.* 105:16–19. He also testified that Adler would have ceased clearing for Hanover had it known that Hanover was out of capital compliance. *Id.* at 105:20–106:7. Adler's second-in-command William Giordano merely confirmed this testimony regarding Adler's knowledge of Hanover's conduct. *See* W. Giordano Dep. 10:16–18, 16:7–11, 34:17–35:8.

Although Adler could have terminated its computer link with Hanover at any time, the evidence does not reflect that Adler should have done so based upon the knowledge it possessed. It clearly was aware of trading and other improprieties at Hanover, questions regarding the value of the House Stocks and the daily volume of House Stock sales, and Hanover's precarious net capital situation. However, that knowledge does not even remotely approach what is tantamount to complicity in Hanover's fraudulent scheme, or even

---

account for 90 days if, among other things, a customer engages in free riding or fails to pay on a timely basis. Sanacore Dep. 76:12–15. If trades were booked into a restricted customer account, Adler would cancel the trade or terminate the account. *Id.* 75:24–76:8.

**98.** Under certain circumstances, a customer may be granted an extension of the time within which he must pay for securities purchased. Sanacore Dep. 94:8–15.

acquiescence in Hanover's actions as a calculated risk with a profit motive. We reject the Claimants' argument that Adler assumed the risk of Hanover's failure because it knew what was happening or that Adler should have closed Hanover down sooner. Moreover, and as a practical matter, Claimants would have been no better off if Hanover had closed its doors earlier because they would either have had House Stocks in their accounts or cash proceeds of same in amounts in excess of SIPA coverage. We find that the evidence does not support the Claimants' contentions.

 Thus, although Adler was clearly aware of trading irregularities at Hanover and that Hanover was struggling financially, Adler had no inkling of the true extent of Hanover's troubles or that it was engaging in fraudulent trading in an effort to stay in business. Regulators were similarly deceived by the efforts Hanover employed to conceal its actions until it was too late. Moreover, "[i]t is no excuse for a culpable misrepresentation that means of probing it were at hand." *Albert v. Title Guarantee & Trust Co.*, 277 N.Y. 421, 423, 14 N.E.2d 625 (N.Y.1938). At best, based upon the evidence, the Claimants' allegations regarding the extent of Adler's knowledge amounts to a claim that Adler was negligent in failing to more carefully scrutinize Hanover's actions. However, negligence is no defense to a charge of fraud under New York law. *Albany City Sav. Institute v. Burdick*, 87 N.Y. 40, 49 (N.Y.1881); *Angerosa v. White Co.*, 248 A.D. 425, 429, 290 N.Y.S. 204 (N.Y.A.D. 1936), *aff'd*, 275 N.Y. 524, 11 N.E.2d 325 (N.Y.1937); *Long Island Sav. Bank, FSB v. Bigman*, No. CV 89–0927, 1991 WL 144224, *6 (E.D.N.Y. June 25, 1991). Nor is assumption of the risk a defense to fraud, unless it can properly be construed as a lack of reliance on the plaintiff's part. *Bio–Vita, Ltd. v. Rausch*, 759 F.Supp. 33,

39–40 (D.Mass.1991) (applying Massachusetts law and holding that "[a]ssumption of risk is not, however, available as a defense in a fraud or contract action") (citing *Underwriters at Lloyd's v. Peerless Storage Co.*, 404 F.Supp. 492, 495 (S.D.Ohio 1975), *aff'd*, 561 F.2d 20 (6th Cir.1977)); *see also Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 619 (7th Cir.1991) ("Whittaker argues that Dexter knew full well that there was a serious risk that 7201C would prove defective yet it went ahead with the purchase anyway, presumably being compensated in the purchase price for the risk it was assuming. If this is true, then Dexter must lose. It would be a case in which the purchaser had placed no reliance on the seller's misrepresentations, and reliance is an essential element of a fraud case, because without reliance, fraud is harmless") (citations omitted).[99]

 New York courts have imposed a duty of investigation only in very narrow circumstances in fraud cases. In general, a plaintiff need not establish due diligence except in cases "in which plaintiff was placed on guard or practically faced with the facts." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *accord Manufacturers Hanover Trust Co. v. Drysdale Securities Inc.*, 801 F.2d 13, 18, 23–25 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (plaintiff bank justifiably relied upon false statements made by defendant broker-dealer even though bank failed to monitor adequately its own risk exposure, failed to take steps other banks routinely engaged in and failed to heed warning signs). The Second Circuit recently summarized the circumstances under which a business entity may be denied relief because of its failure to act with due diligence in the face of fraud:

---

**99.** Few cases address whether assumption of risk is a defense in a fraud case. The issue almost exclusively arises in personal injury or negligence cases. *See, e.g., Turcotte v. Fell*, 68 N.Y.2d 432, 437–38, 510 N.Y.S.2d 49, 502

N.E.2d 964 (N.Y.1986) (holding that since passage of comparative negligence statute, assumption of risk is now subsumed in question whether defendant owed plaintiff duty of care).

First, in many of these cases, there was a contractual provision expressly disclaiming reliance on any oral representations.... Second, a number of these cases involved issues of nondisclosure, rather than affirmative misrepresentation. Since fraud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment, are different causes of action and demand different elements of proof under New York law, those cases are of limited importance here. Finally, and most importantly, all of these cases involved situations in which the relevant facts were easily accessible to the relying party.

*Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir.) (citations and quotations omitted), *cert. denied,* 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997). None of these factors is present here: (i) there is no contractual provision disclaiming Adler's reliance on the *bona fide* nature of the trades booked by Hanover; (ii) Hanover's scheme involved numerous affirmative misstatements and acts of deliberate concealment, rather than mere nondisclosure; and (iii) Hanover went to great lengths to prevent the relevant facts from being "easily accessible" to either Adler or the regulators.

When Hanover gave Adler reason for concern, Adler responded by discussing the situation with Hanover and ultimately requesting that it infuse additional capital into the business. Adler also took other reasonable steps to protect itself, including speaking with regulators.[100] Despite these efforts, Hanover successfully concealed the nature and extent of its fraudulent scheme from Adler and regulators. Accordingly, as in *Lazard* and *Mallis*, the truth about the trades booked during the Final Week

was peculiarly within Hanover's knowledge.

The Claimants rely on a different formulation of the "justifiable reliance" standard. Citing *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), where the Supreme Court construed 11 U.S.C. § 523(a)(2)(A)—non-dischargeability for actual fraud—the Claimants argue that there can be no justifiable reliance "where, under the circumstances, the facts should be apparent to one of [the trustee's] knowledge and intelligence from a cursory glance." Even assuming this is the appropriate standard, the facts do not support a finding that Adler knew or should have known what was going on. Mr. Press testified that Hanover's fraud, and particularly its true financial condition, was not apparent to Adler. *See* Tr.(Press) 64:23–65:10. Unraveling the truth required an extensive investigation by the trustee's experts and information (like Hanover cash records and bank statements) to which Adler did not have access. *Id.* 65:11–17. Finally, the fraud was not apparent to either NYSE or the NASD. LaFond Dep. 13:15–20, 17:18–18:11, 18:24–19:7; Trustee Ex. 87, Bates No. NYSE 00022–27 (N.Y.SE timeline).

Based upon all of the foregoing, we find that Adler reasonably relied on Hanover's false misrepresentations. It was damaged as a consequence of Hanover's fraud by incurring the obligation to deliver cash and Blue Chips in exchange for the House Stocks sold from the Claimants' accounts. No one disputes, and we find, that the trades will result in financial loss to Adler if it is forced to pay for them. Thus, the trustee has met all of the requirements of a claim for rescission under New York law.

100. As noted previously, by February 15, 1995, Adler was providing reports on a daily basis to NASD reflecting Hanover's standing in terms of inventory of House Stocks as well as trading and settlement of trades in those securities. Sanacore Dep. 23:9–24:9. Also by that date, a team of people from NYSE were on Adler's premises on a daily basis to monitor trading by Adler and Hanover and to ensure that they were both in capital compliance. *Id.* 24–26. Adler had been giving financial information to NYSE on Hanover's condition for approximately two weeks before Hanover closed. *Id.* 85:22–86:11, 87:8–21.

## B. Illegality of Contracts under Federal Securities Laws

■ The trustee contends that the Claimants cannot enforce the Challenged Trades because they are illegal contracts under the 1934 Act. Under § 10(b) of the 1934 Act

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities agency——

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The particular rule "prescribed" by the SEC is Rule 10b–5, which provides that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ The six material elements of a cause of action under § 10(b) are: (1) a misstatement or omission by the defendant; (2) as to a material fact; (3) involving scienter on the part of the defendant; (4) relied upon by the plaintiff; (5) made in connection with the purchase or sale of security; and (6) causing damage to plaintiff. *See Schick v. Ernst & Young*, 808 F.Supp. 1097, 1101 (S.D.N.Y.1992); *see also Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540 (2d Cir.1996); *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 264 (2d Cir.1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

The trustee contends, and we have found, that Hanover deceived or defrauded Adler by controlling and artificially affecting the price of the House Stock. He denies that Adler willingly participated in that fraud, and maintains that he can avoid the trades under § 10(b) and Rule 10b–5 because if we enforce the Challenged Trades, we will make Adler a "forced" buyer of House Stocks.

■ While the Claimants do not dispute that Adler was an involuntary purchaser of securities [101] to the extent that it had to pay the NSCC for all of the House Stocks that Hanover purchased from the Short Sellers, *see Joseph Roberts & Co. v. Mishkin (In re Adler, Coleman Clearing Corp.)*, No. 95–08203, Adv. Proc. No. 95/8266A, slip op. at 25 (Bankr.S.D.N.Y.

---

101. Both "voluntary" and "involuntary" purchasers of securities can assert claims under Rule 10b–5. *See A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir.1967) (broker who had been compelled to sell securities and thereby incur a loss by customer's refusal to pay for securities had standing to bring 10b–5 claim); *Rooney Pace, Inc. v. Reid*, 605 F.Supp. 158, 161 (S.D.N.Y.1985) (same); *Jefferies &*

*Co. v. Arkus–Duntov*, 357 F.Supp. 1206, 1213 (S.D.N.Y.1973) (privity between plaintiff and defendant not required in order to have standing to sue, and broker had standing where "for reasons beyond its control, [it] ended up being a purchaser from [the fraudulent seller] as if it had acquired the stock directly from the [fraudulent seller]") (citation omitted).

Feb. 7, 1997) (finding that trustee had standing to assert Rule 10b–5 claim in light of allegations that Adler became a forced purchaser of the House Stocks Hanover purchased from the Short Sellers), they deny that the trustee can avoid the Challenged Trades because Adler has not purchased their House Stocks. Indeed, they note, the purpose of this litigation is to avoid the obligation to do so. However, since Adler will have to purchase those securities if the trustee does not prevail in this litigation, he has standing to seek to rescind the Challenged Trades under Rule 10b–5. They also deny that Adler relied on Hanover's omissions and misrepresentations. However, we have previously found that Adler reasonably relied on them.

Next, the Claimants dispute that the Challenged Trades are illegal contracts since they do not obligate anyone to commit a crime or violate the law, and contend that the trades themselves are not proscribed by law. While they do not deny that Hanover violated the 1934 Act in effecting the Challenged Trades, they say that the violation is merely collateral to the Challenged Trades, and does not make them illegal. Alternatively, the Claimants contend that even assuming, *arguendo*, that the Challenged Trades violate the 1934 Act, the trustee cannot prevail because they are innocent of any wrongdoing, and § 29(b) of the 1934 Act makes contracts voidable only against persons who have violated a provision of the 1934 Act, or the rules and regulations promulgated thereunder.[102]

Contrary to the Claimants' assertions, Hanover's fraud was not merely collateral to the Challenged Trades. The evidence proves that but for that fraud, the Challenged Trades would not exist, because the Fake Buys and Fake Short Sales were part of the fraud. The Claimants concede that Hanover manipulated the House Stock prices during the Final Week. Tr. (Lowry) 726:25–727:2. The securities laws prohibit that kind of illegal market manipulation. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Contrary to the Claimants' assertions, the Challenged Trades are unlawful contracts that are avoidable under § 29(b). *See Zerman v. Jacobs*, 510 F.Supp. 132, 135 (S.D.N.Y.) ("under § 29(b) of the Exchange Act, only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts") (footnotes omitted), *aff'd*, 672 F.2d 901 (2d Cir.1981); *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*, 903 F.Supp. 479, 498 (S.D.N.Y.1995) ("contracts to purchase securities were induced through fraud in violation of the anti-fraud provisions of the Exchange Act, thus rendering those contracts 'unlawful contracts' under § 29"). To be sure, courts narrowly read that section to preclude the voiding of a contract against a party innocent of the violation. *See Occidental Life Ins. Co. v. Pat Ryan and Assocs., Inc.*, 496 F.2d 1255, 1265–66 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974). Thus, even if § 29(b) itself did not compel recission of the trades, § 10(b) and Rule 10b–5 would— § 29(b) is "more properly viewed as an adjunct to the other remedies provided by the [1934 Act] and ... should be read as complimenting those remedies

---

**102.** Under § 29(b) of the 1934 Act,

every contract made in violation of any provision of this Act or of any rule or regulation thereunder, and every contract ... heretofor or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this Act or any rule or regulation thereunder, shall be void (1) as regards to the rights of any person, who in violation of such provision, rule or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards to the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation ....

15 U.S.C. § 78cc(b).

available to injured parties and not as being antagonistic." *Id.*

Finally, the Claimants say that under federal and New York common law, in applying the defense of illegality to a transaction protected by a statute, we must consider the effect on the policies underlying the violated statute. They contend that they are innocent third parties and that we should not avoid the Challenged Trades *ab initio*, because § 29(b) does not provide that remedy, and because if we do, we will undermine the goal of the 1934 Act, which is to protect innocent customers and provide certainty and efficiency to the market. Without disputing the trustee's assertion that Hanover violated the criminal provisions of SIPA and the Martin Act in effecting the Challenged Trades, they make similar arguments to counter his efforts to avoid those trades as illegal under those statutes. According to them, to redress the fraud on Adler, the trustee should sue the illegal Short Sellers and individual Hanover brokers. In fact, he has sued both Hanover and certain of its former brokers. However, irrespective of his success in that litigation,[103] we will not permit the Claimants to reap the benefits of the fraud of Hanover and its agents. As the *Salmon* cases illustrate, settled and vital public policy requires that legitimate creditors of brokerage firms, including SIPC, must not become easy targets for unscrupulous brokers.

The Claimants also argue that in January and February of 1995, Adler knew that Hanover had been engaging in unauthorized buying of House Stocks and other questionable acts to maintain the value of the House Stocks, and that armed with such knowledge it elected to speculate on its and Hanover's ability to beat the illegal Short Sellers in the hopes of getting very rich. For the Claimants, Adler took a chance and lost and should not be permit-

ted to thwart their legitimate expectations and the benefit of the Challenged Trades.

We have already determined that, as a matter of fact, that is not what transpired. However, to rescind the Challenged Trades the trustee must establish only that Adler did not act recklessly in its dealings with Hanover. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 79 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Manufacturers Hanover*, 801 F.2d at 22 n. 7; *Johnson & Staley, Inc. v. Bushan & Levy, P.C.*, 527 F.Supp. 1159, 1162 (S.D.N.Y.1981) ("in a Rule 10b–5 action, where the defendant puts the plaintiff's own conduct and behavior at issue with respect to the purchase or sale of securities, due diligence does not encompass concepts of negligence—rather the issue is one of plaintiff's recklessness, and plaintiff's burden is not to establish due care but to negate recklessness"). He has done so. As discussed previously, Hanover took extensive steps to conceal the nature and extent of its fraudulent scheme. Although Adler had the ability to monitor Hanover's trading, was aware as early as December of 1994 of trading irregularities, was aware in January of 1995 that Hanover was in financial difficulties and was being investigated by the SEC, the evidence does not reflect that Adler knew or should have known what was actually transpiring. Hanover closed before the Fake Buys and Fake Short Sales that it booked on or after February 17 could settle. Thus, as of the date Hanover closed, none of the purported buyers or short sellers had yet failed to pay for or deliver securities, so Adler had no timely notice of the number or volume of fake transactions booked as part of the fraud. *See* Tr. (Press) 57:18–22, 306:15–25. As noted, the fictitious buys and short sales were entered into to Adler's records as if they were real and had every appearance of being legitimate. Tr.(Lowry) 684:25–

---

**103.** The trustee obtained a default judgment against Hanover in the amount of $24,914,-805.61 on October 19, 1995. *See Mishkin v. Hanover Sterling & Co., Ltd.*, No. 95 Civ. 5551 (S.D.N.Y. Oct. 19, 1995). Actions against the Hanover brokers are still pending, but have been removed to the district court for determination.

685:6, 732:23–24. While with the benefit of hindsight, it may be easier to claim that Adler should have been more vigilant, the fact remains that it took an investigation lasting several years to uncover the details of Hanover's fraud, while Adler, at best, had one or two weeks.

We find *Manufacturers Hanover*, 801 F.2d at 13, to be instructive on this point. In that case, an auditor (Arthur Anderson) was held liable under Rule 10b–5 as a consequence of its actions in providing the plaintiff-bank with audited financial information falsely attesting to the solvency of a broker-dealer (DGSI) engaged in a fraudulent Ponzi scheme. DGSI collapsed three months after it began transacting business, causing tens of millions of dollars in losses to the bank. The auditor was held liable even though the bank never requested a balance sheet and other banks had the foresight to get out before DSGI collapsed:

> Anderson introduced evidence that at no time did MHT request a DGSI balance sheet as of February 1, 1982, or a DGSI balance sheet or income statement as of any later date. Anderson also introduced evidence that MHT inadequately monitored DGSI's creditworthiness and MHT's own risk exposure, in contrast to other financial institutions, several of which extricated themselves from business dealings with DGSI in time to avoid the kind of loss that MHT ultimately suffered.

*Id.* at 18. Also, while Anderson's expert identified certain improvements to the way MHT marked DGSI's repurchase contracts to market that might have protected the bank, the court found that it conduct did not amount to recklessness:

> [E]vidence of these internal controls by MHT was sufficient to justify a jury's negating the charge of recklessness as to market risk, whether or not MHT could have or should have actually initiated, as opposed to merely processed and periodically monitored, markings to market.

*Id.* at 24.

The trustee concedes that Adler might have done more to protect itself, but states, as we have already discussed, that Adler did take some steps in the short time available to it, such as going to the regulators and asking Hanover to put up additional capital. *See* Cohan Dep. 207:20–208:3; W. Giordano Dep. 10:12–20, 21:8–23:17; Trustee Ex. 87, Bates No. NYSE 0000022–27 (N.Y.SE timeline); Trustee Ex. 88, Bates No. NYSE 0000029–32 (N.Y.SE memorandum); Tr.(Lowry) 597:11–598:15 (Claimants' expert Lowry testifying that Adler was scrutinizing Hanover closely and concluding that "Adler was watching them as close as they possibly could").

In *Manufacturers Hanover*, it was a matter of months between evidence of DGSI's fraud and its collapse, while here it was a matter of at best one week:

> Anderson also argues that MHT recklessly failed to heed warning signs of DGSI's impending collapse. In our view, Andersen relies improperly on *Edwards & Hanly [v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980),] and thereby mischaracterizes MHT's immediate response to warning signals as a longer-term organizational policy of conscious avoidance. During the approximately one month preceding DGSI's collapse, DGSI often failed to return securities due. As Andersen points out, in April 1982 "fails" lasting three or more days occurred on 58 percent of DGSI's scheduled returns. But the countervailing evidence was sufficient to allow a finding that the charge of recklessness had been negated: MHT officers Martello, D'Amore and Zinns apparently worked with DGSI in April and May in an effort to reduce exposure risks; and, in May 1982, MHT was in daily communication with DGSI

regarding the former's exposure. Further, there was evidence that in MHT's experience, DGSI consistently cured fails, and that, in any event, only fails that occurred in the week prior to the collapse of DGSI were still open on May 17, 1982. This contrasts with *Edwards & Hanly,* where, in response to fails of up to several months for securities due within several days, repeatedly over a period of approximately one year, plaintiff E & H made only "sporadic inquiries" and even then apparently contented itself with evasive answers. *Edwards & Hanly,* 602 F.2d at 486–87. Finally, we must recognize the sheer speed of events herein in contrast to *Edwards & Hanly.* While E & H had approximately one year during which it could have protected itself from ongoing fails, here MHT had at most one-quarter to one-third that duration from the time of the circulation of the Andersen statement in February 1982 until the ultimate collapse of DGSI in May 1982. Indeed, the duration must be considered shorter still when measured from the time when fails became a legitimate source of concern. In sum, as to the brief period of MHT's interaction with DGSI, the evidence supports the conclusion that MHT endeavored to protect its investments, and negated the charge of recklessness.

*Manufacturers Hanover,* 801 F.2d at 24–25. Although Hanover's operational problems and capital position may have been a "legitimate concern" to Adler for some weeks before February 1995, we find that Adler was not reckless in failing to shut Hanover down in the four business days that elapsed between the booking of an unprecedented volume of fictitious buys on February 17 and Hanover's closure before noon on February 24.

While the Claimants contend in substance that the clearing industry generally should implement further measures to prevent fraud, Tr.(Lowry) 554:21–556:23, they introduced no evidence regarding whether other clearing firms could or would have avoided the Hanover calamity. *Cf. Manufacturers Hanover,* 801 F.2d at 23–24 (fact that the plaintiff-bank followed prevailing industry practice negated the charge of recklessness—even though other banks in fact avoided being caught up in the wreckage). Indeed, the Claimants' expert conceded that

> [i]n the defense of clearing firms, no rule of the SEC, New York Stock Exchange, NASD, or other rule requires that clearing firms [ (1) ] conduct any due diligence regarding prospective introducing brokers, [ (2) ] provide any regulatory notice or obtain any approval before commencing or when terminating a clearing relationship, [ (3) ] determining the capital adequacy of its introducing firms, or [ (4) ] apply or enforce any capital standards in leverage limits upon an introducing broker.

Tr.(Lowry) 734:25–735:14.

The Claimants also contend that Adler contributed to its downfall by improperly extending credit to Hanover secured by House Stocks that were "non-marginable". *Id.* 593:14–595:7, 598:16–23, 382:9–384:6. However, under the governing federal regulations and NYSE rules, the concept of "marginability" does not apply to the relationship between Adler and Hanover. Federal Regulation T governs the extension of credit by broker-dealers. It permits clearing firms to extend market makers credit secured by the securities in which they make a market, irrespective of whether the securities are "margin securities" or "nonmargin securities" as defined by the regulation. As it existed in 1995, a "Supplement" to Regulation T contained the general rules regarding the required margins for different types of securities. *See* 12 C.F.R. § 220.19 (1995). Nonetheless, it permitted broker-dealers to extend credit to market makers based on "good faith margin", exempting such extensions of credit from the strictures of the Supplement. Thus, while the Supplement required 100% margin for "nonmargin, non-

exempted securit[ies]", *see id.* § 220.19(2), Regulation T stated that "[a] creditor may clear or finance with a good faith margin, marketmaking transactions for an OTC marketmaker". *Id.* § 220.12(d)(1). For these purposes, the term "good faith margin" meant

> the amount of margin which a creditor, exercising sound credit judgment, would customarily require for a specified security position and which is established without regard to the customer's other assets or securities positions held in connection with unrelated transactions.

*Id.* § 220(k). The regulation also indicated that if the borrower ceased to act as a market maker, the rules in the Supplement would come back into force:

> If the credit extended to a marketmaker ceases to be for the purpose of marketmaking, or the dealer ceases to be a marketmaker for an issue of securities for which credit was extended, the credit shall be subject to the margin specified in § 220.18 (the Supplement).

12 C.F.R. § 220.12(d)(2) (1995).[104] We read the regulation to provide that so long as the borrower was a market maker, the broker-dealer could extend it credit without regard to margin requirements contained in the Supplement, including the 100% margin requirement for "nonmargin" securities.[105]

The NYSE rules governing Adler's conduct were to similar effect:

> A member organization may carry the account of an 'approved specialist or market maker,' which account is limited to specialist or market making transactions, including option hedge transactions established pursuant to the requirements of Rule 105, upon a margin

basis which is satisfactory to both parties.

NYSE Rule 431(e)(5)(A). The next subsection, which governs non-market maker accounts, specifically incorporates Regulation T:

> A member organization may carry the proprietary account of another broker/dealer, which is registered with the Securities and Exchange Commission, upon a margin basis which is satisfactory to both parties, provided the requirements of Regulation T of the Board of Governors of the Federal Reserve System are adhered to and the account is not carried in a deficit equity condition.

NYSE Rule 431(e)(6). We conclude that Adler was entitled to extend credit to Hanover upon a margin basis which was satisfactory to both parties. Even the Claimants' expert conceded that Adler was "free to reach any agreement it want[ed] to with a market maker with respect to how much it wish[ed] to loan against those stocks." Tr.(Lowry) 613:12–23.

■ Finally, the fact that Adler was a sophisticated player in the securities markets is unavailing. Even sophisticated corporate insiders can be defrauded in connection with the purchase or sale of the corporation's securities if they are deprived of access to material inside information. *See Dupuy,* 551 F.2d at 1022, *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1973), *aff'd after remand,* 527 F.2d 880 (3d Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).

## C. *Illegality under the Criminal Provisions of SIPA*

■ In relevant part, SIPA's criminal penalty provision states that

---

**104.** This cross-reference was apparently a typographical error since the Supplement was codified at 12 C.F.R. § 220.19 in 1995.

**105.** Regulation T has been amended since 1995. However, it continues to permit the extension of credit to market makers secured by securities that are not otherwise marginable. Under the version of Regulation T that

became effective on April 1, 1998, "[a] creditor may extend the following types of credit with good faith margin: ... [c]redit to a member of a national securities exchange or registered broker or dealer to finance its activities as a market maker or specialist." 12 C.F.R. § 220.7(g)(5) (1999).

Any person who, directly or indirectly, in connection with or in contemplation of any liquidation or direct payment procedure—

(A) employs and device, scheme, or artifice to defraud;

(B) engages in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; or

(C) fraudulently or with intent to defeat this chapter—

 (i) conceals or transfers any property belonging to the estate of the debtor
 . . .

 (iv) receives any material amount of property from a debtor . . .

shall be fined not more than $50,000 or imprisoned for not more than five years or both.

15 U.S.C. § 78jjj(c).

Hanover violated this section by hatching its fraudulent scheme in contemplation of, and to insure that the Claimants obtained preferred claims in, this SIPA proceeding. *See Investors Center, Inc.,* 129 B.R. 339, 353 (Bankr.E.D.N.Y.1991) (court suggested that a "course of business," operating as a "fraud or deceit," upon persons placing sell orders with the brokerage house in its last weeks of operations would be prohibited by § 78jjj(c)(1)(B)); *see also Salmon # 1* at pp. 13–15 (holding that sale of house stocks just prior to bankruptcy is fraud on SIPC). *But see Newsome v. Culp (In re Fitzgerald, DeArman & Roberts, Inc.),* 129 B.R. 652, 661 (Bankr. N.D.Okla.1991) (although declining to decide the issue, court suggested that § 78jjj(c) is directed to crimes committed during the pendency of a SIPA proceeding rather than prior to its filing).

■ Even if Adler had been negligent or assumed the risk in connection with the Challenged Trades, it would have no bearing on whether Hanover or its traders and brokers are guilty of this crime. There is no reliance element in the statute—one cannot plausibly argue that the victim of the crime asked for it by assuming the risk and acting negligently. Moreover, the victim of a § 78jjj(c) offense is not Adler, but creditors who must satisfy their claims out of the estate, and SIPC, which must protect some of those creditors against the estate's inadequacy. *See United States v. Saacks,* 131 F.3d 540, 543 (5th Cir.1997) (estate's creditors are "victims" of bankruptcy fraud under sentencing guidelines); *United States v. Shadduck,* 112 F.3d 523, 531 (1st Cir.1997) ("the primary victims of a bankruptcy fraud, for the most part, are the individual creditors").

### D. *Illegality under the Martin Act*

■ The Martin Act, New York's Blue Sky Law,[106] prohibits any "fictitious or pretended purchases or sales of securities," the use of "any device, scheme or artifice to defraud," or the use of "any deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise" in the sale of securities. N.Y. Gen. Bus. L. § 352(1) (McKinney 1999). It does not require that the victim be a buyer or a seller of the securities in question, or that there be privity between the victim and the wrongdoer. *Florentino,* 116 Misc.2d at 700–02, 456 N.Y.S.2d 638. As long as fraudulent activity has occurred, the statute does not require that there have been any sale of securities. *People v. Electro Process, Inc.,* 284 A.D. 833, 833, 132 N.Y.S.2d 531 (N.Y.A.D.1954).

---

**106.** The Martin Act is embodied in article 23–A of the General Business Law of New York. It was first enacted in 1921 to prevent fraudulent sales of securities " 'and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited.' " *People v. Florentino,* 116 Misc.2d 692, 693 n. 1, 456 N.Y.S.2d 638 (N.Y.Crim.Ct.1982) (citation omitted). It is directed primarily to the protection of the public to a greater degree than the protection provided by an action for fraud. *Id.* Section 352(1) of the law gives the attorney general investigatory powers with respect to allegations of fraud. Section 352-c provides that violations of the act are subject to prosecution as either a misdemeanor or felony.

Hanover's efforts to execute the Challenged Trades clearly violated the Martin Act because they were designed to deceive Adler, the regulators and the public. As such, the trustee has the power to rescind them.

### Trustee's Ability to Cancel Trades under the Clearing Agreement

The trustee correctly contends that the Clearing Agreement gives him another basis for canceling the Challenged Trades. That agreement gave Adler the right to cancel, refuse to confirm or cancel confirmation of any trade whenever it had reasonable grounds to believe that such action was necessary to protect its interests. *See* Trustee Ex. 771 (Clearing Agreement) ¶ 3(b); *see also* Trustee Ex. 66 ¶ 5(b) (Customer Agreement) (giving Adler same right). The trustee maintains that he can cancel the Challenged Trades because if the Claimants enforce them, it may cost the estate tens of millions of dollars.

The Claimants maintain that the trustee cannot assert Adler's rights under the Clearing Agreement because under § 365 of the Bankruptcy Code, that agreement is an executory contract that was deemed rejected by Adler 60–days after the Filing Date since the trustee failed to assume it. *See* 11 U.S.C. § 365(d)(1).[107] For those purposes, an executory contract "is one in which the obligations of each party remain substantially unperformed." *In re C & S Grain Co.*, 47 F.3d 233, 237 (7th Cir.1995). A contract is no longer executory if one party has breached the contract prepetition and the

other party has no further duty to perform. *See id.; see also* 3 COLLIER ON BANKRUPTCY ¶ 365.02[1], at p. 365–18 (15th ed. rev.1999) ("only contracts substantially unperformed on both sides" are executory). State law governs the questions of construction and breach of contracts. *See Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1496–97 (9th Cir.1991). Under New York law, a party is relieved of continued performance under a contract only when the other party's breach is material. *See Medical Malpractice Insurance Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir.1997) (citing Restatement (Second) of Contracts § 237 comment b (1979); Walter H.E. Jaeger, *Williston on Contracts* § 1455 (3rd ed.1970)). A material breach is one "that goes to the root of the contract." *Id.*

At the latest, Hanover was in material breach of the Clearing Agreement on February 24, 1995, when the regulators shut it down because as of that date, Hanover was in default under the agreement [108] and could not perform thereunder. Thus, as of February 24 (at the latest), that agreement was not executory because Adler had no obligation to perform under it. The agreement was not deemed rejected under the Bankruptcy Code. While the agreement was not "executory" for purposes of the Bankruptcy Code, it did not cease to exist, and the trustee can exercise Adler's right thereunder to cancel the trades in accordance with the terms of the contract, except as restricted or prohibited by appli-

---

**107.** It is undisputed that § 365 of the Bankruptcy Code applies in a SIPA liquidation proceeding. *See* 15 U.S.C. § 78fff(b); *Camp v. National Union Fire Insurance Co. (In re Government Securities Corp.)*, 111 B.R. 1007, 1011–12 (S.D.Fla.1990) (finding that securities dealer blanket bond was not executory contract that had to be assumed with 60 days by trustee or would be deemed rejected), *aff'd*, 972 F.2d 328 (11th Cir.1992), *cert. denied*, 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993). Pursuant to § 365(d)(1), [i]n a case under chapter 7 of [the Bankruptcy Code], if the trustee does not assume

or reject an executory contract ... of the debtor within 60 days of the order for relief, or within such additional time as the court, for cause, within such 60–day period fixes, then such contract ... is deemed rejected. 11 U.S.C. § 365(d)(1).

**108.** *See* Trustee Ex. 771 ¶ 16(d) (Clearing Agreement) ("This Agreement may be terminated by [Adler] immediately if [Hanover] is enjoined, disabled, suspended, prohibited or otherwise unable to engage in the securities business").

cable law. *See Ensminger I*, 218 B.R. at 707–08.

The Claimants maintain that, in any event, the agreement does not permit the trustee to cancel the trades unless it was objectively reasonable for Adler to do so, and cite several reasons why the trustee cannot make that showing. First, they argue, in essence, that Adler cannot cancel the Challenged Trades because it guaranteed them.[109] However, we previously rejected that contention and do not alter that conclusion. *See Ensminger I*, 218 B.R. at 708–09. Next, they say that in the eyes of the NSCC and NYSE, the Clearing Agreement does not permit Adler to cancel the Challenged Trades, because on at least two occasions, Adler specifically requested and was denied permission from the NSCC and NYSE to cancel the trades. However, the evidence that the Claimants rely on does not bear out that contention.[110] Rather it shows that Adler unsuccessfully sought leave to cancel trades between Hanover and the Street that cleared through the NSCC. Adler guaranteed those trades. Finally, they say that Adler booked the Challenged Trades as part of its alleged plan to preserve its own profit potential through a buy-in, even though it knew that Hanover could not pay for its purchases and had been engaging in fraudulent trading, and thus cannot in good faith cancel the Challenged Trades simply because SIPC interrupted that plan. We have determined that Adler did not engage in any such plan. In any event, the tort

concepts of contributory negligence and assumption of the risk cannot vitiate the trustee's contractual right to cancel the Challenged Trades. *Cf. Viacom Int'l, Inc. v. Midtown Realty Co.*, 235 A.D.2d 332–33, 652 N.Y.S.2d 740 (N.Y.A.D.1997) ("negligence is not a defense to a cause of action for breach of contract").

The trustee plainly has reasonable grounds for canceling the Challenged Trades and under the Clearing Agreement, he is entitled to do so.

Each of the Claimants who submitted separate findings of fact and/or conclusions of law maintains that he or she authorized the Challenged Trades. We have already discussed their factual allegations in connection with the trustee's allegations that they did not. Before concluding this decision, we address their legal arguments.

David Laskey, Kenneth Leech and Michael and Laura Polselli claim that Norris' methodology in reaching his opinion as to what Adler knew about the financial position of Hanover as of February 16 is fatally flawed because Norris was aware that Adler had a Risk Management Committee, yet did not know that it had issued reports and when informed of same attempted to discount their relevance. According to them, had Norris made diligent inquiry, he would have discovered the existence of the reports, and thereby gained direct and contemporaneous information concerning Adler's knowledge of Hanover's financial condition. Based upon the foregoing, they

---

109. In making this argument, Claimants rely on the report of their expert, Robert Lowry, who opines, in part, as follows:

Adler was obligated to deliver cash to Claimants on those executed sales regardless of whether Hanover defaulted because Adler was obligated to clear and settle those trades.

Lowry Report at 4. In reaching this conclusion, Lowry states, as follows:

Trades where contra parties fail to perform, due to either the inability or refusal to deliver cash or securities, occur routinely in the securities markets. Adler, by agreeing to settle Hanover's principal and agency trades, agreed to incur this risk of non-

performance. Therefore, Adler did not have a valid basis for refusing to confirm or canceling the Claimants' trades....

*Id.* at 5. They maintain that Lowry's conclusions are especially true for the exercise of the provisions of the agreement against customers, like themselves, as opposed to Hanover because all securities professionals are held to the highest standards of good faith and fair dealing in transactions with the investing public.

110. Claimants' misplace their reliance on the Giordano Dep. 91:14–25, 187:5–24; LaFond Dep. 64:23–65:12; Cl. Ex. 24 (Testaverde Memo. to Cohan).

contend that Norris' opinion does not meet the standards for expert testimony under FRE 702 and 703. We have already determined that Norris qualifies as an expert. *See Ensminger III,* 1998 WL 160039, *5–8. Moreover, our conclusions concerning Adler's contemporaneous knowledge of Hanover's financial affairs is not limited to Norris' testimony.

Gary Anderson claims that contrary to our decision in *Ensminger I,* Hanover's fraud cannot be imputed to him as a matter of law. We determined otherwise in *Ensminger I, see* 218 B.R. at 706, and as noted herein, we see no reason to alter that conclusion herein.

Dr. Jude Barbera and Catherine and John Romano argue that the trustee and SIPC's legal theories can only apply to those customers who are "select" or "favored" in some sense beyond having been beneficiaries of Hanover's fraud. None cites authority for this proposition, and we are aware of none. As noted herein, whether or not those Claimants were especially favored customers, they are liable for Hanover's fraud to the extent that they seek to enforce the Challenged Trades. Moreover, whether they were in fact "favored customers" is of no relevance whatsoever in addressing the trustee's constructive fraud claim, which hinges on the objective determination of whether Adler received reasonably equivalent value for the obligations it incurred and whether it was solvent at the time it incurred those obligations.

Norman Bennett argues that the Fake Buys were not effected within the scope of Hanover's agency with respect to him. We have already rejected this argument.

Robert Juregensmeyer claims that as an ordinary investor he should be allowed to avail himself of the benefit of the Challenged Trades because it would bolster confidence in the securities markets. In light of the massive fraud involved, the fact that Hanover's activities destroyed two brokerage houses, temporarily froze the accounts of 66,000 customers at more than three dozen introducing brokers and resulted in the largest liquidation in SIPA's history, Mr. Jurgensmeyer's argument is simply untenable.

Ann Kusch argues in substance that because in *Ensminger V,* 1998 WL 182808, *9, we excluded evidence that her Hanover Broker, Jason Prussing, invoked the Fifth Amendment, for the purpose of drawing the adverse inference (against her) that Hanover (and its brokers) intended to defraud Adler and SIPC, none of the trustee's theories can apply to her. We disagree. Whether or not her individual broker was blameless, merely negligent, or actually intended to defraud, his actions were part of a fraudulent scheme orchestrated by Hanover, and could not have been executed without the complicity of one of Hanover's two traders, each of whom's invocation of the privilege we found to be admissible. Kusch seeks to benefit from that scheme.

A.F. Lehmkuhl merely makes a conclusory and untenable legal argument that his claims for cash and securities should be allowed, without responding to any of the trustee's legal theories.

Finally, Stuart and Judy Smith make a policy argument that SIPA should protect customers like themselves. While SIPA was clearly designed to protect customers of failed broker-dealers, it was not intended to be a vehicle for shifting investor accounts from worthless securities to cash or securities with value by means of fraudulent manipulation.

### *Conclusion*

We grant judgment to the trustee on the Complaint and in doing so, uphold his determinations disallowing the Claimants' claims and expunging the Claimants' objections to those determinations.

SETTLE ORDER AND JUDGMENT.